UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
3  --------------------------------X
                                  :
4  UNITED STATES OF AMERICA,       :
                                  : 18-MJ-02695 (UA)
5             Plaintiff,           :
           v.                      : April 25, 2018
6                                  :
   ROBERT FARKAS, et al.,          : 500 Pearl Street
7                                  : New York, New York
                Defendant.        :
8  --------------------------------X
```

9        TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
                BEFORE THE HONORABLE ONA T. WANG
10               UNITED STATES MAGISTRATE JUDGE

11  APPEARANCES:

12

13  For the Government:        NEGAR TEKEEI, ESQ.
                              United States Attorney's Office,
                              One Saint Andrew's Plaza
14                            New York, New York 10007

15

16  For the Defendant:        DANIEL JAMES HORWITZ, ESQ.
                              McLaughlin and Stern, LLP
                              260 Madison Avenue
17                            New York, New York 10016

18

19  Court Transcriber:        SHARI RIEMER, CET-805
                              TypeWrite Word Processing Service
20                            211 N. Milton Road
                              Saratoga Springs, New York 12866

21

22

23

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE CLERK:  Good evening.  This is <u>United States v.</u>

2    <u>Farkas</u>, 18-MJ-2695.  Counsel, can I have your appearances for

3    the record please?

4          MS. TEKEEI:  Good evening, Your Honor.  Negar Tekeei

5    on behalf of the United States.  And joining me at counsel's

6    table is Special Agent Brandon Raz [Ph.] with the FBI.

7          THE COURT:  Okay.  Good evening.

8          MR. HORWITZ:  Good evening, Your Honor.  From

9    McLaughlin and Stern, 260 Madison Avenue, New York, New York,

10   10016, by Daniel J. Horwitz, for the defendant for arraignment

11   only.

12         THE COURT:  Okay.  Good evening.  And good evening

13   Mr. Farkas.  Please be seated.  Mr. Farkas, are you able to

14   speak and understand English?

15         THE DEFENDANT:  Yes, your Honor.

16         THE COURT:  Okay.  Can I have the date and time of

17   arrest?

18         MS. TEKEEI:  Your Honor, the defendant arrived here

19   via Marshal's transport either late yesterday evening or early

20   this morning.  He was originally arrested in the Southern

21   District of Florida on April 1st and ordered removed here on

22   April 5, 2018.  He was ordered detained without prejudice to

23   making a future bail application upon arriving here.

24         THE COURT:  Okay.  I am Judge Wang.  You are here

25   because you were charged with certain crimes by a complaint

1  supported by an affidavit.  Do you have a copy of the

2  complaint?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Okay.  The purpose of today's proceeding

5  is to advise you of certain rights that you have, inform you

6  of the charges against you and consider whether counsel should

7  be appointed for you and decide under what conditions, if any,

8  you shall be released pending bail.

9          I'm now going to explain certain constitutional

10 rights that you have.  You have the right to remain silent.

11 You're not required to make any statements.  Even if you have

12 already made statements to the authorities  you do not need to

13 make any further statements.  Any statements that you do make

14 can be used against you.  You have the right to be released

15 either conditionally or unconditionally pending trial unless I

16 find that there are no conditions that would reasonably assure

17 your presence at future court appearances and the safety of

18 the community.

19         If you're not a United States citizen, you have the

20 right to request that a government attorney or law enforcement

21 official notify a consular officer from your country of origin

22 that you've been arrested.  In some cases a treaty or other

23 agreement may require the United States government to give

24 that notice whether you request it or not.   You have the

25 right to be represented by an attorney during all court

proceedings including this one, and during all questioning by the authorities. You have the right to hire your own attorney. If you cannot afford an attorney I will appoint one today to represent you. Do you understand your rights as I've just explained them?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And I understand that Mr. Horwitz is retained counsel, is that right?

MR. HORWITZ: Yes, your Honor.

THE COURT: I have before me a complaint containing the charges against you in this case. The charges include conspiracy to commit securities fraud, securities fraud, conspiracy to commit wire fraud, and wire fraud. Mr. Horwitz, have you received a copy of the complaint?

MR. HORWITZ: Yes, I have, Your Honor. I have conferred with my client about it. We waive the formal reading and enter a plea of not guilty.

THE COURT: Okay. Mr. Farkas, do you understand the charges against you?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. Mr. Farkas, you have the right to a preliminary hearing in which the Government will have the burden of showing that there is probable cause to believe that the crime for which you are being charged has been committed and that you are the person who committed it. At the hearing

you or your counsel would be entitled to cross-examine any

witnesses and introduce evidence.  However, a preliminary

hearing will not be held if you are indicted by a grand jury

before the date of a preliminary hearing.  I will set a

preliminary hearing date at the conclusion of these

proceedings.

Now I understand that we do not have an agreement as

to a bail package.  So next I will hear from the Government.

MS. TEKEEI:  Thank you, your Honor.  And as set

forth in the papers that we submitted earlier today, the

Government seeks detention based on the risk of flight this

defendant poses and based on economic danger to the community.

THE COURT:  Okay.  Can you get into a little bit

more, I mean, this is not a presumption case, right?

MS. TEKEEI:  That is correct, Your Honor.  And I'm

more than happy to.  I think we should start with the nature

and circumstances of the defendant's offense.  As is detailed

in the complaint against him and the complaint against one of

his co-conspirators, Raymond Trapani who was arrested a few

weeks after this defendant, the defendant and his co-

conspirators, Sohrab Sharma and Ray Trapini perpetrated a

massive fraud in connection with a scheme to induce victim

investors to invest more than 25 million dollars in crypto

currencies through material mis-representations and omissions

in connection with an Initial Coin Offering by the defendant's

company, a company called Centra Tech.  Today, those digital

assets are worth more than 55 million dollars.  They sit in a

digital wallet that the defendant and his co-defendants

previously had access to and it is the Government's belief

that they still have access to given that no one has -- bless

you, Your Honor --

THE COURT:  Sorry.

MS. TEKEEI:  -- relinquished control over the assets

within that wallet to the Government as required by seizure

warrants served on all of the defendants.

Let me just go into describing a little bit more

about the details of the offense conduct.  To be specific,

from approximately July 2017 through the date of the complaint

the defendants and his co-conspirators lied to the investing

public and the public in multiple ways.  First, they lied

about having an experienced executive team with credentials.

Including a purported CEO named Michael Edwards who had

purportedly more than 20 years of experience in the banking

industry.

At various times, an individual who is not named

Michael Edwards' picture was used in connection with those

material misrepresentations.  First, it was a professor, and

then subsequently the defendant and his co-conspirators used

the picture of the defendant's father as the picture of

Michael Edwards in marketing materials that were posted

throughout the internet in connection with raising investor funds.

The defendant and his co-conspirators also lied to the public about developing a debit card -- namely the so-called Centra card -- which they purported would allow users to spend crypto currency of their choice to make a purchase at various establishments using Visa and MasterCard.  The defendant and his co-conspirators also lied about partnerships that they had with financial -- with entities in the financial services sector to include Bancorp, Visa, and MasterCard.

And finally, and among other things, the defendant and his co-conspirators also lied about having individual licenses at different states in order to operate.  In sum, they created fake people, they created fake documents, they created fake money at -- excuse me, they created fake licenses all in order to make money.  And they did this using the high speed web, the connections that people make and that people act on in investing and they took advantage of the investing public in doing so.

As I said earlier today, more than 25 million dollars that the defendant and his co-conspirators raised during the initial ICO is worth more than 55 million dollars.  And those assets sit in a digital wallet that is worth more than 60 million dollars standing here today.  Those are the nature and circumstances of the offense.  And the evidence of

1  the defendant's crimes is conclusively strong.

2       We have, as is conveyed in the complaint, against

3  both the defendant and his co-defendant and co-conspirator,

4  Raymond Trapani, the defendant's own text messages and emails

5  and his co-defendants' own text messages and emails that they

6  sent and received regarding their crimes and regarding

7  concealing their crimes, regarding obstructing justice and

8  concealing their crimes from being found.  We have the

9  marketing materials that the defendant and his co-defendants

10 prepared containing the numerous fraudulent representations to

11 the public.  And we have the -- we have various videos of the

12 defendant out there in the public purporting to advertise on

13 behalf of Centra Tech.

14      Your Honor, these factors all give the Government

15 significant concern about the defendant's risk of flight.  And

16 I'll just go into a couple of more pieces of information that

17 are conveyed in our papers.   Your Honor, the defendant was

18 interviewed by Pre-trial Services in florida and he was

19 interviewed by Pre-trial Services here.  And it is the case --

20 and I don't think it is in dispute -- that over the course of

21 the conspiracy, the defendant had access to millions of

22 dollars in crypto currencies.

23      And based on the information that's summarized in

24 the complaint, the defendant had access to those funds.  He

25 engaged in, and he and his co-defendants have engaged in

1　concealing those funds.  And it is the case that the 55

2　million dollars of investor funds that remain in the digital

3　wallet, have still been unable to be accessed by law

4　enforcement and secured.  Those, in addition to the facts set

5　forth in the complaint about the defendant's request for

6　extradition research, the defendant's request and intimation

7　that the emails related to extradition research that he had

8　requested a company counsel to perform for him be deleted, all

9　of that gives the Government serious and grave concerns about

10　the defendant's risk of flight and about -- and leading into

11　the defendant's economic danger posed to the community.

12　　　　　I'd like to say, Your Honor, that this is not your

13　typical white collar securities fraud and wire fraud case.

14　The amount of money that is held in the digital wallet would

15　take a split second for the people who have the access to the

16　code to transfer for themselves and use for themselves

17　significantly depleting and dissipating investor funds; funds

18　that are owed to the victim investors in this case.

19　　　　　As is conveyed in our filing papers and in our

20　letter the Court, company counsel and counsel for various of

21　the individual defendants have represented to us that at the

22　time of the SEC's investigation -- at the time fo the SEC's

23　investigation to Centra Tech became apparent and known by the

24　issuance of a subpoena, the defendant's co-defendant, Sohrab

25　Sharma purported to provide the defendant and compliance

officer for the company with a copy of the passcode. Which

was then divided in two and held at two separate safe deposit

boxes at two separate banks. Purportedly to keep the wallets

in the -- the assets in the digital wallet safe and secure.

Now we've learned today from counsel, and I'll let

him go into it, the defendant's assertion of facts as to

whether he had the actual access and key -- the passcode to

the digital wallet to begin with. But the facts as they stand

before the Court today are that this defendant and his co-

defendant had access to the digital wallet at some point, have

not relinquished access to that wallet to the Government, and

in a matter of seconds, the funds in that wallet could be

dissipated an the investors will never be able to be made

whole. That gives the Government substantial concern as to

the economic danger to the community that the defendant and

his co-defendants -- but particularly the defendant for

purposes of today's proceeding -- pose.

We have been in extensive communication with defense

counsel regarding our concerns about the defendant's reporting

of his own personal assets or lack there of to the Pre-trial

Services office. We've communicated with defense counsel

about the Government's concerns regarding the defendant's

access to the digital wallet. We have raised any number of

concerns with defense counsel and we have been engaged in what

have been helpful and informative discussions.

1       So I will say that since the filing of the letter to

2   the Court, the Government has facts that have been conveyed by

3   defense counsel that it did not previously have.  But, Your

4   Honor, I will also say that the facts that the Government has,

5   that have been conveyed by the defense counsel and I expect

6   Mr. Horwitz will convey to the Court today, are sourced by the

7   defendant.  In other words, the very same person who engaged

8   in creating fake people, the very same person who engaged in

9   fraudulent misrepresentations to the public for many, many,

10  many months, to the tune of being able to access millions of

11  dollars in crypto currency and in real monetized currency in

12  U.S. dollars over the course of the time period of the

13  conspiracy, has -- is the one who is providing the facts to

14  the Court in hopes of being released on bail.

15      We cannot, here today, allow or agree to a release

16  on bail conditions given the nature and circumstances of the

17  offense, the seriousness of the charges, the fact that the

18  defendant now faces up to approximately 210 to 262 months in

19  prison if convicted for these crimes.  And the fact that the

20  assets in the digital wallet remain suspended, remain out

21  there and the only people who had access to the digital wallet

22  still have not relinquished control over that wallet to the

23  Government as required by seizure warrants and other legal

24  process.

25      The lights are turning off which is a signal to me,

1  Your Honor --

2          THE COURT:  Oh, boy.

3          MS. TEKEEI:  I am happy to address the Court's

4  questions whatever they  may be after -- now or at the

5  conclusion of defense counsel's argument.  In our letters, we

6  set forth what, at a minimum, we believe, should be any bail

7  conditions if the Court is inclined to grant bail in this

8  case.  And we strongly believe that if the Court is inclined

9  to grant bail, all of those conditions should be met prior to

10  the defendant's release.  Thank you, your Honor.

11          THE COURT:  Okay.  Can I hear from Mr. Horwitz.

12          MR. HORWITZ:  Thank you.

13          THE COURT:  And is there -- I'll ask the CSO, is

14  there anything we can do about the lights to prevent them from

15  turning off?

16          UNIDENTIFIED SPEAKER:  [inaudible]

17          THE COURT:  Thank you.

18          MR. HORWITZ:  Thank you, your Honor.  I want to

19  frame the discussion with appropriate legal standard for

20  detention.  I want to provide the Court with additional facts

21  that pre-date the Government's arrest of my client, which are

22  relevant, particularly with respect to risk of flight.  I want

23  to explain to the Court that while we have had extensive

24  discussions with the Government about bail, there's been a lot

25  of information that was provided to the Government and before

1 that there was a lot of information that was provided --

2          THE COURT:  Mr. Horwitz, it's after 8:00.  We're in

3 danger of the lights turning off on us.  Let's skip the

4 preliminaries and get down to the facts that you have in your

5 argument.

6          MR. HORWITZ:  Sure.  I mean, I do think it's

7 important to note that clearly under the Bail Reform Act that,

8 you know, defendant should be released on the least

9 restrictive condition and that for when the Government seeks

10 detention is an extraordinary remedy and there is a

11 presumption for bail.  And clearly the standard, I think what

12 was set for this, was in the Madoff case and the cite there is

13 586 F. Supp, 240.  It's a case that I actually argued in this

14 court for bail when the Government sought detention.

15          THE COURT:  My -- I'm going to interrupt you --

16          MR. HORWITZ:  I --

17          THE COURT:  -- because it is late, but my concern is

18 with the digital wallet and the access to the proceeds there.

19          MR. HORWITZ:  Right.  So let me address that first.

20 So the digital wallet -- the contents of the digital wallet

21 have been and are today available for review by the public.

22 That has always been the case.  It is available on a website.

23 The Government has that information and at no time at all in

24 either the SEC's investigation or since my client's arrest has

25 there been any diminution of those assets.  With respect to

the digital wallet -- if I may, Your Honor, I do want to

address the risk of flight first. Because I think that's an

important --

THE COURT: I think the risk of flight is tied to

the access to the digital wallet. So please do.

MR. HORWITZ: Absolutely. Absolutely. So if I may,

may I start with that?

As the Government has indicated, and I think the

Court is aware from the letter, there was, in an SEC

investigation, that became known to the defendant and his

employer, the company, and the co-defendants sometime either

in December of last year or early this year. The notice of

the investigation came by way of a subpoena to the company for

a large number of documents. Company had counsel, Ballard

Spahr, they were -- and they negotiated and provided

information to the SEC about the documents including

information related to the digital wallet and the information

I've just relayed to the Court about the contents of the

digital wallet.

There was a request by the SEC for a code to, if you

would, access the digital code. That information was provided

by counsel for the company to the SEC and --

THE COURT: My understanding is it didn't work,

right?

MR. HORWITZ: My understanding that it did not work

1   when the Government tried to access it.  I don't believe that
2   the information was ever accessed by the SEC
3              THE COURT:  The SEC is the Government, right?
4              MR. HORWITZ:  Well, I mean, I mean, Government
5   meaning -- correct.  But I think we all sort of refer to the
6   Government as the U.S. Attorney's Office --
7              MS. TEKEEI:  I think he means --
8              MR. HORWITZ:  -- in [inaudible].
9              MS. TEKEEI:  -- law enforcement, Your Honor.
10             MR. HORWITZ: Yes.  Correct.
11             MS. TEKEEI:  As opposed to Securities Counsel.
12             THE COURT:  So is there any understanding why the
13  Government or law enforcement was not able to access the
14  digital wallet given the information that was provided by
15  counsel?
16             MR. HORWITZ:  Yes.  But if I may, I just want to
17  finish the -- I want to ask -- obviously I'm going to get --
18  answer the Court's question.  But I do want to --
19             THE COURT:  Well it's 8:10 so let's get to it.
20             MR. HORWITZ:  I know, Your Honor.  And we've all
21  been here -- I've been here since -- I've been here since noon
22  and the defendant's mother and uncle have been waiting
23  patiently, so I truly -- he's been locked up since April 1st.
24  So this is really my first opportunity, and I apologize.
25             So in any event, the short point that I want to make

is that at no time was there any indication that there was a

Government investigation.  And I believe that the predicate

for the defendant's arrest at the airport on April 1st when he

was supposed to depart for a previously scheduled trip to

South Korea was this email that the Government had indicated.

The email which purportedly claims to deal with extradition

and suggests that Mr. Farkas was seeking to flee the country.

In fact, the email, which we provided to the Government today,

and I'm happy to share with the Court pursuant to 502(d) of

the Federal Rules of Evidence, because it is marked

privileged, was from a lawyer to Mr. Farkas.

        THE COURT:  Is -- who's copy of that email is it?

Is it the lawyers or is it Mr. Farkas'?  Because my

understanding was that Mr. Farkas deleted his copy.

        MR. HORWITZ:  This was a copy that I received from

the company counsel.  And, again, provided to the Government

today.  Although it's in the complaint.  I was under the

impression they had it.  What's important about the email is

there are two points about the email.  Number one, the email

was written on February 5th.  Almost two months before Mr.

Farkas' scheduled trip to South Korea.  Number one.  Number

two, both before the email was written, but after the SEC's

investigation was known, Mr. Farkas traveled overseas for

business and returned.  Number three, after February 5th, the

date of the email, Mr. Farkas traveled to South Korea at the

end of February, and he traveled to Canada at the beginning of March and returned each time.

So in other words, this email that purportedly, you know, indicates that Mr. Farkas was thinking about fleeing the country when there was no information at all about a criminal investigation that Mr. Farkas had, he went overseas and he returned. Not once but twice. And that's why I think it's important before we deal with the wallet, discuss the risk of flight.

With respect to the wallet, after the SEC asked for the information -- I'm sorry -- SEC asked for the information, the request was made via company counsel to provide access to this particular wallet. What I shared with the Government today, and this was the first time, today that I had an opportunity to speak to my client without having a recording because he's been incarcerated since April 1st -- so I was not in a position to learn these facts. As soon as I learned them today, which I'm about to relate to the Court, I shared them with the Government. We had a number of conversations this afternoon in the hopes of trying to be able to reach a package.

Mr. Farkas was -- Mr. Farkas' co-defendant transmitted an iMessage to him when he was in San Francisco when the SEC's request for the information about the wallet was made. And that information was printed out. And it was

torn in half.  Half of the piece of paper with the code was
given to company counsel, half was with Mr. Farkas and was put
in a safe deposit box.  The Government executed a -- when the
criminal case was -- after Mr. Farkas' arrest, the code was
provided to the Government.  So in other words, after April
1st, Ballard Spahr provided the code either to the SEC or to
the Government.  And the code apparently didn't work.  Mr.
Farkas believed then, in good faith, that that in fact was the
code.  What he did not know however, and learned toward the
end of his incarceration in Florida before he came here, was
that his co-defendant, Mr. Sohrab had apparently either
switched out a number of the digits or indicated or -- or
changed the sequencing --

THE COURT:  Which --

MR. HORWITZ:  -- of the --

THE COURT:  -- which co-defendant is that?  Is that
Mr. Sharma?

MR. HORWITZ:  Correct.  That's Mr. Sharma.

THE COURT:  Okay.  Not a Mr. --

MR. HORWITZ:  Not Mr. Trapani, no.

THE COURT:  Okay.

MR. HORWITZ:  And so what I'm reporting to the Court
is what I reported to the Government today.  As soon as I
learned this from my client, after I spoke to him for the
first time and debriefed him about these allegations and

talked about the things that we needed to talk about in order
to make a [inaudible] and bail application either to the Court
or to try to convince the Government that there should be a
package, the Government and I, Ms. Tekeei, had a number of
conversations this afternoon, and I conveyed that information.

THE COURT: Conveyed what information?

MR. HORWITZ: What I just relayed to the Court. In
other words that when the Government executed its seizure
warrant and when the Government requested of company counsel -
-

THE COURT: Okay. So nobody has the code as of
right now? Nobody in the Government has the code as of right
now.

MR. HORWITZ: Correct. And Mr. Farkas does not know
the code. He does not have access to the code. He does not
know where the code is stored. However, as I indicated, the
balance of the account is visible. In other words, everybody
can watch the account. You can go online. It's not like a
bank account where only you have access to it. [inaudible] --

THE COURT: I understand that.

MR. HORWITZ: So to the extent that A, we submit
that there is no risk of flight. In other words, the entire
predicate for the arrest was this canard of an email that
suggested that he was about to flee. And, again, I'm happy to
provide a copy of that email to the Court so long as it's

1   subject to 502(d) so --

2         THE COURT:  I don't need to see it.

3         MR. HORWITZ:  Yeah.  In any event.  Again, the

4   timing here is so important.  Because this email was written

5   two months before this trip that the Government thought that

6   Mr. Farkas was taking to run away.  And in fact, nothing

7   happened with the wallet.  Nothing has been done with the

8   wallet and so to the extent that again, the concept of risk of

9   flight -- I mean, bail is -- under these circumstances, if you

10   look at the totality of the circumstances -- A, we're not sure

11   that the Government has established risk of flight by

12   preponderance, particularly because of the date of this email.

13   Which is not in dispute.

14         THE COURT:  Let me stop you right there because

15   you're focused on the time difference --

16         MR. HORWITZ:  Yeah.

17         THE COURT:  -- and the fact that Mr. Farkas traveled

18   internationally.  I have some familiarity with the Madoff case

19   as well.  And there were numerous defendants who -- numerous

20   defendants in the asset recovery actions who claimed that they

21   did not have knowledge of the fraud, because why would they

22   leave their money in -- you know, why didn't they pull it out

23   before the date of Mr. Madoff's arrest?  Well that doesn't --

24   that's not dispositive.  It just means that either they chose

25   to leave it in or they didn't get to it in time or anything

1  like that.

2        So the fact that he traveled internationally at some

3  time after this email is of far less concern to me than the

4  issue of the digital wallet, who has the code, and who has

5  access to it.  Because as I understand it, the fact that the

6  public can see the value in the digital wallet is of no moment

7  if those assets can be depleted on a moment's notice by

8  somebody who does have the correct code.  And that is my

9  concern here.

10        MR. HORWITZ:  I understand that, and I would again,

11  ask the Court to consider Judge Ellis -- Magistrate Judge

12  Ellis' decision on the issue of detention.  Because in that

13  case, the Government argued when they sought detention that

14  not all of Mr. Madoff's assets were known.  Not all of the

15  whereabouts were known.

16        THE COURT:  But those assets were not movable in the

17  same way that this digital wallet is.

18        MR. HORWITZ:  Well, but again, we're talking about

19  detention.  And what the Court, obviously you understand the

20  standard is, are there no circumstances or no conditions or

21  combination of conditions that could reasonably assure the

22  defendant's return to the Court.  And so if you look at the --

23  one, and I do think respectfully that the email is important

24  because it does go in the picture of the total preponderance,

25  number one.  Number two, if you look at the totality of the

1    circumstances under a consideration when the Government's

2    requesting bail, one, you've got a defendant who's got no

3    record whatsoever.  Number two, you've got -- clearly the

4    complaint says what it says.  But with respect to whether he

5    was the leader or the organizer or the principal mover, I

6    think a fair reading of the complaint would indicate that his

7    co-defendants were.  He was not.  That's number two.

8           Number three, even if the Court is concerned about

9    access to the wallet, notwithstanding our representation Mr.

10   Farkas does not know what the code is, does not know where to

11   get the code, and doesn't have access to it.  There are

12   conditions that are short of detention that the Court can

13   impose as part of a reasonable bail package.  Including

14   limiting, as the Government indicated in its alternate

15   proposal -- limiting his access to the internet.  Limiting

16   access to who he can call.  He does not need to be in jail

17   detained if the Court is that concerned about access to this

18   wallet -- to these [inaudible].

19          THE COURT:  How do you propose to have that limit of

20   access to the internet and to any calls be maintained on a

21   real-time 24/7 basis?  Because this is what we're talking

22   about?

23          MR. HORWITZ:  Well I mean, I think the Government,

24   there are conditions that Pre-trial Services can monitor

25   internet access.  They can monitor phone calls.  There is a

way to do that, frankly, Your Honor.  And I think that the
proof in the pudding there is that the Government in its
alternate package or its proposal for bail, indicated that
those are conditions that the Government would want to impose
if the Court considered bail.

THE COURT:  In addition to the requirements with the
April 16th seizure warrant, right?

MR. HORWITZ:  Well, I mean, to the extent that was
represented to us -- well first of all, I mean, I just want to
-- I just feel it's important to put this on the record.  So
yes, there was a seizure warrant, number one.  Number two, it
was not served on my client because he was in jail in Florida.
It was emailed.  And there was -- so, A, we have an issue of
serving, but we'll put that aside.  My client was in jail, he
didn't have the ability to access the code, number two.
Number three, as I've represented to the Court, this is the
first opportunity today that I've had to have a conversation -
- a confidential conversation with my client that was not
monitored by the Broward County Bureau of Prisons or the
Federal Bureau of Prisons.

So I think that to the extent that the Government
has been satisfied that they don't know how the code works, we
have exhausted our remedies here.  I can't do more than talk
to my client and ask him.  We have no other evidence or no
other indication that he's in possession of the code.  If we

1 knew where the code was we would tell the Government, which is

2 exactly what we said.  I can't do anything more than that.

3 Whether the Government finds that credible or not, you know,

4 I'm disappointed that at this point, frankly, we've had a lot

5 of discussions and I think they've been carried out very

6 professionally.  The office has given us -- the office has

7 given us, you know, every courtesy to make these arguments.

8         But, frankly, at this point, and particularly and

9 again, I'm sorry to keep coming back to the email but it's so

10 troubling to me that the detention was predicated on an email

11 that was written two months before.  There was never a risk of

12 flight.  We wouldn't be having this conversation if -- and

13 again, I have said, as I've said to the Government, I believe

14 what happened was an email is a bad game of telephone which is

15 worth ten seconds of the Court explaining what happened.  In

16 fact, the Government didn't even see the email until I sent it

17 to them today.

18         My understanding that this email was sent in

19 February.  In March there was an employee at the company who

20 was a lawyer, who, notwithstanding the fact that the email was

21 marked attorney/client privilege and confidential, shared it

22 with somebody else at FINRA.  Somebody at FINRA must have

23 contacted the FBI.  But nobody actually ever saw the email.

24 So the whole predicate to the arrest that Mr. Farkas was about

25 to run away to South Korea and then somehow disappear into one

of the three, or four, or five countries that we don't have
extradition treaties with -- which by the way, the substance
of the email, does not even deal with.  In other words, the
substance of the email, which came about because of a
conversation that this lawyer had with my client about a rap
song called Diplomatic Immunity and this lawyer apparently
thought that Mr. Farkas was asking about extradition, the
substance, of the email has to do with extradition treaties
between the United Kingdom and the Cayman Islands, and the
United States and the Cayman Islands.

It does not in any way indicate you can go to
Algeria, or Albania or whatever countries we don't have
extradition treaties with.  Which -- and again, I'm sorry to
keep harping on this, Your Honor, especially at this late
hour, but I do think it's so important that the Court consider
was there actually a real risk of flight?  And when you
analyze the question about access to the wallet, the risk of
flight, I think diminishes -- I'm not saying it's not a
concern that, you know, the Government, or the Court should
have -- but I do think it diminishes the concern particularly
given the information we've provided today about whether Mr.
Farkas is, A, going to flee, and is a risk of flight.  And, B,
whether or not he's going to access the funds.  And even if he
does, you know, he -- there's just not an indication that
notwithstanding the funds, that there was a risk of flight.

1  And the last thing, I would say, Your Honor, and I know you're

2  [inaudible], you're familiar with the Madoff case and more

3  than perhaps before you became a Magistrate Judge --

4          THE COURT:  Much more familiar.

5          MR. HORWITZ:  I think I understand your background

6  and I --

7          THE COURT:  Yeah.

8          MR. HORWITZ:  -- I understand now what your

9  involvement was, and, Your Honor, and say that obviously

10  respectfully.  And the last thing I would just submit to the

11  Court is that, and I said this to the Government in a number

12  of conversations, both with the [inaudible] and with the

13  supervisor, that the analysis in this case now seems to have

14  come down to, if in a white collar case there are substantial

15  assets but not all assets that are unaccounted for, does that

16  A, priority mean that there must be detention and that there

17  is a risk of fligh and an economic danger.  And I would submit

18  to you that the evaluation that the Court must do even if you

19  find that there's a preponderance, is that you have to look at

20  -- you have to look at the totality of the circumstances --

21  the totality.  What his record is.  What his role was in the

22  allegations.  What the state of the case is.  This is a

23  complaint.  He's not an indicted defendant.

24          At the time that he was arrested, there was

25  virtually no indication to this defendant -- or I should

admit, to the company -- that there was a criminal

investigation afoot.  And I will add that while I only read on

my phone the Government's letter to the Court, there is an

indication in that letter that just simply because Mr. Farkas

had retained counsel in the SEC case, that that somehow

translates into knowledge that there is a criminal

investigation.  So there was no indication that there was a

criminal investigation.

He has a clean record.  His family is here in court,

his mother and his uncle are here.  His father had a

previously scheduled outpatient surgical proceeding which took

place today.  Had it not taken place today, he would be here.

This is a good family, Your Honor.  We've discussed the bail

package.  They own their own home.  It is assessed at a value

of $622,000.  We have discussed with the Government pledging

that property as security on a PRB [Ph.].  I will point out

that both the District of Florida and the Southern District of

Pre-trial Services have recommended that there be release on a

bond without security.  The Government has indicated three co-

signers.  We have two right here.  Mr. Farkas' uncle and his

father are in business in a business in New Jersey and they

are responsible and available to sign the bond, as is Mrs.

Farkas who's here and works for her husband's company.

Obviously I'm happy to answer the Court's questions,

but I do think, respectfully, that there are conditions short

1   of detention that could reasonably assure the defendant's
2   return.
3           THE COURT:  Okay.  I'd like to -- it's now
4   approaching 8:30 so I would like the Government to respond.
5   But before responding on the points that you see fit to
6   respond on, I have a couple of questions.  One, are -- does
7   Mr. Farkas have -- are there any assets that are available to
8   Mr. Farkas, and let's include the digital wallet for now, that
9   the Government would concede are not proceeds from the alleged
10  fraud and conspiracy?
11          MS. TEKEEI:  Your Honor, that's a -- it's a
12  difficult question to ask and I'm not in any way trying to
13  evade the Court's question, but this defendant and his co-
14  defendants had multiple bank accounts across multiple
15  different banks.  The Government is just getting its arms
16  around the scope of the bank accounts.  For example, the
17  defendant has a bank account in his name -- a business bank
18  account -- that's linked to him to which he has sole control
19  at a Citibank in the name of Digital Card Solutions in which
20  there exist $750,000 approximately today.
21          And we're -- when I say we're learning new facts
22  about the defendant and his co-defendants and their shell
23  companies and their bank accounts every day, it is not an
24  exaggeration.  We are.  So it is hard for us standing here
25  today to answer that question.  We do know that shortly before

his scheduled departure -- or shortly before his flight to
South Korea, the defendant liquidated more than $114,000 of
his crypto currency assets held in a digital wallet.  And we
don't know where those assets landed.  We don't know where
they went.  We know that he did not report those assets to
Pre-trial Services in Florida or here.  And there may be other
assets that he did not report to Pre-trial Services in both
districts.

THE COURT:  Okay.  That brings me to -- makes me
skip ahead to a different question which is, does the United
States have an extradition treaty with South Korea?

MS. TEKEEI:  Your Honor, I have not done that
research myself, so I would hesitate to give the Court an
answer except for that I doubt it.  But I'm happy to look into
that and I think we could figure that out relatively quickly.
We may -- I'm sorry.  The Agent tells me we may.

THE COURT:  Okay.

MS. TEKEEI:  So I just don't know but I can find
out.  Your Honor, I'm sorry, I didn't mean to interrupt the
Court if you have additional questions that I can answer.

THE COURT:  Mr. Horwitz did you have an answer to
that question in particular?

MR. HORWITZ:  I do.  And in fact perhaps Ms. Tekeei
might not have been on the call, but in one of my early calls
with her co-counsel, from the U.S. Attorney's office, he did

1   indicate to me, and I have verified, that we do have an

2   extradition treaty with South Korea.  I will say -- I just

3   want to quickly put something o the record -- I know my client

4   would like me to.  With respect to this company called Digital

5   Card Solutions, I'm told by my client that during his

6   Pre-trial Services interview in Florida he was asked questions

7   about his accounts, this is a business account, but that after

8   the interview, he called the local counsel that he had in

9   Florida to say I want you to make sure that Pre-trial Services

10  knows about the Digital Card Services [sic].  He made that

11  call from either Broward County or from the federal detention

12  center.  It was a recorded call.  I don't know whether or not

13  local counsel ever made that call or what happened with that.

14        When Ms. Tekeei indicates that the Government is

15  learning new facts, I think some of the facts that she's

16  learning are some of the facts that I disclosed today.

17  Because we did have discussions about Digital Card Solutions,

18  about the balance in that account.  And we had a discussion

19  about the crypto currency account that she just referenced.

20        THE COURT:  The 114,000?

21        MR. HORWITZ:  Correct.  And it's my understanding

22  that that was an account -- and I disclosed this to the

23  Government today.  That is an account that was used for two

24  purposes.  One, it was used at times as a personal account for

25  crypto that Mr. Farkas used -- not having anything whatsoever

1    to do with any of the allegations here.  And that --

2            THE COURT:  Still concerned that it wasn't disclosed

3    to Pre-trial Services in Florida.

4            MR. HORWITZ:  I understand that.  I believe, and I

5    think that -- I think that this is in the Government's letter,

6    that the -- and I wasn't present for either of the interviews,

7    so I hope this is not too -- I hope this is not, if you would,

8    cutting the salami too thinly.  My understanding is that the

9    Pre-trial Services officer in florida asked about bank

10   accounts and business bank accounts.  And the subject of

11   crypto currency or crypto accounts didn't come up.

12           As I said to Your Honor, as soon as I had a chance

13   to speak to Mr. Farkas today about all of his holdings, I

14   communicated them to the Government.  And what the Government

15   hasn't indicated to you is that in that conversation that I

16   had this afternoon with the Government, I indicated another

17   account which the Government wasn't aware of -- another

18   business account that was used over which Mr. Farkas had at

19   some point had signing authority.  And I think that, with

20   respect, Your Honor, I think that's important because to the

21   extent there are questions about credibility we're not only

22   answering the Government's questions, but we were volunteering

23   information that the Government didn't have before, which

24   perhaps may be useful to them in their investigation.

25           THE COURT:   Okay.  Mr. Horwitz, before I ask Ms.

1   Tekeei to speak again, can you tell me who -- which of Mr.

2   Farkas' family is here today?

3            MR. HORWITZ:  Yes.  Mr. Farkas' mother, Cindy, is

4   here.  And Mr. Farkas' uncle, Glen Farkas is here.  He is a

5   co-partner or co-owner of the business that he has with Mr.

6   Farkas in suburban New Jersey.  They own a tiling company.

7   And, again, Mr. Farkas' father is at home recuperating from

8   his outpatient surgery.  We frankly thought that -- we thought

9   that the defendant might come today, but we were counting on

10  the presentment to be tomorrow, which is why he didn't

11  reschedule the surgery.

12           THE COURT:  Okay.  So sorry, I interrupted you, Ms.

13  Tekeei, or got a little distracted.  Before you go on to your

14  rebuttal to Mr. Horwitz' presentation, what is Mr. Sharma's

15  status at this time?

16           MS. TEKEEI:  We've been in extensive communication

17  with the Marshal service.  It appears as though he did not

18  make -- Mr. Sharma did not make the air lift, which was

19  supposed to bring him here estimated today.  We don't know

20  why.

21           THE COURT:  Otherwise I would have been seeing him

22  today, too.

23           MS. TEKEEI:  That's correct, Your Honor.

24           THE COURT:  Okay.  But he is arrested and he will be

25  brought to the SDNY?

1        MS. TEKEEI:  He is arrested, he is detained.  He has
2   been ordered removed to our district and we're eagerly
3   awaiting his arrival.  Your Honor, I'd like to just -- a
4   couple of quick points unless the Court has any questions
5   about that.

6        THE COURT:  I guess the last question was -- and you
7   may -- if you -- if this is involved in part of your
8   proceedings to go into -- tell me a little bit more about the
9   email, but why don't you go ahead.

10        MS. TEKEEI:  Oh, sure, Your Honor.  The facts that
11   the Government or the prosecution team have at hand are the
12   facts as they are conveyed in the sworn to complaint.  Which
13   is that there is an employee at Centra Tech who was counsel at
14   Centra Tech who conveyed to an employee at a regulatory
15   authority that Mr. Farkas had requested that employee to do
16   extradition related research.  We did not convey in our -- in
17   the complaint and did not have a date as to when that
18   extradition research was to be -- was done.  And we have facts
19   conveyed through the employee of the regulatory agency that
20   Mr. Farkas in the days leading up to his departure for Korea
21   deleted or requested or sometime around that time discussed
22   the deletion of that email with the employee who provided him
23   with that research.

24        THE COURT:  I just want to --
25        MS. TEKEEI:  Sure.

1        THE COURT:  -- note for the record, that Mr. Farkas

2   is shaking his head.  And Mr. Farkas, you have been advised of

3   your rights.  I don't want you --

4        THE DEFENDANT:  Sorry.  Sorry.

5        THE COURT:  -- to be doing anything that potentially

6   could jeopardize your rights under --

7        THE DEFENDANT:  I'm sorry, Your Honor.

8        THE COURT:  -- United States v. Miranda.

9        THE DEFENDANT:  I'm sorry, Your Honor.

10       THE COURT:  So please don't -- please try not to

11  comment, even non-verbally --

12       THE DEFENDANT:  I'm sorry.

13       THE COURT:  -- at this point.

14       MS. TEKEEI:  Thank you, your Honor.  And the facts

15  are, as we know them, in the complaint, a Wall team [Ph.] has

16  interviewed the employee at Centra Tech.  We're waiting on the

17  Wall team to communicate with defense counsel to discuss any

18  privilege issues before the prosecution team has additional

19  facts.  As Mr. Horwitz has conveyed, he provided the

20  Government with a copy of that email today with understandings

21  as to the use of that email.  I will not speak to the

22  substance of the email except for to say that it speaks for

23  itself.

24       Your Honor, it is also relevant to the Government

25  that in -- shortly before the defendant's departure or

1   supposed -- or attempted departure to South Korea, the assets

2   and the monetized assets in the Centra company's coffers were

3   depleted.  The employees had been fired or laid off and the

4   company was on its last leg.  There are many places that one

5   can go from South Korea so that even though the Government has

6   an extradition treaty with South Korea, there are so many

7   places that one can go from South Korea that the Government

8   does not have extradition treaties with.  So we don't think

9   that his planning that travel either in advance or at any time

10  was -- is necessarily -- should necessarily give the Court

11  comfort that he did not intend to flee.  Given that it could

12  have very well been under the guise of a regularly planned

13  trip.

14          That's as to the email.  I want the Court to be

15  clear as to who has access to the digital wallet.  The U.S.

16  Attorney's Office, the FBI and law enforcement do not have

17  access to the digital wallet full stop.  The wallet portions

18  that were provided pursuant to the seizure warrants and legal

19  process are -- have been altered.  They do not work.  And we

20  know, and the record before the Court is that two people had

21  access to that and had that code to begin with.  That is Mr.

22  Sharma and Mr. Farkas.  Now when we said earlier to the Court

23  that we appreciate Mr. Horwitz' candor with us and in

24  attempting to and trying to come to an agreement on bail

25  conditions, we mean that.  This is not to say that we don't

1  believe what Mr. Horwitz is telling us.  Our problem is with

2  the source of the information and that is Mr. Farkas.  And we

3  have no way of corroborating the facts as they have been

4  conveyed.  We don't believe that Mr. Horwitz has messed up

5  conveying the facts.  We believe that we just don't trust the

6  source of that information.

7          And so as it stands today, in a nano-second, the

8  person who has or the people who have the real portions of

9  that access code to the digital wallet can deplete it

10 immediately.  It doesn't matter if everyone in the world has

11 their eyes on the digital key and is watching the wallet, it

12 can be depleted in a nanosecond.  And that gives us grave

13 concerns for risk of flight and economic danger to the

14 community.  We do not seek detention lightly.  And we provided

15 alternatives for the Court to explore in light of all those

16 factors to include the successful transfer of the assets in

17 the digital wallet to law enforcement.  Unless the Court has

18 any further questions.

19         THE COURT:  Mr. Horwitz, I may be sabotaging myself,

20 but do you have anything else to add?

21         MR. HORWITZ:  That's okay.

22         THE COURT:  It's 8:40.

23         MR. HORWITZ:  No, it's -- the only point I would

24 make, Your Honor, is that it seems like it's a bar that I can

25 never reach.  In other words, unless I can -- I'm trying to

1  prove the negative which is I'm saying that we don't have

2  digital -- we don't have access to the code.  We provided it

3  in good faith.  We provided information to the Government and

4  until the Government gets its hands on the code, which is out

5  of my control, I can't do anything.  And I would, again, just

6  end by saying it would seem that there are in fact less

7  restrictive conditions that could be placed on Mr. Farkas

8  short of detention.

9         THE COURT:  Okay.  I'm just going to take a quick

10  two minute break on the bench, but just be relaxed.  We're off

11  the record for a few minutes.

12         THE CLERK:  Judge, we are back on the record.

13         THE COURT:  Please be seated.  I am going to cut to

14  the chase before I enumerate everything else.  I am going to

15  order that Mr. Farkas be detained right now.  But that his

16  detention can be modified subject to several enumerated

17  conditions.  I don't make this decision lightly.  And I do

18  want to recognize the presence of Mr. Farkas' uncle and his

19  mother here.  I am a parent myself and it would break my heart

20  to be here today.  However, I find that the Government has

21  shown by a preponderance of evidence that Mr. Farkas as he

22  sits here today without access to the digital wallet

23  constitutes a flight risk.  And I did that by reviewing the

24  totality of the circumstances including the nature of the

25  assets at issue in this case, the ability for anybody who does

have access to the digital wallet to deplete those assets in a matter of nanoseconds, which distinguishes this case from the Madoff case where the assets were not movable and not easily transferrable.

Another concern is that this case sounds in fraud and my concern was that information was only provided to the Government and only volunteered to the Government after Mr. Farkas was caught lying and that there is a record of assets depleted over time. So the conditions under which Mr. Farkas may be released are as follows; a personal recognizance bond of five million dollars cosigned by three financially responsible persons. And secured by one million dollars in real property and/or cash. Home detention and location monitoring. Compliance with the April 16th seizure warrant which we all understand, which -- here -- which directs any person or entity presently in possession or control of the property to effectuate the transfer of 91,000 ether currently on deposit in ether wallet address, 0XDA6F983076725CB2899205A16E16D1ED60A0067A with compliance defined as the actual or -- actual and successful transfer of the relevant assets into the custody and control of law enforcement. And if I have misread any of the ether wallet address, I believe we all understand which warrant we are speaking about so we should not be slicing the salami too thin as Mr. Horwitz has referenced before.

An additional condition will be a prohibition against accessing directly or indirectly the digital wallet containing Centra Tech ICO funds or transferring any funds out of the digital wallet except for purposes of complying with the seizure warrant. A prohibition against use or access to any computer, smart phones, or internet. Prohibition against possession of any firearms, destructive devices, or other weapons. Drug testing as required by the Pre-trial Services officer. Travel restricted to the Southern District of New York, Eastern District of New York, and the Southern District of Florida. That Mr. Farkas also surrender any travel documents and make no new applications. And I will also add internet monitoring to -- as an additional condition to the home detention if Mr. Farkas is able to satisfy the other conditions and is released. And in additional conditions is also disclosure of all assets that Mr. Farkas may have possession, custody, or control or access to including ones that he may share jointly in business accounts, and that include not actual cash, but any crypto or digital currency. And if I didn't say it already, all of these above conditions are to be met before Mr. Farkas may be released. And any other conditions as recommended by Pre-trial Services.

MR. HORWITZ: Your Honor, I'd just like to make a record that Mr. Farkas' passport was taken by the FBI when he was arrested on April 1st. He does not have other travel

1   documents.

2           THE COURT:  All right.

3           MS. TEKEEI:  That is correct.  And, Your Honor, if I

4   may, and with apologies for interrupting.  One additional

5   condition that we failed to put in our list was no

6   communication with any of his co-conspirators to include Mr.

7   Sharma and Mr. Trapani absent the presence of counsel.

8           THE COURT:  Okay.  Yes.  An additional condition is

9   no communications with any of Mr. Farkas' co-defendants absent

10  -- outside of the presence of counsel.  I'm going to give Mr.

11  Farkas -- because I am hopeful that you can comply with these

12  conditions and that you can be released because you have

13  family that cares about you very much.  They've spent all day

14  here with you.  That I'm going to give the warnings that I

15  usually give upon release even though you are to be detained

16  right now.  Because I want you to have the time to think about

17  them and think about what you would be doing to yourself and

18  to your family if you were to violate any of these conditions.

19          That if, upon release, you fail to appear in court

20  or if you violate any of the conditions of your release, one,

21  a warrant will be issued for your arrest.  Two, you and anyone

22  who signed the bond will be responsible for paying its full

23  amount which is five million dollars.  And three, you may be

24  charged with a separate crime of bail jumping which can mean

25  additional jail time of no more than one year and/or a fine.

1       In addition, if you commit a new offense while you
2  are released, and in addition to the sentence prescribed for
3  that offense, you would be sentenced to an additional term of
4  imprisonment of not more than 10 years if the offense is a
5  felony.  Or not more than one year if the offense is a
6  misdemeanor.  This term of imprisonment will be -- would be
7  executed after any other sentence of imprisonment is
8  completed.
9       And I also will give you a warning while you are
10  awaiting trial, warn you not to have any contact with or
11  engage in any intimidation of potential or designated
12  witnesses or jurors.  Not to engage in any intimidation of any
13  court officer and not to engage in any conduct that would
14  obstruct any investigation by law enforcement.  And finally,
15  you do have a right to appeal my order.  Okay.  Is there
16  anything else -- we need to set a preliminary hearing date,
17  right?
18       MS. TEKEEI:  Yes.  But, Your Honor, before we do
19  that, and, again, apologies if I missed this, but so that the
20  record is clear, our understanding of the reasoning behind the
21  Court's decision is because the defendant poses a risk of
22  flight and an economic danger to the community.
23       THE COURT:  Yes.  Yes.
24            [Pause in Proceedings]
25       THE COURT:  All right.  What date should I set for

1  the preliminary hearing?

2          MR. HORWITZ:  We would take the full 30 days, Your

3  Honor.

4          THE COURT:  Excuse me.

5          MR. HORWITZ:  I said we would take the full 30 days,

6  Your Honor.

7          THE COURT:  Okay.  So you'll waive to May 25 --

8          MR. HORWITZ:  Correct.

9          THE COURT:  -- 2018?

10          MR. HORWITZ:  Yes, your Honor.

11          THE COURT:  Okay.  Is there anything else from the

12  Government or from defense counsel at this time?

13          MS. TEKEEI:  Not for the Government, Your Honor.

14  Thank you.

15          THE COURT:  No, Your Honor.

16          THE COURT:  Okay.  Best of luck to you, Mr. Farkas.

17  And, again, apologies for keeping you and your family waiting

18  all day.  We have a very, very full day today.  All right.

19  Thank you.

20          MS. TEKEEI:  Thank you, your Honor.

21          THE CLERK:  All right.  This matter is adjourned.

22

23                      *  *  *  *  *

24

25

1    I certify that the foregoing is a court transcript from
2  an electronic sound recording of the proceedings in the above-
3  entitled matter.

4

5  _____

6                          Shari Riemer, CET-805

7  Dated:  May 6, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25