UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                     :

UNITED STATES OF AMERICA

                                     :

        - v. -

                                     :     18 Cr. 340 (LGS)

SOHRAB SHARMA, et al.,

                                     :

                      Defendants.

                                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE INDICTMENT AND MOTION FOR A CONTINUANCE**


                                               CRAIG STEWART
                                               Attorney for the United States
                                               Acting Under 28 U.S.C. § 515

Samson Enzer
Negar Tekeei
Assistant United States Attorneys
        *- Of Counsel -*

## Table of Contents

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................. 3

ARGUMENT ...................................................................................................... 6

The Court Should Deny the Defendants' Requests to Dismiss the Indictment and for Other Relief
................................................................................................................. 6

I.   Relevant Additional Factual Background ........................................................ 7

    A.   The FBI Obtains a Search Warrant for Six Centra Tech Slack Workspaces ............. 7

    B.   Sharma and Farkas are Arrested Pursuant to a Complaint and Later Indicted ........... 7

    C.   The Defendants Agree to a Filter Team Review Protocol ................................. 8

    D.   The Prosecution Team Receives the Slack Search Warrant Returns and Engages the Filter Team to Segregate Potentially Privileged Materials ..................................... 11

    E.   The Filter Team's Review of the Slack Search Warrant Returns ........................... 14

    F.   Production of the Slack Search Warrant Returns to the Defendants ........................ 17

    G.   The Defendants Alert the Government to the Inadvertent Disclosure of Potentially Privileged Materials ........................................................................... 19

    H.   The Filter Team's Review of Additional Categories of Records ............................ 21

II.  Relevant Law ................................................................................... 22

    A.   Dismissal of the Indictment and the Sixth Amendment Right to Counsel ............... 22

    B.   Disqualification ........................................................................... 24

    C.   Taint Hearing ............................................................................. 25

III. Discussion ...................................................................................... 27

    A.   The Privilege at Issue was Held by Centra Tech, a Defunct Entity With No Privilege to Assert ................................................................................... 27

    B.   Dismissal of the Indictment is Unwarranted and Would be Unprecedented ........... 28

    C.   Disqualification is Similarly Unwarranted .............................................. 33

    D.   In Evaluating the Defendants' Requests for Dismissal and Disqualification, the Court Should Also Consider the Various Reasons Why The Defendants May Have No Valid Claim of Privilege ....................................................................... 35

    E.   The Defendants Are Not Entitled to a Taint Hearing ..................................... 38

    F.   A Special Master is Not Required ......................................................... 39

The Defendants' Request to Continue the Trial Date by 18 Months and to Extend the Associated Motion Deadlines Should Be Denied .................................................................. 43

I.   Factual Background ............................................................................. 43

    A.   The Slack Search Warrant Returns ....................................................... 44

    B.   The Sharma Devices ...................................................................... 44

C.      The Subpoena Response Records..............................................................................45

    1.   The Selected Devices ...............................................................................................45

    2.   The Six Devices.........................................................................................................46

II.  Relevant Law ...................................................................................................................47

III. Discussion........................................................................................................................49

CONCLUSION................................................................................................................52

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to defendants Sohrab Sharma's and Robert Farkas's (the "defendants") motions (i) to dismiss the Indictment in this case or disqualify the prosecution team, for a taint hearing, and for the appointment of a special master ("MTD") (Dkt. 117)[1]; and (ii) to continue the trial date to April 2021 and to extend the associated motion deadlines ("MTC") (Dkt. 115).

Based on entirely speculative and conclusory allegations, and with little to no supporting evidence, Sharma and Farkas claim that law enforcement has allegedly violated their Fifth Amendment due process rights and their Sixth Amendment right to counsel by receiving potentially privileged communications in response to a validly issued search warrant, and seek the extreme remedies of dismissal of the Indictment and disqualification of the investigating agents and prosecutors.

The defendants' conjectural claims are meritless, and the relief they seek should be rejected without a hearing.

---

[1] "Dkt. [Number]" refers to a docket entry in this case; "Ind." refers to the Indictment in this case; "Ex. A" refers to a search warrant authorizing the FBI to search specified "Slack.com" workspaces and supporting affidavit; "Ex. B" refers to April 9, 2018 email communications with Ballard Spahr LLP; "Ex. C" refers to May 31, 2018 email communications with counsel for the individual defendants in this case; "Ex. D" refers to July 20, 2018 email communications with counsel for Farkas; "Ex. E" refers to a October 22, 2018 seizure warrant and supporting affidavit; "Ex. F" refers to communications between Sharma and "Eric Pope," (produced by Centra Tech in response to a subpoena from the SEC); "Ex. G" refers to a Centra Tech Twitter capture; and "Ex. H" refers to July 20, 2018 email communications with counsel for the defendants; and "Ex. I" refers to August 8 to August 10, 2018 email communications with counsel for the defendants; "Ex. J" refers to July 18 through September 4, 2018 email communications with counsel for Sharma; "Ex. K" refers to a January 15, 2019 discovery production letter; "Ex. L" refers to a February 7, 2019 discovery production letter; "Ex. M" refers to April 15, 2019 email communications with counsel for the defendants; "Ex. N" refers to April 17, 2019 email communications with counsel for the defendants; and "Ex. O" refers to a consent form signed by Farkas.

First, it remains unclear whether any applicable privilege presently exists.   The defendants have failed to specify exactly whose privilege they allege has been violated.   Based on the established record and the defendants' motion, it appears that any applicable privilege at issue related to internal and external counsel for *Centra Tech*, not the individual defendants in this case. As set forth herein, any privilege held by Centra Tech has likely ceased to exist by virtue of Centra Tech's demise, mooting the defendants' motion.

Second, in the course of its review of materials pursuant to a judicially authorized search warrant for records maintained by "Slack," an internet-based communications platform that the defendants used to exchange communications with victims of their fraudulent scheme and in furtherance of the charged offenses, the prosecution team took steps to segregate potentially privileged communications through the use of a "taint" or "filter" team of law enforcement personnel who were walled off from the investigation.   In fact, the protocol put in place was the very same protocol that the defendants themselves had agreed to with respect to records they and their counsel had produced to law enforcement.   Only two investigating agents on the prosecution team (and not the prosecutors on this case) may have been exposed to the potentially privileged materials at issue, and any such exposure was inadvertent and extremely limited, especially when considered in the context of the overall volume of materials reviewed.   Additionally, as soon as the defendants made law enforcement aware of the potentially privileged communications at issue, a team of walled-off prosecutors and agents took immediate steps to contain the communications and investigate the review process.   In sum, law enforcement at all times acted in a manner consistent with what the law requires with respect to the records that are the subject of the defendants' motions: reasonably, prudently, and in good faith.

Third, the defendants were not prejudiced by the investigating agents' possible exposure to a discrete and limited set of potentially privileged materials. The materials at issue were not even reviewed by law enforcement until *more than two months* after their arrests, and one month *after* the Indictment. The indisputable circumstances and chronology of events wholly undercut the defendants' wildly speculative and unsupported allegations that members of the prosecution team used potentially privileged communications in obtaining charges in this case. The defendants offer no evidence to support the allegation that they were prejudiced.

Fourth, because the defendants' sweeping and conclusory allegations of misconduct and prejudice are defeated by undisputed (and indisputable) facts, they are not entitled to a hearing, and are also certainly not entitled to the installation of a special master, relief that constitutes a stark departure from the common practice and procedure in this District. Courts in this District have, except in the most unusual of circumstances, approved the Government's use of a designated filter team like the one used here to address issues relating to the review of potentially privileged material.

The defendants' extraordinary request for an 18-month adjournment of the trial date and corresponding extension of the motions deadlines in this case is also unwarranted, as neither the nature of the discovery to date nor the investigating agents' inadvertent exposure to a limited set of potentially privileged documents justifies the extraordinary amount of delay that they seek.

## BACKGROUND

The Indictment charges Centra Tech, Inc. ("Centra Tech") co-founders Sharma, Farkas, and Trapani with securities fraud, wire fraud, and conspiracy to commit those offenses in connection with a scheme from approximately July 2017 through March 2018 to induce victims

to invest more than $25 million in investments in Centra Tech through material misrepresentations and omissions arising from the company's "initial coin offering" or "ICO," in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. §§ 371, 1343, 1349 and 2.[2] During the time period of the charged conspiracy, Centra Tech was a startup company headquartered in Miami Beach, Florida, that purported to offer a cryptocurrency debit card and other related financial products.

As part of their fraudulent scheme, which began on or about July 30, 2017, Sharma, Farkas, and Trapani solicited digital funds, including thousands of units of a cryptocurrency called "Ether," worth more than $25 million from investors in exchange for the purchase of digital tokens issued by Centra Tech during the company's ICO.  After the completion of the ICO in early October 2017, Sharma, Farkas, and Trapani continued the fraudulent scheme until at least in or about April 2018 by dissuading Centra Tech investors from seeking a return of their investments in the company and by artificially inflating the value of Centra tokens traded on secondary cryptocurrency exchanges.

During Centra Tech's ICO, Sharma, Farkas, and Trapani, in oral and written offering materials that were disseminated via the internet, made or caused Centra Tech to make multiple misstatements in soliciting investments in Centra Tech, including the following:

- Sharma, Farkas, and Trapani claimed to investors that Centra Tech had developed a debit card that enabled users to spend various cryptocurrencies to make purchases at any stores that accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra Tech debit cards.   In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.

---

[2] A fuller recitation of the defendants' charged offense conduct is set forth in the Government's submission in opposition to defendant Sharma's motion to suppress evidence, which is filed contemporaneously with this submission.

- Sharma, Farkas, and Trapani claimed to investors that Centra Tech's executive team included a purported Chief Executive Officer named "Michael Edwards" and a purported Chief Financial Officer named "Jessica Robinson" who had impressive work histories and academic credentials. In fact, neither "Michael Edwards" nor "Jessica Robinson" was a real person.

- Sharma, Farkas, and Trapani claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states. In fact, Centra Tech did not have such licenses in several of those states.

Ind. ¶¶ 15-31; Cr. Compl. 18 Mag. 2695, ¶¶ 17-27.

Sharma, Farkas, and Trapani utilized a communications platform operated by Slack Technologies, Inc. ("Slack") to carry out their scheme. Slack offers users a digital workspace, allowing groups of people to communicate with each other and collaborate on projects through real-time messaging, document sharing, archiving, and search functions. (*See* Ex. A., ¶ 4). Slack workspaces contain "channels" that users can use to communicate with other members, and the channels can be organized in any manner – for example, by a project, office location, or department. (*Id.*) Slack offers "public" channels that are open to an entire team of users in a workspace, "private" channels that allow a group of teammates to discuss and share privately within Slack based on invitation only, and "shared" channels (which can be public or private) that connect channels across workspaces. (*Id.*) In other words, a company that uses Slack workspaces can structure them to meet various needs – for example, for internal communications amongst company employees, for external communications with the public, or both.

Centra Tech controlled multiple Slack workspaces, and directed the public to its Slack workspaces for information and inquiries. (*Id.* ¶ 30). Centra Tech also used its Slack workspaces to respond to questions and criticisms from the public and to advertise and promote Centra Tech products. (*Id.* ¶ 31). Centra Tech also actively used Slack to communicate with

5

investors in the Centra Tech ICO.  (*Id.* ¶ 32).  Defendants Sharma, Farkas, and Trapani each maintained Slack user accounts linked to their Centra Tech email addresses, and which accessed various Centra Tech Slack workspaces from approximately August 2017 through March 2018. (*Id.* ¶ 33).

As set forth in more detail below, on March 30, 2018, the Government obtained a search warrant for six Slack workspaces used by Centra Tech and the target subjects of the investigation, Sharma, Farkas, and Trapani (the "Slack Search Warrant").   (Ex. A). The materials produced by Slack were reviewed by members of the prosecution team for materials responsive to the Slack Search Warrant, and once responsive materials were identified, they were produced to defense counsel.   The defendants identified potentially privileged materials that were included in that production.   Based on the inadvertent disclosure of potentially privileged materials from the Slack Search Warrant Returns, the defendants seek (a) dismissal of the Indictment, or the "affected counts," (b) disqualification of "the entire current prosecution team from any further proceedings involving the Defendants," or, as an initial matter, (c) "a hearing to determine the extent to which the prosecution team has invaded the defense camp," and (d) a special master appointed to take on the Filter Team review.   (MTD at 14-15).

## **ARGUMENT**

### **The Court Should Deny the Defendants' Requests to Dismiss the Indictment and for Other Relief**

The Court should deny the defendants' motion in its entirety.  As an initial matter, it appears that the claims on which the defendants have based their motion to dismiss depend on the alleged mishandling of communications involving internal and external counsel *for the corporate entity Centra Tech*.   The defendants have not alleged that these lawyers represented the

defendants in their personal capacity.   Additionally, and as set forth herein, Centra Tech's status as a dissolved or defunct corporation likely renders its privilege also defunct, thereby mooting any potential claim of privilege regarding the records that form the basis for the defendants' motions.

But, even if it could be said that the individual defendants have a claim of privilege over the potentially privileged communications at issue, the defendants have not established a basis to justify the extreme remedies of dismissal and disqualification, which are unwarranted in light of (a) the limited scope of the potentially privileged materials at issue, (b) the inadvertent nature of the disclosure of potentially privileged materials, (c) the careful and prudent manner in which the Prosecution Team and the Filter Team (defined below) reviewed and handled the Slack Search Warrant Returns, and (d) the lack of any prejudice to the defendants.   In sum, the indisputable facts establish the speculative and unsupported nature of the defendants' allegations.

## I.    **Relevant Additional Factual Background**

### A.  **The FBI Obtains a Search Warrant for Six Centra Tech Slack Workspaces**

In approximately January 2018, the Government initiated a criminal investigation of Centra Tech and its co-founders, Sharma, Farkas, and Trapani.   On March 30, 2018, based on publicly available information and records produced by Centra Tech to the United States Securities and Exchange Commission (the "SEC") (and that the SEC provided to the Government) in connection with a parallel SEC investigation that was initiated several months before the Government's criminal investigation, the Government obtained the Slack Search Warrant.   The Slack Search Warrant was "limited to items sent, received, created, posted, modified, archived or exported between July 11, 2017 and the date of [the] Warrant, inclusive."   (*Id.* at 33).

### B.  **Sharma and Farkas are Arrested Pursuant to a Complaint and Later Indicted**

7

In the afternoon on Friday, March 30, 2018, the Government became aware of information that Centra Tech's bank account had been depleted, that Farkas had requested research regarding foreign extradition laws, and that Farkas had made plans to travel to South Korea on April 1, 2018. (*See* Cr. Compl., 18 Mag. 2695, at 23-24).   The next day, on Saturday, March 31, 2018, the Honorable James L. Cott, United States Magistrate Judge, signed a warrant for the arrest of Sharma and Farkas, based on Criminal Complaint 18 Mag. 2695 charging them with securities and wire fraud offenses stemming from the above-described scheme to defraud Centra Tech investors.   On Sunday, April 1, 2018, Sharma and Farkas were arrested and detained pending bail proceedings. On May 14, 2018, a federal grand jury in the Southern District of New York returned the Indictment against Sharma, Farkas, and Trapani.

### C.  The Defendants Agree to a Filter Team Review Protocol

On April 2, 2018, the Government issued grand jury subpoenas to (a) Centra Tech via its outside counsel at Ballard Spahr LLP ("Ballard Spahr"), and (b) Sharma, Farkas, and Trapani, in their respective capacities as corporate custodians for Centra Tech.   On April 9, 2018, the Government issued an additional subpoena to Centra Tech.   In response to the subpoenas, on April 10, 2018—shortly before Centra Tech was evicted from its sole office space in Florida— Centra Tech, through Allan Shutt, Centra Tech's Chief Compliance Officer and General Counsel at the time, and with the assistance of Ballard Spahr, provided numerous computers, drives, and cellphones (the "Devices") and certain hard copy documents (the "Hard Copy Documents") to the FBI to ensure that the Devices and Hard Copy Documents would not be damaged or lost during the company's eviction, because those Devices and Hard Copy Documents likely contained materials responsive to the grand jury subpoenas. (*See* Dkt. 31 at 1).   In connection with receiving

the Devices and Hard Copy Documents, the Government reached an agreement with Ballard Spahr regarding a review protocol involving identifying and segregating privileged and potentially privileged materials.   (*See* Ex. B).   Subsequent to these communications, Ballard Spahr conveyed that it would not represent Centra Tech in the criminal investigation, and referred the Government to counsel for the individual defendants (Sharma and Farkas) for questions regarding the Devices and Hard Copy Documents, to include a review protocol.

The Government and defense counsel for the individual defendants agreed upon a review protocol, to include what is often referred to as a "filter," "taint" or "wall" team of law enforcement personnel who were walled off from the investigation so that they could identify and segregate privileged materials (the "Filter Team").   (*See* Ex. C).   Counsel for the individual defendants provided names of attorneys and law firms that had done work "either on behalf of Centra Tech or the individual defendants."   (*See* Ex. C; Ex. D).

By way of background, and as is relevant to the privilege review protocol, are certain facts related to Centra Tech's development, its employees, and its internal and external legal counsel. On or about October 5, 2017, Centra Tech completed its fundraising efforts through the ICO, which raised at least 100,000 Ether units (then worth more than $30 million).   (Ex. E, ¶ 18).   (From approximately July 2017 through early October 2017, Sharma, Farkas, and Trapani operated Centra Tech out of a single bedroom in an apartment in Miami where Sharma and his girlfriend Brielle Farkas, defendant Robert Farkas's sister, resided.)   In or about early October 2017, after raising millions of dollars in digital assets, Centra Tech leased office space in a luxury office building in Miami and subsequently hired a variety of executives and employees.

On or about August 9, 2017, after the ICO had already begun, Sharma began communicating with a purported attorney named "Eric Pope," at a purported law firm called "Pope & Dunn," who was, in fact, an individual without a law license named John Lambert posing as an attorney.[3]  (Ex. F).   After the completion of the ICO, Allan Shutt, an attorney, began working for Centra Tech as its Chief Compliance Officer and General Counsel.  (Ex. G at 19 (October 10, 2017 Centra Tech Twitter announcement)).   In approximately the fourth quarter of 2017, the SEC initiated its investigation of Centra Tech.  (Dkt. 77 at 9).   In connection with its investigation, the SEC issued subpoenas to Centra Tech, care of Centra Tech's outside counsel at Ballard Spahr. (*Id.*).  In approximately January 2018, David Brill began working at Centra Tech as its Chief Executive Officer.   Brill had a license to practice law, but was not hired to act as a lawyer and did not perform legal work on behalf of Centra Tech or defendants Sharma, Farkas, or Trapani.  (*See* Ex. C (Brill not listed as an attorney who "did work either on behalf of Centra Tech or the individual defendants")).   Also in January 2018, Centra Tech hired attorneys Jaclyn Haughom and Jessica Franklin as in-house counsel for Centra Tech.   (MTD at 4-5).

In connection with the parties' agreement on the privilege filter review protocol, the parties also agreed on which of the Devices, in addition to the Hard Copy Documents, would be imaged and reviewed by the Filter Team.  (*See* Dkt. 31 at 2-3; Dkt. 44 at 2-3).   On July 20, 2018, the Government received confirmation from defense counsel that counsels' list of attorney names was complete.  (Ex. H).

---

[3] On April 16, 2019, Lambert was arrested pursuant to a criminal complaint filed in this District, *United States* v. *John Lambert*, 19 Mag. 3608, for crimes relating to his pretending to be an attorney.

Since approximately late July 2018, and on a rolling basis, the Filter Team has reviewed electronic records from the Selected Devices and the .Hard Copy Records pursuant to the agreed-upon protocol, and utilizing the list of attorney and law firm names provided by counsel for the defendants.   The Filter Team's standard review process is as follows:

- First, searching for potentially privileged communications.

- Second, determining whether the material was (a) not privileged, (b) potentially privileged, (c) required redaction, and/or (d) potentially met an privilege exception (for example, the crime-fraud exception).

- Third, releasing to the prosecution team any non-privileged materials, and engaging with defense counsel regarding any potentially privileged materials or materials that potentially met an applicable privilege exception.

- Fourth, providing the parties with a log of materials that were identified as potentially privileged and/or which potentially met an applicable privilege exception.

### D.  The Prosecution Team Receives the Slack Search Warrant Returns and Engages the Filter Team to Segregate Potentially Privileged Materials

As described in further detail below, the Filter Team has investigated facts relevant to the defendants' allegations in their motion papers that law enforcement personnel accessed potentially privileged materials in records produced by Slack pursuant to the Slack Search Warrant.   In connection with their investigation, the Filter Team has provided the undersigned Assistant United States Attorneys (who, along with FBI case agents, are primarily responsible for the investigation and prosecution of this case and, together, are referred to as the "Prosecution Team"), with facts related to the process by which the Slack Search Warrant returns were received, reviewed, and prepared for production, without revealing any potentially privileged information with the

Prosecution Team.   The facts set forth in this section, and sections I.E, I.F., I.G., and I.H., below were, unless otherwise indicated, provided by the Filter Team to the prosecutors:[4]

On or about April 16, 2018, Slack sent an email to Special Agent Brandon Racz of the FBI, one of the primary case agents on this matter, providing a link to download records that Slack was producing in response to the Slack Search Warrant (the "Slack Search Warrant Returns"). Because of the size and complexity of the electronic files contained in the Slack Search Warrant Returns, Special Agent Racz experienced difficulty downloading the files in a format that could be transmitted to the FBI's Computer Analysis Response Team ("CART") to load onto a review platform to initiate a review of the Slack Search Warrant Returns.   On April 26, 2018, Special Agent Racz submitted a request to CART for technical support to download and access the Slack Search Warrant Returns.   Special Agent Racz provided CART with disks comprising the Slack Search Warrant Returns, but CART also had difficulty accessing and using the disks and, therefore, ultimately re-downloaded the files from the original link provided by Slack.   On June 5, 2018, the Slack Search Warrant Returns were loaded onto a review platform that was available on the FBI's computer system (the "Review Platform").

The Slack Search Warrant Returns are voluminous and technically complicated.   The Slack Search Warrant Returns are drawn from six different Centra Tech workspaces, and the overall data consists of approximately 1,326,909 files.   Each Slack workspace is subdivided between types of conversations:

---

[4] Should the Court request it, the Government can provide the Court with affidavits or declarations.   This necessary background is provided in response to the defendants' motions, and also in response to the Court's May 2, 2019 Order directing the Government to "be prepared to discuss the extent to which it had access to privileged material" at the conference scheduled for June 18, 2019.

- <u>Channels</u>:  Channels are large, group chats, which can be public or private and on which multiple people, both internal and external to Centra Tech, can communicate.

- <u>Direct Messages ("dms")</u>:  Dms consist of either two- or three-person message exchanges.

- <u>Files</u>:  These are files that include the attachments that can be shared by Slack users over both channels and dms.  For example, opening a text file of a channel where a file was shared will show a viewer the text name of the shared file but will not include a hyperlink to the file. The file can only be viewed by looking for the file of that name within the "files" folder of the relevant workspace.

- <u>Users</u>:  Names and subscriber information for the various people who used the Centra Tech Slack workspaces.

Channels and dms can contain several months' worth of communications and data, with conversations (some containing hundreds, if not thousands, of messages) sorted in lengthy files of an overall channel or in one-on-one direct message conversations.   In addition, Slack appears to have saved and produced the dms twice in the Slack Search Warrant Returns.   For example, a dm between User A and User B is saved and produced as both <User A-User B> and <User B-User A>.

The Review Platform allows for the following three types of markings: "labels," "flags," and "bookmarks."[5]

---

[5] "Labels" are tags that a user can assign a document, and which are viewable on the Review Platform.   "Flags" are binary options.  For example, one "flag" option is "privileged," and documents can be either flagged "true," meaning they are privileged or potentially privileged, or "false," meaning they are not privileged.   The "flag" setting on the Review Platform also governs the inaccessibility of potentially privileged documents to the members of the Prosecution Team. "Bookmarks" are a way a user can mark a document for future use, and can be shared with other users.   A user can create a "bookmark" with any name, and can later click the "bookmark" and see all documents assigned to the bookmark.   Unlike "labels" and "flags," a user cannot see all of the "bookmarks" assigned to a document in a single view.   Instead, a user would need to click on each "bookmark" to see documents falling within that "bookmark."

On June 12, 2018, CART released the Slack Search Warrant Returns to Special Agent Racz for his review.   Prior to June 12, 2018, Special Agent Racz had only been able to view the general structure and formatting of the Slack data as produced, but not the content.

On or about July 11, 2018, AUSA Negar Tekeei met with Special Agent Racz and Special Agent Kristin Allain, one of the primary case agents on this matter, to discuss the volume and nature of the Slack Search Warrant Returns, and the scope of their review.   On or about July 23, 2018, the Prosecution Team engaged the Filter Team to begin the process of searching for and segregating any potentially privileged materials in the Slack Search Warrant Returns.   In late July or early August 2018, Special Agent Tim Bergen was assigned to participate in the Filter Team's review.   On August 10, 2018, CART disabled Special Agent Racz and Special Agent Allain's access to the Slack Search Warrant Returns, pending the Filter Team's review.

### E.  The Filter Team's Review of the Slack Search Warrant Returns

Based on the current information gathered by the Filter Team regarding its investigation into the inadvertent disclosure of potentially privileged materials in the Slack Search Warrant Returns, a total of only approximately 21 documents (out of the approximately 1,326,909 files within the Slack Search Warrant Returns) constitute the universe of potentially privileged documents to which two members of the Prosecution Team (the investigating agents) were possibly exposed.

Here is a summary of the relevant protocol implemented by the Filter Team during its Slack Search Warrant Returns review process:

Beginning with the lists of attorney and law firm names provided by defense counsel in connection with the Filter Team protocol for reviewing the Selected Devices, the Filter Team ran

privilege search terms and filters through the Slack Search Warrant Returns to identify potentially privileged materials.   Using "labels," "flags," and "bookmarks," a Filter Team agent, Special Agent Bergen, marked items containing potentially privileged materials.   On September 4, 2018, CART created a report of the 57 items that Special Agent Bergen had marked potentially privileged with "flags" and "bookmarks" (the "September 4 Slack Report").[6]   The September 4 Slack Report did not, however, contain 11 files that Special Agent Bergen had "labelled" potentially privileged (and which were not otherwise "flagged" or "bookmarked" potentially privileged).

Special Agent Bergen provided the September 4 Slack Report to Filter Team AUSA Lisa Korologos, who reviewed the 57 items in the September 4 Slack Report for privilege.   On October 18, 2018, AUSA Korologos identified 15 items that could be released to members of the Prosecution Team on the Review Platform because they were not privileged, and requested that the remaining items remain segregated from the Prosecution Team as potentially privileged. Special Agent Bergen then directed CART to release 16 items (one of which was a duplicate). CART then marked 13 documents with "not privileged" flags and bookmarks, such that the 13 documents could be made available to the Prosecution Team.   Of these 13 documents, 12 were appropriately released to the Prosecution Team, while the remaining one was a potentially privileged document that was inadvertently released.   Specifically, this single file was an <.xml> file that the Filter Team has determined to be potentially privileged ("Document-1").

Document-1 was one of three documents "flagged" privileged and "bookmarked" under two distinct titles.   One of the bookmarks was attached to a particular version of Document-1 where its contents were viewable and recognizable as a potentially privileged communication.

---

[6] These 57 items contained three duplicates.

15

AUSA Korologos designated this version of the document as potentially privileged and it was not released to the Prosecution Team.   The other version of Document-1 was exported in a way that it was bookmarked to a stand-alone file, was very difficult to read in its text file format, appearing as a long file of html code, and not recognizable in that format as a potentially privileged communication.   Only if the Document-1 were viewed in a native format could its content be deciphered.   Because AUSA Korologos viewed the 57 documents in the text file format, a version of Document-1 was not viewed in its native format and was thus inadvertently made available to members of the Prosecution Team.

On or about November 9, 2018, CART allowed Special Agent Racz access to the Slack Search Warrant Returns on the Review Platform.   Special Agent Racz's viewing privileges barred access to any items that had been "flagged" as privileged or potentially privileged, which, after the above-described Filter Team and CART review and marking process, comprised 41 documents. Special Agent Racz subsequently recommenced his review for responsiveness.   On or about January 2, 2019, Special Agent Allain was also again given access to the Slack Search Warrant Returns on the Review Platform, and had the same viewing privileges and restrictions as Special Agent Racz.   In connection with their review of more than one million records comprising Slack channels, direct messages, files, user data in Slack Search Warrant Returns, the investigating agents searched for responsive materials using search terms.   The investigating agents would, at times, mark individual documents as "responsive," and, other times, mark a batch of multiple records that were responsive to particular search terms "responsive" altogether, without undergoing a document-by-document review, depending on the nature of the search terms.   In other words, the investigating agents at times marked individual documents responsive, and other

times "batch" marked multiple documents as responsive without necessarily viewing each individual file depending on the search terms and volume of hits.

Special Agents Racz and Allain completed the responsiveness review on or about January 4, 2019.   At the completion of the responsiveness review, approximately 112,508 files in the Slack Search Warrant Returns were marked "Responsive."

**F.  Production of the Slack Search Warrant Returns to the Defendants**

On August 8, 2018, the Government informed defense counsel that it had received the Slack Search Warrant Returns, and sought the consent of all defense counsel to receive a copy of the entirety of the returns (i.e., the entire universe of documents produced by Slack) while the Filter Team and responsiveness review processes were undertaken.   (*See* Ex. I, Email Correspondence beginning August 8, 2018).   In September 2018, the Government provided defense counsel with the entirety of the Slack Search Warrant Returns (on a rolling basis, and depending on when defense counsel provided the requested hard drives for copies of the records). (*See, e.g.*, Ex. J; Dkt. 60 at 2).[7]

On January 7, 2019, after completing the responsiveness review of the Slack Search Warrant Returns, Special Agent Racz requested that CART produce two sets of Slack database reports from the Review Platform:  (1) a report for defense counsel consisting of documents labeled "responsive" (the "Defense Report"), and (2) a report for internal purposes consisting of the same set of documents labeled "responsive," but which also included documents filed under shared "bookmarks" (which contained the tags, or work product, that the reviewers from the Filter

---

[7]  Because Sharma and Farkas owned and/or controlled Centra Tech at various times, the production of the entirety of the Slack Search Warrant Returns was not contrary to any privacy interests of Centra Tech when those records were produced.

Team and the Prosecution Team had applied to the documents during the course of the review process (the "Internal Report").  On January 9, 2019, CART generated multiple copies of Blu-ray disks containing the Defense Report (the "Defense Disks") and a disk containing the Internal Report (the "Internal Disk"), which were subsequently provided to the U.S. Attorney's Office. The contents of the Internal Disk were loaded onto a shared drive accessible by U.S. Attorney's Office personnel, including members of the Prosecution Team.  However, the AUSAs on the Prosecution Team – Samson Enzer and Negar Tekeei – did not view the contents of the Internal Disk, and had not viewed the contents of the Slack Search Warrant Returns on the Review Platform maintained on FBI's computer system.  This remains the case.  To date, the AUSAs on the Prosecution Team have not reviewed the contents of the Slack Search Warrant Returns on the Review Platform or via the shared drive accessible by U.S. Attorney's Office personnel.

On January 15, 2019, the Government produced the Defense Disks to defense counsel (the "January Production").  (*See* Ex. K; Dkt. 101 at 1).  In late January 2019, defense counsel informed the Government that it was experiencing technical difficulties in reviewing the January Production.  Because the technical difficulties may have been caused by the Blu-ray disk format of the Defense Disks, the Government requested that the defense provide hard drives to re-produce the responsive Slack Search Warrant Returns, and re-produced the materials on February 7, 2019 (the "February Production").  (*See* Ex. L).  The February Production inadvertently contained the contents of the Internal Disk, which included various work product bookmarks, flags, and labels applied by CART, the Filter Team, and the investigating agents.[8]

---

[8] On or about May 14, 2019 the Filter Team informed defense counsel about this inadvertent production of work product, and conveyed to the defense that the Filter Team was working with

### G. The Defendants Alert the Government to the Inadvertent Disclosure of Potentially Privileged Materials

On April 15, 2019, two weeks before the Court's deadline of April 29, 2019 for pretrial defense motions pursuant to Federal Rule of Criminal Procedure 12, defense counsel emailed the Government with the following question:   "Were the Slack documents that we have reviewed by the taint team."   (Ex. M).   The Government responded with its then-understanding of the report of responsive Slack Search Warrant Returns that CART had prepared for production:

> In September 2018, we produced a copy of the entire Slack search warrant returns to all defense counsel (on consent of all defense counsel).  On January 15, 2019 and again on February 7, 2019, we produced the Slack search warrant returns that the Filter Team had released to the prosecution team and which the prosecution team marked as responsive to the search warrant.

(*Id.*)[9]

On April 17, 2019, defense counsel first notified the Government and the Filter Team regarding potentially privileged materials in the Slack Search Warrant Returns produced in January or February 2019.   (*See* Ex. N).   The Filter Team then began consulting with defense counsel and investigating the inadvertent disclosure of potentially privileged materials in the January Production and the February Production.   In addition, the Filter Team and the Prosecution

---

CART to prepare a new report of the responsive Slack Search Warrant Returns, without the work product, for the defense.   On May 15, 2019, the Filter Team conveyed to the Prosecution Team that it had confirmed that the February Production contained work product applied by CART, the Filter Team, and the investigating agents, and that it had discussed this finding with the defense. On May 16, 2019, the Government requested that the defense return the February Production containing work product, with the exception of the copies that are subject to the instant motion.

[9] The reference to "prosecution team" in the Government's April 15, 2019 response to defense counsel's email was a reference to the members of the prosecution team who conducted the responsiveness review of the Slack Search Warrant Returns, which were the investigating agents, but not the prosecutors.

Team took steps to block of the members of the Prosecution Team from access to any Slack Search Warrant Returns pending the Filter Team's investigation and review.

The Filter Team's review of the inadvertent disclosure of potentially privileged materials in the Slack Search Warrant Returns has identified three categories of potentially privileged materials that were inadvertently released and/or potentially viewed by members of the Prosecution Team:

- <u>First</u>, as described above, Document-1 was inadvertently released to the Prosecution Team via the Review Platform and via the Internal Disk (the "Category 1").

- <u>Second</u>, nine documents[10] that are labelled "responsive" are also "flagged" potentially privileged, indicating that they may have been viewed by the investigating agents prior to when the Filter Team was engaged (since the investigating agents were barred from reviewing them on the Review Platform after the Filter Team had segregated them as potentially privileged) ("Category 2"). It is unclear whether these documents were individually marked "responsive," or batch-marked "responsive" in based on search terms run by the investigating agents.

- <u>Third</u>, eleven documents were "labelled" potentially privileged but were not provided to the Filter Team AUSA for review in the September 4 Slack Report (*see supra* I.E.), and were therefore inadvertently released to the Prosecution Team ("Category 3"). Of these 11 documents, five of them carry "responsive" labels, indicating that some of the 11 documents may have been viewed by the investigating agents. It is unclear whether these five documents were individually marked "responsive," or marked responsive in batches based on search terms run by the investigating agents, and it is unclear when these documents were marked "responsive."

The Filter Team is reviewing the documents in Category 2 and Category 3 to determine whether they are privileged. Special Agents Racz and Allain do not recall coming across anything they believed to be potentially attorney-client privileged in the Slack Search Warrant Returns and, if

---

[10] Two of these nine documents are duplicates, meaning that this set comprises seven distinct documents.

they had, they would, as is their standard practice, immediately notify the AUSAs assigned to the case.

To be explicit, the Government in this memorandum does not consent to, or ratify, the conclusion that all 21 implicated documents are, in fact, privileged (or that the defendants hold a valid privilege).   Because the undersigned have not reviewed those documents, they are unable to take any position regarding whether they are actually privileged.   To the extent that the Government challenges the designation of any of these documents as privileged, it will be done by the Filter Team in sealed filings.

### H.  The Filter Team's Review of Additional Categories of Records

In addition to the Slack Search Warrant Returns, the records being reviewed by the Filter Team for potentially privileged documents include:

1. Electronic records from an Apple MacBook, iPhone 7, and iPhone 10, all seized in connection with Sharma's arrest and searched pursuant to a search warrant (the "Sharma Devices").

2. Electronic records from Centra Tech Selected Devices, which comprise (a) an iMac used by Centra Tech's purported Chief Technology Officer, Steven Sykes, (b) a MacBook Pro used by Centra Tech's former Chief Executive Officer, David Brill, (c) an HP Spectre Laptop used by Brill, and (d) an iMac used by Centra Tech's former Chief Compliance Officer and General Counsel, Allan Shutt (the "Shutt Laptop").

3. The Hard Copy Documents provided by Centra Tech in response to Grand Jury subpoenas.

The Filter Team's review of the records in these materials, to include its determinations as to privilege, is ongoing, and these materials are not subject to the defendants' instant motion.

With respect to the Shutt Laptop, and as the Court is aware from the parties' discovery status update letters to the Court, defense counsel requested time to conduct their own review of the Shutt Laptop records that the Filter Team had determined were not privileged and releasable

21

to the Prosecution Team, and to provide the Filter Team with a log of any such materials that the defendants claim are privileged.   (*See* Dkt. 108 at 3; Dkt. 114 at 2).

Based on information provided by the Filter Team, the Government understands that the Sharma Devices, Selected Devices, and the Hard Copy Documents contain materials that the Filter Team has designated as (i) potentially privileged, (ii) requiring redaction, and/or (iii) potentially met an applicable privilege exception (for example, the crime-fraud exception).   As described in the parties' correspondence with the Court, in connection with its review, the Filter Team will continue to engage with defense counsel directly in connection with their determinations, and, to the extent the Filter Team and defense counsel are unable to reach agreement regarding the Filter Team's determinations, the Filter Team will provide a log of any materials in dispute to all parties, and the Prosecution Team will engage in any necessary motion practice.   (*See, e.g.*, Dkt. 108 at 3; Dkt. 114 at 2).

## II.   **Relevant Law**

### A.  **Dismissal of the Indictment and the Sixth Amendment Right to Counsel**

The Second Circuit has "held that, unless 'the conduct of the Government has . . . been . . . manifestly and avowedly corrupt,' . . . a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege."   *United States* v. *Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991) (alterations in original) (quoting *United States* v. *Gartner*, 518 F.2d 633, 637 (2d Cir. 1975)).   Importantly, the "dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."   *United States* v. *De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (internal citation omitted).

The burden to establish the information is privileged unequivocally rests with the

defendant.  *See United States* v. *Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989) ("The burden of establishing the attorney-client privilege, in all its elements, always rests upon the person asserting it.").  The attorney-client privilege protects from disclosure certain communications involving a client and his legal adviser related to the provision of legal advice.  *See, e.g.*, *United States* v. *Kovel*, 296 F.2d 918, 921 (2d Cir. 1961).  "To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice."  *United States* v. *Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996).  Thus, the privilege does not attach to communications between two or more persons that do not enjoy an attorney-client relationship.  *Schwimmer*, 892 F.2d at 243 ("The relationship of attorney and client, a communication by the client relating to the subject matter upon which professional advice is sought, and the confidentiality of the expression for which the protection is claimed, all must be established in order for the privilege to attach.").  Additionally, it is settled that even where an attorney-client relationship does exist, disclosure of a privileged communication to a third party waives privilege as to that communication.  *See Schaeffler* v. *United States*, 806 F.3d 34, 40 (2d Cir. 2015) (privilege "is generally waived by voluntary disclosure of the [privileged] communication to another party"); *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) ("subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed").

The Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  "The Sixth

Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: 'it does not attach until a prosecution is commenced.'" *Rothgery* v. *Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (quoting *McNeil* v. *Wisconsin,* 501 U.S. 171, 175 (1991)). The Supreme Court has "for purposes of the right to counsel, pegged commencement [of a prosecution] to 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id.* (quoting *United States* v. *Gouveia,* 467 U.S. 180, 188 (1984)).

### B. Disqualification

Like dismissal of an indictment, disqualification is an extreme remedy that is "reserved for situations of prior representation, conflicts of interest, prosecutorial misconduct, and other unethical attorney behavior." *United States* v. *Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (denying motion to disqualify AUSA who had inadvertently reviewed an email containing attorney work-product, and who took steps to protect the document upon learning about counsel's assertion of privilege); *United States* v. *Skeddle*, 989 F. Supp. 890, 899 (N.D. Ohio 1997) (holding that prosecutors' access to attorney-client and work product-protected documents did not compel their disqualification, because the search that uncovered the documents was properly executed and "access has not given [the prosecutors] insight . . . to the strategies, theories, and tactics of the lawyers representing the defendants")). "Absent concrete allegations of taint, there is no reason to use disqualification as a remedy for the inadvertent review of factual work product." *Stewart*, 294 F. Supp. 2d at 494 (citing *United States* v. *Chong*, 58 F.Supp.2d 1153, 1160 (D. Haw. 1999) (refusing to disqualify prosecutor for inadvertently reviewing a document filed under seal, because he did not engage in misconduct and "did not gain any substantial insight into the relationship

between Defendant, his attorneys, and their defense strategies so there could be no prejudice")).

Thus, when faced with motions for disqualification, district courts commonly look for (i) prosecutorial misconduct, and (ii) prejudice to the defendant. *See United States* v. *Walker*, 243 F. App'x 621, 624 (2d Cir. 2007) (summary order) ("[W]e express no opinion on whether [egregious] misconduct would call for disqualification without substantial prejudice to the defense."); *Stewart*, 294 F. Supp. 2d at 494 (discussing issues of misconduct and prejudice). In *Walker*, four privileged documents – one that was privileged, and three others that were protected by the work-product doctrine – reached the trial team despite the use of a taint team. *Walker*, 243 F. App'x at 623. The district court denied the defendant's motion to disqualify the trial team, finding that the trial team's review of the four documents was inadvertent. *Id.* The Second Circuit affirmed, holding that "[a] district court's refusal to disqualify an attorney is reviewed for abuse of discretion," and finding that the district court acted within its discretion when it refused to disqualify the prosecutors who had inadvertently reviewed the documents. *Id.* at 623-24. In affirming the district court's refusal to disqualify the trial team, the Second Circuit found that the defendant, Walker, had suffered "no prejudice," and that "the documents at issue could not possibly have provided insight into defense strategy or into the relationship between Walker and his attorney." *Id.* at 623.

### C. Taint Hearing

The Second Circuit has held that, in order to be entitled to a hearing on the use of privileged information, the defendant has the burden of establishing that the privileged information is related in substance to the criminal investigation. *See United States* v. *Hoey*, 725 F. App'x 58, 61 (2d Cir. 2018) ("To force the government to make an affirmative demonstration that it derived its

25

evidence from legitimate, independent sources, Hoey had to show a factual connection between the allegedly privileged information and the charges in this case."); *United States* v. *Blau*, 159 F.3d 68, 72 (2d Cir. 1998) ("Blau's failure to show the requisite factual relationship [between his immunized proffers and the subject matter of the federal prosecution] would be sufficient to end the inquiry and avoid the necessity of a *Kastigar* hearing."). Thus, "a taint hearing is not required merely because a defendant has *asserted* that a prosecution is tainted by the Government's use of immunized testimony (or privileged communications). Rather, the defendant must demonstrate a 'factual relationship' between the protected information and the present prosecution." *United States* v. *Hoey*, No. 15 Cr. 229 (PAE), 2016 WL 270871, at *4 (S.D.N.Y. Jan. 21, 2016) (emphasis in original) (citing *Blau*, 159 F.3d at 72).

Furthermore, courts have required defendants to establish a non-speculative claim of taint before granting a *Kastigar* hearing. *See United States* v. *Helmsley*, 726 F. Supp. 929, 933 (S.D.N.Y. 1989) ("Accordingly, unless the defendant has made a threshold showing either that the subject matter of the challenged prosecution and the immunized testimony are related, or that there is otherwise a distinct, as opposed to a speculative, possibility of taint, a *Kastigar* hearing . . . is not required."); *Hoey*, 2016 WL 270871 at *4 (declining to grant a *Kastigar* hearing related to attorney-client privilege information unless the defendant could "show a distinct, as opposed to a speculative, possibility of taint" and a "connection between the *content* of the evidence to be used in the present prosecution and the protected information" (emphasis in original) (internal quotation marks omitted)); *Hoey*, 725 F. App'x at 61 ("Hoey had to show a connection or at least make a plausible showing as to how privileged information from the first investigation influenced the second investigation. He failed to do so and the district court did not clearly err in denying his

requests for a *Kastigar* hearing.").

### III. <u>Discussion</u>

#### A. The Privilege at Issue was Held by Centra Tech, a Defunct Entity With No Privilege to Assert

As a threshold matter, the relief the defendants seek is predicated on the assertion that the materials in question are in fact subject to a valid claim of attorney-client privilege.   The record, including the defendants' allegations in their motion, supports a conclusion that the privilege at issue belonged to Centra Tech, and not the individual defendants.   Indeed, the claims on which the defendants' motion rest relate only to communications with attorneys who served as internal or external counsel for the corporate entity Centra Tech.   The defendants do not assert that any of those attorneys represented them personally.

The fact that the privilege at issue belonged to Centra Tech, as opposed to the individual defendants, has fatal consequences to the defendants' motion.   The indisputable facts demonstrate that Centra Tech as an entity is defunct and no longer operates as a going concern.   As described above, Centra Tech was evicted from its only office space, appears to have no employees, relinquished its Hard Copy Documents and the Devices to the FBI, and has failed to comply with subpoenas served more than a year ago.   No lawyers have entered an appearance in this case on behalf of Centra Tech or otherwise moved to intervene.

If, in fact, the relevant privilege belongs to Centra Tech (as it so appears), its status as a dissolved or defunct corporation likely renders its privilege also defunct.   *See S.E.C.* v. *Carrillo Huettel LLP*, No. 13 Civ. 1735 (GBD), 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) ("The weight of authority . . . holds that a dissolved or defunct corporation retains no privilege." (collecting cases)); *accord Express Homebuyers USA, LLC* v. *WBH Mktg., Inc.*, No. 18-60166-

CIV, 2018 WL 4922467, at *2 (S.D. Fla. Feb. 9, 2018) ("[T]he greater weight of authority suggests that, applying federal law, when a corporation ceases to exist, it can no longer assert privilege." (collecting cases)).   This reality renders the defendants' motions entirely moot.   Accordingly, to avoid rejection of their motion on this basis alone, the defendants should clarify (1) exactly who they assert is the relevant privilege holder – i.e., the client whom the actual or purported attorney was acting on behalf of in tendering the advice – and, (2) if they allege that it is the defendants individually, what their factual basis is to make such an assertion.   Absent the ability to affirmatively allege that the privilege at issue is held by the defendants in their individual capacity, the Court can dismiss their motion on this basis alone.


### B.  Dismissal of the Indictment is Unwarranted and Would be Unprecedented

To the extent the defendants raise a valid claim of privilege over the potentially privileged materials in the Slack Search Warrant Returns, dismissal of an indictment for review of privileged information is an extreme remedy never before imposed in this Circuit in the attorney-client privilege context, and wholly unwarranted in light of the cautious and prudent manner in which the Prosecution Team and the Filter Team handled the Slack Search Warrant Returns.

First, the Government took reasonable and prudent steps to avoid reviewing potentially privileged communications in the Slack Search Warrant Returns, and any exposure to potentially privileged communications was extremely limited and inadvertent.   As described in detail above, after initiating the responsiveness review of the Slack Search Warrant Returns, the Government ceased reviewing the records and initiated specific procedures for the review of potential privileged records, cutting off the Prosecution Team's access until potentially privileged materials could be

segregated by the Filter Team.    In fact, the Government used the same Filter Team protocol agreed to by the parties in connection with the Devices and Hard Copy Documents (*see supra* I.C.), and informed defense counsel that the Slack Search Warrant Returns were pending a Filter Team and responsiveness review.    Counsel for the defendants did not object to those procedures, and consented to receiving the entire Slack Search Warrant Returns pending the Filter Team and responsiveness review.    The Government's actions with respect to the Slack Search Warrant Returns are a far cry from the type of "manifestly and avowedly corrupt" conduct that would require automatic dismissal of the Indictment.    *See Schwimmer*, 924 F.2d at 447.    Instead, the Government acted reasonably and in good faith throughout the Slack Search Warrant Return review process.

Furthermore, as described above, to the extent the investigating agents were exposed to potentially privileged communications in the course of their review of materials included in the Slack Search Warrant Returns, any such exposure was inadvertent and minor relative to the more than one million files contained in that return alone.    Significantly, of the more than one million electronic files received in the Slack Search Warrant Returns, the Filter Team has thus far identified a relatively miniscule number of documents containing potentially privileged communications to which two members of the Prosecution Team may have been exposed.

Of this limited set of potentially privileged records, Document-1 (the lone document in Category 1) was inadvertently released to the Prosecution Team due to the technically specific way in which it was viewed by the Filter Team.    The eleven documents that were "labelled" as potentially privileged but not provided to the Filter Team AUSA for review in the September 4 Report (Category 3) were similarly inadvertently released to the Prosecution Team, but this time

as a result of technician error in omitting them from the September 4 Report.   Of those eleven

documents, five carried "responsive" labels that may have been the result of batch-marking based

on search terms run by the investigating agents.   Thus, most of these potentially privileged

materials were inadvertently disclosed due to the technical nature of how they were viewable or

how they were marked during the review process.   As to the nine documents marked potentially

privileged that are also labeled "Responsive," (Category 2), these records, too, may have been

batch-marked as responsive to particular search terms rather than individually reviewed.

However, even if the investigating case agents on the Prosecution Team had viewed each of these

nine records, their exposure to the records was *not* the result of "manifestly and avowedly corrupt

conduct."[11]   The Slack Search Warrant Returns review process and the investigating case agents'

inadvertent exposure to three areas of potentially privileged communications, as identified by the

Filter Team, should also be viewed in context: the Slack Search Warrant returns comprise

1,326,909 files, subdivided between channels, direct messages, files, and user data, and each file

alone could contain hundreds, if not thousands, of communications, some of which were

duplicated throughout the data.   The Government took reasonable measures to review the Slack

Search Warrant Returns, and to the extent the investigating agents were exposed to potentially

privileged communications, it was hardly the result of bad-faith actions or intentional misconduct

but, instead, the result of inadvertent human and technical error.

　　　For the same reasons, the defendants' argument that the Government somehow "invaded"

the "defense camp" (MTD at 8), is also baseless.   With no factual basis whatsoever, the defense

---

[11] As set forth above, the AUSAs on the Prosecution Team have not been exposed to any of the
potentially privileged documents.

makes the blanket assertion that, when Sharma and Farkas were arrested, "[G]overnment agents had already sought copies of their attorney client communications and their attorneys' work product from various sources including Slack through the issuance of search warrants." (MTD at 3). This is indisputably inaccurate. While the Government had obtained a search warrant for the Centra Tech Slack Workspaces prior to the defendants' arrests, it in no way specifically "sought copies of . . . attorney client communications and . . . attorneys' work product." The defense also argues that by seeking "all content and other information," the records were "obviously likely to yield attorney client privileged communications about the pending investigation." (MTD at 13-14). That is not so. But, even if the Slack Search Warrant Returns could be deemed "obviously likely" to contain attorney-client communications or work product, there would have been nothing "manifestly or avowedly corrupt" about obtaining the records pursuant to a court-authorized search warrant and engaging a Filter Team to search for and remove potentially privileged communications – which is precisely what the Government did here.[12]

Second, the defendants have failed to demonstrate any prejudice stemming from the

---

[12] It also bears worth noting that the defendants' assertions that they, "their lawyers, and their employees communicated with each other via Slack" and that "at least three lawyers even worked full time in Centra's offices" (MTD at 2) elide the fact that the defendants, based on their public announcements and the list of attorney names they provided to the Government in connection with the Filter Team's review of the Selected Devices (*see supra* I.C.), in fact, did not hire Shutt until *after* the Centra Tech ICO, and did not hire Haughom or Franklin until January 2018. Brill, who was also hired in approximately January 2018, did not perform legal work on behalf of Centra Tech or defendants Sharma, Farkas, or Trapani. The defendants do not provide the date on which they retained Ballard Spahr "as outside counsel for compliance and SEC matters" (MTD at 2) but there is no indication that Ballard Spahr was retained before or during the Centra Tech ICO. Thus, the potentially privileged attorney communications at issue are likely to be communications that occurred after the Centra Tech ICO in connection with and during the defendants' continued commission of the fraudulent scheme, and potentially subject to the crime-fraud exception to the attorney-client privilege (*see infra* III.D.).

investigating agents' potential exposure to potentially privileged documents.   The defendants do not – and cannot – cite any evidence or facts in the record to support their argument that the inadvertent exposure to potentially privileged communications "amounts to an unconstitutional invasion of the defense camp that has disrupted defense trial preparations and given the prosecution an unfair tactical advantage that can only be remedied through dismissal of the affected counts."   (MTD at 10).   As described above, the prosecutors have not seen any of the potentially privileged communications at issue.   To the extent that the investigating agents were exposed to them, the defense has not alleged how such exposure has prejudiced the defendants' Fifth Amendment or Sixth Amendment rights in any way.   Setting aside any substance of the potentially privileged communications, the communications requested by the Slack Search Warrant were communications that occurred between on or about July 11, 2017 and March 30, 2018, the date the Slack Search Warrant was executed.   Thus, the communications requested by the Slack Search Warrant represent the time period *before* the defendants were arrested, and before their Sixth Amendment right to counsel had attached.   *See Rothgery*, 554 U.S. at 198 (the Sixth Amendment right to counsel commences at the initiation of adversary judicial criminal proceedings).   It is not apparent how the potentially privileged materials in the Slack Search Warrant Returns could possibly "consist of very specific factual and legal defenses to the charges contained in the Indictment and that will be some of the same defenses that the Defendants currently plan to raise at trial," when the Slack Search Warrant sought records up to March 30, 2018, before the defendants were arrested pursuant to the criminal complaint, and the grand jury did not return the Indictment until weeks, if not months, *after* the potentially privileged

communications occurred.[13]   And, as soon as the defense alerted the Government to the existence of potentially privileged communications in the February Production, the Government took immediate steps to contain those records and investigate the nature and scope of the investigating team's exposure to potentially privileged communications.   These facts undercut the defendants' conclusory claims of prejudice.

The Court should deny the defendants' motion to dismiss the Indictment.

### C.  Disqualification is Similarly Unwarranted

There is also no basis to disqualify the AUSAs and case agents involved in this investigation and prosecution.

First, the defense does not – because they cannot – point to any misconduct on behalf of the prosecutors, the investigating agents, or the Filter Team at any point in the handling and review of the Slack Search Warrant Returns.   *Stewart*, 294 F. Supp. 2d at 494 (disqualification "reserved for situations of prior representation, conflicts of interest, prosecutorial misconduct, and other unethical attorney behavior").   The distinction between inadvertent review and purposeful misconduct is of primary importance in the disqualification context, both inside and outside this District.   *See United States* v. *Chong*, 58 F. Supp. 2d 1153, 1160 (D. Haw. 1999) ("Because there has been no prejudice and no prosecutorial misconduct, the Court finds that disqualification is not justified."); *United States* v. *Kouri-Perez*, 992 F. Supp. 511, 512 (D.P.R.

---

[13] The defendants were, of course, aware of the SEC's investigation for several months before they were arrested in this criminal case.

1997) (refusing to disqualify AUSA where his receipt of information in casual conversation was "at the very worst a minor indiscretion, against which disqualification would be wildly disproportionate"). Disqualification is certainly unwarranted here, where the Government properly executed a court-authorized search warrant, initiated a responsiveness review, and then, early in the review process, ceased reviewing records and engaged a Filter Team to segregate potentially privileged materials in a manner consistent with parties' agreement as to other categories of records (specifically, the Selected Devices).

Second, the defendants have not articulated the manner in which they have suffered prejudice as a result of the investigating agents' inadvertent exposure to potentially privileged communications. The Government recognizes that certain defense arguments regarding prejudice may, insofar as they discuss the content of the potentially privileged communications at issue, be the subject of sealed briefing before the Court to which the prosecution team is not a party. However, to disqualify members of the Prosecution Team, the defendants must show how the communications at issue could have given the Prosecution Team insight to the defense's strategy and theories, or into the relationship between the defendants and their lawyers in this case. *See Walker*, 243 F. App'x at 623 (affirming refusal to disqualify the trial team when the defendant had suffered no prejudice and "the documents at issue could not possibly have provided insight into defense strategy or into the relationship between [the defendant] and his attorney"); *Skeddle*, 989 F. Supp. at 899 (no disqualification where access to documents "ha[d] not given [the prosecutors] insight . . . to the strategies, theories, and tactics of the lawyers representing the defendants"). Based on the temporal limitations imposed in the Slack Search Warrant – records spanning the time between July 11, 2017 through the date of the Slack Search Warrant, March

30, 2018, before criminal proceedings were initiated – although the defendants were, of course, aware of the SEC investigation at some point during that time period, it is unclear how the potentially privileged communications at issue here could have given members of the Prosecution Team insight into the criminal defense strategies, theories, or tactics of the lawyers representing the defendants in this case.[14]   Thus, absent any concrete allegations of taint, there is no reason to use disqualification as a remedy for the inadvertently released or reviewed potentially privileged communications here.   *See Stewart*, 294 F. Supp. 2d at 494.

The Court should deny the defendants' motion to disqualify members of the Prosecution Team.

### D.  In Evaluating the Defendants' Requests for Dismissal and Disqualification, the Court Should Also Consider the Various Reasons Why The Defendants May Have No Valid Claim of Privilege

Two additional topics should be considered as they relate to potential prejudice suffered by the defendants as a result of the investigating agents' inadvertent exposure to potentially privileged communications: (1) the applicability of the crime-fraud exception to the attorney-client

---

[14] On April 2, 2018, the SEC filed a complaint against Sharma and Farkas in the Southern District of New York charging them with civil federal securities law violations arising from Centra Tech's ICO, and, on April 20, 2018, filed an amended complaint against Sharma, Farkas, and Trapani with substantively the same charges (the "SEC Complaint").   *See S.E.C.* v. *Sharma, et al.*, 18 Civ. 2909 (DLC).   Unlike the criminal charges, the SEC Complaint charges the defendants with selling unregistered securities in connection with the Centra Tech ICO, in violation of Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and 77e(c).   Notably, in this criminal case, "the government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security under the Securities Act."   *United States* v. *Tucker*, 345 F.3d 320, 330 (5th Cir. 2003) (involving violation of 15 U.S.C. §§ 77q(a)), quoting *United States* v. *Brown*, 578 F.2d 1280, 1284 (9th Cir. 1978)).   In other words, "[t]he government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security."   *Id.* (quoting *Brown*, 578 F.2d at 1284).

privilege, and (2) the defendants' potential assertion of an advice of counsel defense.    As the Court

is aware, the Prosecution Team has informed the Filter Team that it has reason to believe that some

of the potentially privileged materials in the categories of records the Filter Team is reviewing may

fall within the crime-fraud exception to the attorney-client privilege, which will likely be the

subject of forthcoming motions practice.    (*See, e.g.*, Dkt. 101 at 2-3).    The Government notes its

intention to file such a motion now, in light of the defense's motion to dismiss the Indictment, to

the extent any of the potentially privileged materials identified by the defense and the Filter Team

would also be subject to the crime-fraud exception to the attorney-client privilege, and thus

discoverable by the Prosecution Team and mooting any issues relating to inadvertent exposure to

those materials.[15]

Similarly, any potential advice of counsel defense asserted by the defendants should also

be considered.    The Government has attempted to obtain clarification from the defendants if they

---

[15] In particular, the Prosecution Team has reason to believe that the following categories of communications that may be privileged are subject to the crime-fraud exception to the attorney-client privilege:

    (1) communications regarding Sharma's scheme to obstruct the SEC's investigation of Centra Tech by making materially misleading statements and omissions regarding the Digital Wallet containing 100,000 Ether units raised from investors who had been defrauded into purchasing digital tokens issued by Centra Tech during its ICO;

    (2) communications in furtherance of Sharma, Trapani, and Farkas's efforts to further the charged securities and wire fraud scheme by making materially misleading public statements to prevent or delay revelation of the fraudulent representations that Centra Tech made during its ICO;

    (3) communications made in furtherance of efforts to conceal information about the SEC's investigation from Centra Tech's auditors, who were hired to perform an audit of Centra Tech's financial statements;

    (4) communications concerning research on foreign extradition laws; and

    (5) communications concerning "Spend" or "Spend.com" or "Phantom," which concerned Sharma and Farkas's efforts to launch a new cryptocurrency-based enterprise, using the fraudulently-obtained Centra Tech investor funds, based on a series of new false and misleading representations.

will seek to assert an advice of counsel defense, and the defendants have refused to represent whether they will seek to assert such a defense.    As the Court is aware, on February 20, 2019, the Government sent counsel for defendants Sharma and Farkas a letter requesting (among other things) that each of the defendants provide the Government with notice as to whether he intends to assert any defense based on alleged advice of counsel as to any of the crimes charged in the Indictment, and, if so, to produce all discovery relating to any such defense.    (*See* Dkt. 114 at 2-3).    In response the Government's requests, counsel for defendants Sharma and Farkas conveyed that they do not believe they are required to disclose their defense at this time as they have not completed discovery review.    (*Id.*).    Whether Sharma or Farkas intend to assert any defense based on alleged advice of counsel is relevant to the instant motions, insofar as, in asserting any such defense, they would necessarily waive any attorney-client privilege over their communications with the counsel in question and such communications would be discoverable. *See, e.g.*, *United States* v. *Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (defendant had to waive attorney-client privilege over communications with counsel regarding the legality of his conduct in order to mount a defense that he made a good faith attempt to comply with the securities laws).

Indicating that they may assert an advice of counsel defense, Sharma and Farkas have, on multiple occasions, requested and received discovery regarding "Eric Pope," the purported attorney with whom Sharma communicated after the ICO had already begun.    In response to subpoenas issued by the SEC in connection with the SEC's parallel investigation of Centra Tech and its co-founders, Centra Tech produced to the SEC various communications between representatives of Centra Tech and "Eric Pope," concerning whether Centra Tech's ICO qualified as a securities offering subject to the jurisdiction of the SEC and applicable federal securities laws

and regulations, and Centra Tech, notably, waived any claim of attorney-client privilege over those communications.   To date, Sharma and Farkas have not informed the Government whether they or Centra Tech intend to assert any privilege claim over communications between representatives of Centra Tech and "Eric Pope."   If Sharma or Farkas intend to assert an advice of counsel defense (with respect to communications with "Eric Pope," or anyone else), the potentially privileged communications identified by the defense and the Filter Team, to the extent they are relevant to the pending charges or proving or undermining an advice of counsel defense, are likely subject to disclosure to the Prosecution Team on that basis alone, thereby eliminating any potential prejudice caused by the inadvertent exposure to those materials.

### E.  The Defendants Are Not Entitled to a Taint Hearing

The defendants' motions are based on vague and conclusory allegations, not facts supported by evidence or the record in this case, and, because the defendants have not established that the potentially privileged information that is the subject of their motion is related in substance to the criminal investigation or prosecution they are not entitled to a hearing.  *See Hoey*, 725 F. App'x at 61.   Indeed, the contents of the potentially privileged communications at issue in the Slack Search Warrant Returns were not even accessible to members of the Prosecution Team until June 12, 2018, more than two months after the criminal complaint against Sharma and Farkas (which was sworn to on March 31, 2018) and almost one month after the Indictment (returned on May 14, 2018).   In other words, the Prosecution Team had no ability to use the Slack Search Warrant Returns – and certainly no ability to use potentially privileged materials contained within them – in connection with the prosecution.   The indisputable circumstances and chronology of events undermine any notion that this case is based or built on the Government's access to

potentially privileged or work-product materials obtained from the Slack Search Warrant Returns.

Because the defendants have not identified a non-speculative basis on which to claim that the investigation leading to the present prosecution and Indictment was in any way tainted by potentially privileged communications in the Slack Search Warrant Returns, the Court should not grant their request for a hearing.  *See Hoey*, 725 F. App'x at 61 (affirming district court's denial of a request for a *Kastigar* hearing where the defendant failed to show a connection or at least make a plausible showing as to how privileged information influenced the instant prosecution); *Hoey*, 2016 WL 270871 at *4 (declining to grant a *Kastigar* hearing related to attorney-client privilege information unless the defendant could "show a distinct, as opposed to a speculative, possibility of taint" and a "connection between the *content* of the evidence to be used in the present prosecution and the protected information); *Helmsley*, 726 F. Supp. at 933 (*Kastigar* hearing not required where the defendant did not make a threshold showing that the subject matter of the challenged prosecution and the immunized testimony were related, or that there was otherwise a distinct, as opposed to a speculative, possibility of taint).

Accordingly, the Court should deny the defendants' motions for dismissal of the Indictment and disqualification of members of the prosecution team without a hearing.

### F.  A Special Master is Not Required

The defendants' request for a special master should also be denied.  The use of a designated Filter Team, like the one in place here, is a "common procedure" in this District. *United States* v. *Ceglia*, 2015 WL 1499194, at *1 (S.D.N.Y. Mar. 30, 2015); *see also United States* v. *Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *7 (S.D.N.Y. Aug. 8, 2017) (noting government use of wall review team as evidence of good faith); *United States* v. *Lumiere*, No. 16

Cr. 483, 2016 WL 7188149, at *7 (S.D.N.Y. Nov. 29, 2016) (noting proposed use of wall review team); *SEC* v. *Lek Secs. Corp.*, 17 Civ. 1879 (DLC), 2018 WL 417596, at *4 (S.D.N.Y. Jan. 16, 2018) (SEC's use of filter team "reflects respect for the privilege").   This common procedure is sufficient for this case.

Moreover, courts in this District have approved the use of Filter Teams over the objection of defendants, including in cases in which the defendants have sought the appointment of a special master.   For example, in *United States* v. *Winters*, No. 06 Cr. 54 (SWK), 2006 WL 2789864 (S.D.N.Y. Sept. 27, 2006), the court specifically found that the U.S. Attorney's Office's proposed use of a "'wall Assistant' adequately protects the defendant's asserted privilege." *Id.* at *2. While recognizing the importance of the attorney-client privilege, the court found that it must be "balanced against competing public policies, including the public's interest in the enforcement of criminal law." *Id.* at *2.   The court explained that the defendant's proposal for in camera review did not "adequately account for society's interest in the enforcement of its criminal law," because:

> [t]he documents in question were gathered during the execution of a search warrant whose lawfulness and manner of execution have not, to this point, been challenged. The Government, having lawfully conducted the initial seizure of evidence, possesses a strong interest in prosecuting crimes revealed by the same. In order to fully advance this interest, members of a Government privilege team should be permitted to review all allegedly privileged documents. Only in this manner can the privilege team acquire information necessary to challenge assertions of privilege.

*Id.* at *2.   The same reasoning applies fully in this case.   The search of Centra Tech's Slack communications was conducted pursuant to a judicially authorized search warrant.   The Filter Team should be permitted to complete its review of potentially privileged communications in the Slack Search Warrant Returns.

Although it is within this Court's discretion to appoint a special master to perform the remaining review, such an appointment is unusual and generally only done in cases involving unique circumstances.   For example, in *United States* v. *Stewart*, 02 Cr. 396, 2002 WL 13000059, at \*3 (S.D.N.Y. June 11, 2002), Stewart was a criminal defense attorney who represented numerous defendants being prosecuted by the U.S. Attorney's Office.   She shared an office with other criminal defense attorneys who similarly represented numerous defendants being prosecuted by the U.S. Attorney's Office.   When agents executed a search warrant on her office, they seized files not just from her own office, but also hard drives and networking hardware from common areas of the office that had been used by other attorneys.   2002 WL 1300059, at \*3.   This fact raised significant Sixth Amendment concerns for numerous defendants in pending criminal cases, as multiple courts have recognized in distinguishing *Stewart*.   *See, e.g.*, *United States* v. *Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258, at \*3 (S.D.N.Y. May 25, 2004) ("[U]nlike the situation in *Stewart*, there are no Sixth Amendment concerns in this case.   The seized documents were not in the files of a criminal defense lawyer, and relate to civil, not criminal, litigation that predates the indictment in this case.").   The Sixth Amendment concerns present in *Stewart* are not present here.

Nor do the cases cited by the defendants support a Special Master review in this case. Several are distinguishable in that they involve the unique circumstances of documents seized from law offices, which is certainly not the case here.   *See In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994); *Klitzman, Klitzman & Gallagher* v. *Krut*, 744 F.2d 955, 962 (3d Cir. 1984).   *Stewart*, as described, above, is distinguishable in that it involved the search of files of a criminal defense attorney who shared offices with other criminal

41

defense attorneys, all of whom represented numerous defendants being prosecuted by the U.S. Attorney's Office for the Southern District of New York.  2002 WL 1300059, at *3.  *United States* v. *Kaplan*, which the defense also cites, is also distinguishable.  No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *1 (S.D.N.Y. Dec. 5, 2003).  In *Kaplan*, the Court took issue with the fact that potentially privileged materials were turned over to the trial team and case agents *before* any challenge to the determination that those materials were subject to the crime-fraud exception could be raised by the defendant and determined by the Court.  *Id.* at 12.  That is not the situation presented here, where a Filter Team was engaged early on in the review process, and well before any determinations had been made regarding the crime-fraud exception to the attorney-client privilege.  The other main cases cited by the defendants are also distinguishable as based on the unique circumstances of those cases.  For example, in *United States* v. *Jackson*, the district court granted the defendant's request for a magistrate judge to review the defendant's potentially privileged electronic communications, when (a) the service provider had not yet produced the materials to the Government, (b) the defendant had challenged the lawfulness of acquiring the documents before the Government had received them, (c) the records were not voluminous, and (d) the appearance of fairness in using an independent reviewer was heightened given the defendant's pre-retrieval objections, "even though using government taint teams might otherwise be commonplace and fair."  No. 07 Cr. 0035 (RWR), 2007 WL 3230140, at *6 (D.D.C. Oct. 30, 2007).  These factors all weigh in favor of the Filter Team's continued review here, where (a) the Government already has the records at issue (as do the defendants), (b) the defendants have raised no challenge to the lawfulness of the seizure, (c) the records are, indeed, voluminous, and (d) Filter Team reviews are commonplace, and there is no indication that this review has been unfair.

Thus, the Court should follow the common procedure in this District and continue to permit the use of a Filter Team.

**The Defendants' Request to Continue the Trial Date by 18 Months and to Extend the Associated Motion Deadlines Should Be Denied**

The defendants also seek an 18-month adjournment of the trial date and a corresponding extension of the motions deadlines in order to review discovery, the majority of which was produced or made available to them by August 2018, more than nine months ago. While the Government has no objection to an adjournment of the trial from its current date in October 2019 to January 2020 – and a corresponding extension of the motions *in limine* and trial-related filings and disclosure deadlines – neither the amount of discovery to date nor the inadvertent release of potentially privileged documents justifies the extraordinary amount of time the defendants seek.

**I.    Factual Background**

The defendants principally complain about three categories of records that they are currently reviewing: (1) the Slack Search Warrant Returns; (2) the Sharma Devices; and (3) materials and devices related to Centra Tech and the defendants' response to grand jury subpoenas, to include Selected Devices and Hard Copy Documents, as well as six devices "that may be responsive to the grand jury subpoena" (the "Six Devices") (MTC at 5) (collectively, the "Subpoena Response Records"). The defendants also raise concerns about the Filter Team's review of the Slack Search Warrant Returns, the Sharma Devices, the Brill Laptop and the Shutt Laptop.[16] Because the defendants have mischaracterized the nature of prior and ongoing discovery, the Government sets forth the relevant facts below.

---

[16] The defense also states that it has "not yet had a chance to review . . . Robert Farkas's devices

### A. The Slack Search Warrant Returns

As described in the parties' correspondence with the Court, the entirety of the Slack Search Warrant Returns were made available or produced to all defense counsel in August and September of 2018.  (*See* Ex. J; Dkt. 60 at 2).  As described in further detail above, records marked responsive to the Slack Search Warrant were produced first on January 15, 2019, and then again on February 7, 2019.

### B. The Sharma Devices

As contemplated in the parties' correspondence with the Court, the Government produced to counsel for Sharma images of the Sharma Devices on September 27, 2018.  (*See* Dkt. No. 60 at 2 (discussing preparing to produce copies of the Sharma Devices to counsel for Sharma).   On February 7, 2019, the Government also produced, with the consent of Sharma's counsel, a copy of the Sharma Devices to counsel for Farkas on an attorneys'-eyes-only basis.   On March 26, 2019, the Government produced to the defense responsive records recovered from Sharma's Apple MacBook; on April 15, 2019 and May 6, 2019,[17] the Government produced responsive records

---

to see if there are any attorney-client privileged documents that were released to the prosecution team."  (MTC at 2).  As the defense is aware, Farkas signed a consent form for the search of two cellular telephones, a thumb drive, and a laptop.  (*See* Ex. O).  Records from Farkas's cellular telephones were provided to counsel for Sharma, on consent and on an attorneys'-eyes-only basis, on August 10, 2018.   At no point have any defendants requested that the records from the devices be subject to a Filter Team review, and Farkas has waived any claim of privilege he may have had over communications contained in those devices.

[17]  After the April 15, 2019 production, the Government became aware that certain categories of the iPhone7 data produced on April 15, 2019 had not actually been marked responsive, but were nonetheless included in the April 15, 2019 production.   Therefore, the Government re-produced only the responsive data from the affected categories on May 6, 2019.

recovered from Sharma's iPhone 7; and on May 6, 2019, the Government produced responsive records recovered from Sharma's iPhone 10.

### C.  The Subpoena Response Records

#### 1.  The Selected Devices

As described in the parties' joint submissions to the Court, images of the Selected Devices, which were exact replicas of the contents of those devices, were previously made available to all defense counsel in August 2018.    (*See, e.g.*, Dkt. No. 60 at 2-3).    Those images included images of the Brill Laptop and the Shutt Laptop.    On January 31, 2019, the Government informed defense counsel that, consistent with the parties' previously-agreed upon protocol for review of the Selected Devices, the Filter Team had run a series of searches designed to identify potentially privileged records from the Shutt Laptop, and had divided the results into three categories:    (1) 10,121 documents not responsive to the search terms run by the Filter Team ("Group One"); (2) 821 documents responsive to generic privilege search terms run by the Filter Team ("Group Two"); (3) 419 documents responsive to the list of attorney names provided by the defense and run by the Filter Team ("Group Three").    The Government informed the defense that the Filter Team was prepared to release the documents that were not responsive to the search terms – the Group One documents – but, out of an abundance of caution, requested that the defense inform the Government as to whether it had any objection to the release of the Group One documents prior to their release.    The defense objected to the release, and requested to review the Shutt Laptop records before they were released to the Prosecution Team.    The Government then proposed that it could re-produce the Shutt Laptop records to the defense, sorted by Group One, Group Two, and Group Three, to help facilitate the defense's review of the records for potential attorney-client

privilege assertions.   On February 4, 2019, the defense agreed to this procedure, and agreed to provide the Government with a privilege log for any potentially privileged materials in two weeks. Pursuant to this agreement, on February 7, 2019, the Filter Team re-produced the Shutt Laptop records sorted by Group One, Group Two, and Group Three, and requested that the defense team inform the Filter Team by February 22, 2019 as to whether they had identified any potentially privileged documents in Group One and, if so, produce a privilege log of the materials.   Since February 22, 2019, defense counsel indicated they needed additional time to review the Shutt Laptop records.   (Dkt. 108 at 3; Dkt. 114 at 2).   To date, the defense has not provided a privilege log and has conveyed that they are taking steps to address the request but will not be able to do so for several months.   (Dkt. 114 at 2).

As described above, an image of the contents of the Brill Laptop was produced to all defense counsel on August 20, 2018.   In the course of the Filter Team's review of the Brill Laptop records, the Government requested that FBI's CART export files from the Brill Laptop to facilitate review of the data, and to make those files available to the Filter Team.   On March 14, 2019, the Government offered to re-produce the Brill Laptop records in the form of these exported files to the defense, although the defense may have already exported the files from the August 20, 2018 production for their own review.   Defense counsel for Sharma conveyed that he would like to receive the exported files, and the Government produced those files to him on April 9, 2019.

### 2.  The Six Devices

In approximately June 2018, the Government became aware that former outside counsel for Centra Tech, at Ballard Spahr, had (a) collected forensic images of Centra Tech computers used by Sharma and Farkas (among others), and collected Centra Tech email accounts of (among

46

others) Sharma, Farkas, and Trapani in response to subpoenas issued to Centra Tech by the SEC in connection with the SEC's parallel investigation of Centra Tech; and (b) Ballard Spahr began the process of reviewing these and other materials collected by Ballard Spahr, segregating privileged materials, and producing to the SEC the non-privileged materials that were responsive to the SEC's subpoenas, but Ballard Spahr did not complete Centra Tech's production of non-privileged materials called for by the SEC's subpoenas.  (Dkt. 31 at 1 fn. 1).  The Government also learned that Ballard Spahr was no longer representing Centra Tech in the criminal matter, although Ballard Spahr still had possession of materials responsive to the April 2018 Subpoenas. The Government then began conferring with defense counsel for the defendants about how and when Centra Tech would comply with the outstanding April 2018 Subpoenas as to the Centra Tech materials in the possession of Ballard Spahr.   For almost a year, the Government has continued to attempt to confer with counsel for the defendants about their obligations to respond to the April 2018 Subpoenas, both on behalf of Centra Tech and themselves as individuals.   In response these requests, including as recently as April 2019, defense counsel for Sharma and Farkas have conveyed that they are taking steps to address the requests but would not be able to do so for several months.  (Dkt. No. 114 at 2).  On April 29, 2019, in their Motion for a Continuance, defense counsel reported, for the first time, that they were "in possession of images of six selected devices (three laptops and three phones) that may be responsive to the grand jury subpoenas." (MTC at 5).  The defense has not identified the owners or users of the Six Devices, and has informed the Government that it does not intend to identify the owners or users of the Six Devices.

## II.    **Relevant Law**

"[A] district court has a great deal of latitude in scheduling trials." *United States* v.

*Griffiths*, 750 F.3d 237, 241 (2d Cir. 2014) (quoting *Morris* v. *Slappy*, 461 U.S. 1, 11 (1983)); *see also United States* v. *Budovsky*, No. 13 Cr. 368 (DLC), 2016 WL 386133, at *10 (S.D.N.Y. Jan. 28, 2016); *United States* v. *Al Fawwaz*, 116 F. Supp. 3d 194, 209 (S.D.N.Y. 2015).   This is so because of the inherent logistical difficulties in scheduling trials: "Not the least of [trial courts'] problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons."   *Morris*, 461 U.S. at 11.

Thus, "trial courts enjoy very broad discretion in granting or denying trial continuances." *United States* v. *Stringer*, 730 F.3d 120, 127 (2d Cir. 2013).   A decision to grant or deny a request for an adjournment is reviewed for abuse of discretion, and the Court of Appeals "will find no such abuse unless the denial was an arbitrary action that substantially impaired the defense."   *Id.* (citation omitted).   Thus, a defendant must show "both arbitrariness and prejudice in order to obtain reversal" based on a denial of a continuance.   *Id.* at 128 (citation omitted). "Only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to assistance of counsel" in a criminal case.   *United States* v. *Scopo*, 861 F.2d 339, 344 (2d Cir.1988) (quoting *Morris* v. *Slappy*, 461 U.S. 1, 11-12 (1983) ("Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel.").   Finally, "[t]he burden of showing [substantial impairment of the defense] is on the party complaining of the lack of a sufficient continuance."   *United States* v. *O'Connor*, 650 F.3d 839, 854 (2d Cir. 2011).

The "societal interest in providing a speedy trial . . . exists separate from, and at times in opposition to, the interests of the accused."   *Barker* v. *Wingo*, 407 U.S. 514, 519 (1972).   A

speedy trial "serves the public interest by, among other things, avoiding extended pretrial delays, which may impair the deterrent effect of punishment." *United States* v. *Bert*, 814 F.3d 70, 83 (2d Cir. 2016) (citation and internal quotation marks omitted). Moreover, there is a "risk [of] loss of important evidence" if a trial is unduly delayed. *Id.* (citation omitted). "Certainly, the public is the loser when a criminal trial is not prosecuted expeditiously, as suggested by the aphorism, 'justice delayed is justice denied.'" *Id.* (citation omitted); *see United States* v. *Moreno*, 789 F.3d 72, 78 (2d Cir. 2015) (mentioning the "public's interest in a speedy adjudicative system" (citation omitted)). Ultimately, the defendant's right to a speedy trial is not so "unqualified and absolute that it must prevail over the demands of public justice." *United States* v. *Ghailani*, 733 F.3d 29, 42 (2d Cir. 2013) (citation and internal quotation marks omitted).

### III.    <u>Discussion</u>

The defendants first argue that a lengthy adjournment is warranted so that they can review the Government's Rule 16 productions. But the defendants have had the vast majority of the records that form the basis of the instant motion for several months, and, indeed, some of them since August 2018. For example, the Brill Laptop and Shutt Laptop records have been in their possession since August 2018. The Government's re-productions of Shutt Laptop materials on February 7, 2019 and Brill Laptop materials on March 14, 2019 were designed to help facilitate the defendants' review of materials they had had access to since August 2018. To be clear, the Shutt Laptop materials were re-produced (in a format organized by the Filter Team) out of an abundance of caution, notwithstanding that the parties had already agreed on a protocol regarding those same materials. The Slack Search Warrant Returns, too, have been in the possession of the defendants for several months: (1) first, since September 2018, in their entirety, and (2) second, in

the form of the vastly smaller subset marked "Responsive," since at least February 7, 2019 (which does not account for the earlier, January 15, 2019 production with which the defense experienced technical difficulties).  To the extent the defense needed to review the Slack Search Warrant Returns in order to, as they argue, review "conversations from numerous potential witnesses and/or contributors amongst themselves and/or with Centra Tech and the defendants," (MTC at 3) they offer no reason why they were unable to accomplish this task in the approximately eight months that they have had the entirety of the Slack Search Warrant Returns and no reason why they will not be able to do so in the next four months.

Similarly, the Government produced the entirety of the Sharma Devices to Sharma on September 27, 2018, and also to Farkas's counsel on February 7, 2019.  Upon the Filter Team's segregation of potentially privileged records contained in the Sharma Devices, the Government expeditiously reviewed those records and produced them on a rolling basis on March 26, 2019 (responsive records recovered from Sharma's laptop), April 15, 2019 (responsive records recovered from Sharma's iPhone 7), and May 6, 2019 (responsive records recovered from Sharma's iPhone 7 and iPhone 10).  Contrary to the defense's assertion, the responsive records from Sharma's laptop were Bates-stamped (USAO-SHARMA-1B8-00000001 – USAO-SHARMA-1B8-00017259) and comprise records which were produced as "load files" and readily viewable on standard document review platforms.  With respect to the responsive records from Sharma's iPhone7 and iPhone 10, the Government produced those records in the same format that the Filter Team and the Prosecution Team viewed them, via a software program (which was also

provided to the defendants) that readily allows for searching and sorting the records.[18]

In short, nothing about the Government's Rule 16 productions warrant the 18-month continuance that the defendants now seek.   The production of electronic evidence from computers and cellphones in a white-collar case, especially one in which the defendants so heavily used electronic communications to commit the offense conduct, is a highly typical occurrence. Defense counsel have had the bulk of these electronic records for several months, and, by the time of the current trial date in October they will have had the vast majority of the records for more than a year.   The 18-month delay the defendants now seek is wholly unwarranted, and would undermine the public's (and the victim investors') interest in a speedy trial, risk the loss of important evidence such as witness memories, and impair the deterrent effect of punishment. *Bert*, 814 F.3d 70, 83.   To the extent the defendants need any additional time to review the Rule 16 discovery, the Government would agree to a brief adjournment of the current October 19 trial date to January 2020, and to extensions of the motions *in limine* schedule, which would give the defendants an additional three months before trial to review the discovery.

The defendants also argue that they need an adjournment so that they can review data from the Six Devices in order to comply with their obligations to respond to the grand jury subpoenas. The Court should reject this argument outright.   The defendants were served with grand jury subpoenas on April 2, 2018 – more than *one year* ago – and the Government has repeatedly requested that they comply with those subpoenas throughout the course of the past year.   The

---

[18]  In their Motion for Continuance, the defendants for the first time complain of technical difficulties opening the files related to the responsive records.   The Government has previously assisted defense counsel with their technical difficulties regarding other Rule 16 materials, and has offered its assistance with respect to these materials.

defendants cannot use their failure to promptly comply with grand jury subpoenas for more than a year as an excuse to delay the trial.   The defendants' assertion that they "will have to manually review all of the data from these devices" *after* they are done with their review of the Rule 16 discovery in this case, and that their review for will take "several months" is confounding.   The defendants have thus far not identified the Six Devices or the volume of the data to be reviewed, and, despite multiple requests by the Government, have refused to identify the users of the Six Devices – all of which would be relevant to the substance and length of their review.   The defendants cannot rely on their failure to comply with grand jury subpoenas to justify their request for an adjournment of the trial date.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny the defendants' motions in their entirety.

Respectfully submitted,

CRAIG STEWART
Attorney for the United States
Acting Under 28 U.S.C. § 515


By:    /s_____
Samson Enzer / Negar Tekeei
Assistant United States Attorneys
(212) 637-2342 / -2482


Dated: May 20, 2019
        New York, New York