UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 18 Cr. 340 (LGS) |
| | : | |
| - against - | : | |
| | : | |
| ROBERT FARKAS, | : | |
| | : | |
| Defendant. | : | |

-----------------------------------------------------x

**DEFENDANT ROBERT FARKAS'**
**SENTENCING MEMORANDUM**

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ........ 1

DISCUSSION ........ 4

1. THE PRESENTENCE REPORT AND THE GUIDELINES CALCULATION ........ 4
2. RJ'S PERSONAL HISTORY AND CHARACTERISTICS ........ 4
   A. RJ'S DEDICATION TO HIS FIANCÉE AND INFANT DAUGHTER IN THE FACE OF RECENT AND SERIOUS ADVERSITY ........ 5
   B. RJ'S COMPASSION AND STRENGTH HAVE HELD HIS IMMEDIATE FAMILY TOGETHER AND HELPED HIS SIBLINGS THROUGH TRULY TOUGH TIMES ........ 12
   C. RJ IS A TRUSTED AND RELIABLE FRIEND ........ 17
   D. RJ'S KINDNESS TO STRANGERS AND CHARITY WORK ........ 19
   E. RJ'S REMORSE AND HOW THAT HAS CHANGED HIM ........ 20
   F. RJ HAS A STRONG SUPPORT NETWORK AND WILL CONTRIBUTE TO SOCIETY ........ 23
   G. RJ'S SERIOUS MEDICAL CONDITION AND PROGNOSIS ........ 25
3. THE NATURE AND CIRCUMSTANCES OF THE OFFENSES ........ 29
4. THE REMAINING 18 U.S.C. § 3553(A) FACTORS SUPPORT TIME-SERVED WITH HOME CONFINEMENT AND COMMUNITY SERVICE ........ 35

CONCLUSION ........ 38

# TABLE OF AUTHORITIES

**Cases**

*United States v. Algahaim*,
842 F.3d 796 (2d Cir. 2016)....................................................................32, 33

*United States v. Behr*,
No. S1 03CR1115-02 (RWS), 2006 WL 1586563 (S.D.N.Y. June 9, 2006)....................36

*United States v. Johnson*,
No. 16 Cr. 457 (NGG), 2018 U.S. Dist. Lexis 71275, (E.D.N.Y. Apr. 25, 2018)..............................................................................................32, 33

**Statutes**

18 U.S.C. § 3553(a)........................................................................................ *passim*

**Other Authorities**

Bransfield, Robert C. "Neuropsychiatric Lyme Borreliosis: An Overview with a Focus on a Specialty Psychiatrist's Clinical Practice."*Healthcare (Basel, Switzerland)* vol. 6,3 104. 25 Aug. 2018, doi:10.3390/healthcare6030104......................27

Bransfield, Robert C. "Suicide and Lyme and associated diseases Neuropsychiatric *disease and treatment* 13 1575-1587, 16 June 2017, doi 10.2147/NDT.S136137 ...............................................................................27

Hajek et al. Am J Psychiatry 2002; 159:291-30 IAn Overview with a Focus on a Specialty Psychiatrist's Clinical Practice.".......................................................26

https://www.nytimes.com/2018/04/02/technology/virtual-currency-arrest-centra.html...........................................................................................36

Lyme and Other Tickborne Diseases Increasing, Centers for Disease Control and Prevention, *available at:* https://www.cdc.gov/media/dpk/diseases-and-conditions/lyme-disease/index.html.........................................................26

Post-Treatment Lyme Disease Syndrome, Center for Disease Control and Prevention, *available at:* https://www.cdc.gov/lyme/postlds/index.html...................27, 28

Signs and Symptoms, Columbia University Irving Medical Center, *available at:* https://www.columbia-lyme.org/signs-and-symptoms;...........................................28

Treatment, Center for Disease Control and Prevention, *available at:* https://www.cdc.gov/lyme/treatment/index.html..................................................27

**PRELIMINARY STATEMENT**

Defendant Robert "RJ" Farkas is deeply remorseful and accepts responsibility for the actions that bring him before this Court to be sentenced. He recognizes his severe lapses in judgment and is grateful for the opportunity to apologize to all those individuals he hurt.

Notwithstanding the consensus of the government, the Probation Office, and the defense that RJ was a "minor participant" in the crimes he committed, he did engage in criminal conduct for which there is no excuse and for which none is offered. RJ's story, however, is also one of redemption; it is a story of someone who accepts his guilt and who has demonstrated a genuine and abiding commitment to building a new and successful life for himself, his fiancée, and their infant daughter. In the years since his arrest, RJ has worked hard to become a changed and better person, and he has done so. He has learned his lesson – this is his first, and will be his last, involvement in criminal activity. He has demonstrated to the Court through his actions from the initiation of this prosecution to date that he is prepared to lead a productive and law-abiding life as a husband, father, son, brother, and friend.

RJ is a 34-year old college dropout who has struggled [redacted] for much of his life. As a result, he was academically challenged and had difficulty in high school and college, and thus left West Virginia University after his first semester there. Before his involvement with the company at the center of this prosecution, Centra Tech, RJ had only been employed in unskilled and manual labor positions, including working as a tile installer for his father's business in New Jersey. After moving from New Jersey to Florida in 2015, he served as a bartender for events and as a waiter at a Bonefish Grill restaurant.

Instead of gaining a fresh start from the move to Florida, RJ's career prospects seemed to be fizzling.

RJ's life, however, appeared to take a turn for the better when his sister's boyfriend, co-defendant Sohrab "Sam" Sharma, offered him a job at his technology start-up company, Centra Tech, to work on its initial coin offering. But what at first blush appeared to RJ as an extraordinary opportunity – even one that could be a classic "plucked from obscurity" story – immediately went wrong. Indeed, rather than being on the cutting edge at a successful technology start-up, RJ wound up committing two crimes: conspiracy to commit securities fraud and wire fraud, to which he pleaded guilty before the Court.

In his letter to the Court, RJ acknowledges that he acted wrongly, accepts full responsibility for his crimes, and is deeply remorseful for his conduct. He also discusses how his young family has brought new and profound meaning to his life. In addition, the letters from family, friends, and others who have known RJ, which have been provided to the Court, present a full – and very positive – picture of RJ, revealing his true character and how committed he is to moving forward in his life with resolve to never again take actions like those that have put him before the Court for sentencing. To be sure, the information presented in this memorandum overwhelmingly evidences that RJ is a good person who deserves a second chance. Those who know him best – including all those who have written letters to the Court – attest to his core goodness, kind heart, and dedication to family, and their belief in him, willingness to stand by him, and desire to be there for him when he returns to society. As the Probation Office noted in its evaluation, RJ "has the ability to

overcome this incident" and be "a productive member of society." (Presentence Investigation Report ("PSR"), at 47 ("Justification")).

RJ is now before the Court to be sentenced as a non-violent, first-time offender for crimes he admits he committed, but in which he indisputably played a minor role. Based on the factors set forth in 18 U.S.C. § 3553(a), many compelling sentencing considerations exist that justify a sentence well below both the stipulated advisory Guidelines range of 70 to 87 months' imprisonment and the Probation Office's recommendation of 60 months' imprisonment. These reasons include:

- RJ was a "minor participant" in the offense conduct;
- RJ has already spent time in jail and has been on very restrictive pretrial conditions for over two years with which he has been fully compliant;
- An ongoing and serious health condition [redacted];
- A young daughter who [redacted] who depends on the presence of her father in the family home;
- The fact that, unlike in many fraud cases, the victims here have a viable means to recuperate their losses;
- The kind of person RJ genuinely is, and will be, going forward in life; and
- The effect of the difficult lesson learned by RJ and his inherent character dictate that there is no risk of recidivism.

Given the specific § 3553(a) factors in this case, the defense respectfully submits that a sentence of time-served with home confinement and a substantial amount of community service is a sentence "sufficient, but not greater than necessary" to meet all of the § 3553 sentencing factors.

## DISCUSSION

1. **The Presentence Report and the Guidelines Calculation**

The final PSR was issued on September 16, 2020. The PSR agrees with both parties' United States Sentencing Guidelines ("Guidelines") calculation of a total offense level of 27, resulting in a Guidelines range of 70-87 months' imprisonment as RJ has no prior criminal record (or even any contacts with the criminal justice system) and is in Criminal History Category I. (PSR ¶ 8.) In calculating the Guidelines, the Probation Office agreed with the defense and government that RJ was entitled to a two-level reduction because he was a minor participant in the charged conspiracies. (*Id.* ¶ 6.) Acknowledging RJ's minor role and the fact that he has "learned the importance of a law-abiding lifestyle" and now shoulders the responsibilities of being a "first-time father," the Probation Office recommended a downward variance from the applicable Guidelines range. (*Id.*at pp. 45-47.)

2. **RJ's Personal History and Characteristics**

Pursuant to 18 U.S.C. § 3553(a)(1), in arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court "should consider, among other factors, the nature and circumstances of the offense and *the history and characteristics of the defendant*." (Emphasis added.) An examination of RJ's personal history and characteristics reveals that a significant downward variance is warranted. This fact is evidenced by information provided to the Court within the letters of support from family members (Exhibit A), friends (Exhibit B), and importantly, RJ himself (Exhibit C).

**a. RJ’s Dedication to His Fiancée and Infant Daughter in the Face of Recent and Serious Adversity**

To truly understand who RJ is as he stands before the Court for sentencing, and how he will be in the future, a good starting point is his relationship with his fiancée Donna Velez; the couple’s relationship with the newborn daughter they have begun to raise; the traumatic experiences the family has recently endured that have brought the family closer and made RJ stronger; and how faith, resolve, and caring have helped him handle the turbulent past few years.

In 2015, RJ moved from New Jersey to Florida (where some of his family members lived) with Donna, who he was dating at the time. (PSR. ¶¶ 205-08.) RJ’s and Donna’s relationship has gradually developed from two young people dating into a loving, caring and permanent bond. Although his arrest and prosecution have understandably placed tremendous stress on their relationship, it has flourished nonetheless.

RJ and Donna are now the proud parents of a 10-month old daughter, I.F, and engaged to be married. (*Id.* ¶ 184.) The birth of the child naturally drew the couple closer with new and important responsibilities. In the letter of support she submitted, Donna explains to the Court how RJ has developed from boyfriend to fiancé to father and family champion.

Unfortunately, some near-tragic events have served to draw RJ and Donna even closer. [redacted] RJ’s mother, Cynthia Farkas, details for the Court in her letter how Donna [redacted]

[redacted] (Ex. A, Cynthia Letter.) Cynthia recounts:

> To see my son crying and begging the doctor to save her life and praying on his knees is something no mom wants to witness. Why I am saying this is because, I said to my son are you going to investigate the doctor, [redacted] He said, "Mom I'm blessed, they saved her life, things happen for a reason. Thank you, God, we are good." He never for a second, wanted to place blame, he recognized how much worse it could have been, and was thankful for the outcome. He always sees the bigger picture and recognized God was on our side. [I.F.] is the love of his life, our angel from God . . . .

(*Id.*) RJ describes the horrific incident in his letter to the Court as follows:

> When my first child [I.F.] was born ten months ago, my fiancé and I went to the hospital for what was supposed to be a [redacted] We were so excited in our scrubs just before the surgery. Moments later, nurses rushed me into the delivery room. I thought it would be to take a quick photo, but as soon as I got into the room I knew something was wrong. There was [redacted]. Nurses handed my fiancé Donna our new baby girl but instead of Donna's smile I watched her [redacted]. Thanks to God and the doctors she was alive.

(Ex. C, RJ Letter.) Donna also tells the Court about the trauma she underwent giving birth to their daughter and how RJ was there for her as her biggest advocate, possibly saving her life, and staying continually by her side when he was not in the nursery visiting their newborn baby girl. (Ex. A, Donna Velez Letter.) RJ physically saw her through [redacted] the difficult childbirth and helped her emotionally address the pain and grief of realizing [redacted]. She writes:

> RJ reassures me every time I think about that fact [[redacted] there's no way he would allow or want me to be pregnant again. I feel our relationship changed after that day. Of course, just from the fact that we were blessed with a beautiful baby girl but also we realized we never want to lose each other or be without each other. RJ is the most devoted fiancé I know. There's not many men like him these days and I do consider myself blessed. Not lucky but blessed that I have a man like him. There is no one more patient, kind and loving daddy. Seeing RJ with our daughter is such a beautiful thing. She is only 9 months old and already has him wrapped around her little finger. His tenderness with her is unimaginable.

(*Id.*)

RJ's father describes their ordeal: [redacted] She was put on [redacted] (Ex. A, Robert Farkas, Jr. Letter.)[1] He too describes the heartbreaking reality that RJ and Donna will [redacted] [redacted], and the fact that they nearly lost their daughter shortly thereafter. (*Id.*) Donna's mother recalls that during her anguish during I.F.'s birth, "I saw Robert kneeling in the hospital corridor crying like a baby and praying for his fiancé and for his baby girl." (Ex. A, Lucy Velez Letter.)

A friend of Donna's, Nichole Perricho, a BSN RN and former labor and delivery nurse who has only known RJ for three years, also recounts the medical emergency and trauma of I.F.'s birth and attests to RJ's devotion to Donna and his daughter. (Ex. B, Perricho Letter.) She describes how "mayhem struck" in Donna's [redacted] "[redacted] . . . Robert never left her side. I truly believe the love and

[1] RJ's father's full name is Robert Farkas, Jr., and RJ is Robert Farkas, III.

prayers she felt from him alone saved her life[.]" (*Id.*; *see also*, Ex. B, Marina Quagliato Letter.)

The couples' serious difficulties were unfortunately not over once Donna recovered and they left the hospital with I.F. At about one-month-old, [REDACTED].

RJ recounts:

> Six weeks later on a Sunday afternoon our little family was on the couch when Donna noticed [REDACTED]

(Ex. C, RJ Letter.) As RJ's mother describes it:

> [REDACTED] RJ comforted [I.F.] and told Donna it was going to be ok. Donna [REDACTED] and my son, the young man I raised was going to be an amazing father, just like his dad, my husband. This is the type of person he really is. RJ never lost sight of the light at the end of the tunnel and comforted and prayed for his entire family when everything really was not ok at the moment.

(Ex. A, Cynthia Letter.) From Donna's perspective, horrific as this incident was, it brought out the best in RJ:

> [REDACTED] As a first-time mom I was a complete mess. Thinking the absolute worst, I was a deer in headlights. RJ is the one who took over speaking to doctors, nurses, specialists. The one who lead this family through such a hard time. I wouldn't have been able to go through that without him by my side. Even writing this right now is bringing tears to my eyes. RJ is going through so much in his life and yet never puts any stress on me or makes me worried about the future, he always try's [*sic*] to keep his emotions at bay to not stress ME out! I really don't know how he does it. He always finds light in every situation. He is such a positive energy.

(Ex. A, Donna Velez Letter.) In the end, as RJ states, "By the grace of God we had caught it early enough that 14 days in the [REDACTED] and we were told that she would grow up to be a normal healthy child." (Ex. C, RJ Letter.)

It is important to point out that, as RJ astutely states in his letter, these incidents are not shared with the Court "for sympathy or pity, but I share these experiences to explain to you how close I am with God now." (*Id.*) Other writers confirm RJ's deep commitment to his faith and how it has helped him. (*See, e.g.*, Ex. A, Donna Velez Letter; Ex. B, Nicole Perricho Letter.) RJ's mother writes that "RJ is the most religious in our family, but we have all become so much more in tune with our faith because of him. . . . No matter what, he has his strong faith to get him through." (Ex. A, Cynthia Letter.) RJ's older sister, Kristina, explains that in her darkest hour, "I wanted to give up, he begged me to turn to God and see the blessings right in front of me." (Ex. A, Kristina Letter.) She further explains their shared faith and how her daughter, RJ's goddaughter, "loves calling him and telling him about her volunteer work, her faith in God, as well as her success in school and on the basketball court as he loves the sport too." (*Id.*)

Although the world is in lockdown due to the pandemic and RJ has restrictions on his freedom, he and his family still get together to attend church online. (*See, e.g.*, Ex. A, Brielle Farkas Letter). RJ's faith is even apparent to his more recent friends. Nicole Perricho, a friend he met through Donna, believes RJ "is a selfless man, god worshiping, the kind of person that would give his shirt off his back for a complete stranger." (Ex. B, Perricho Letter.) RJ explains to the Court, "I owe my life to God and I'm forever grateful for him saving the lives of my family. These two and half years since my arrest have completely

destroyed me yet have slowly built me back into a better, smarter more grateful human being." (*Id.*) Similarly, Donna describes RJ as a young father with a recovering young mother who still managed to be the rock for everyone:

> He's fallen into fatherhood so effortlessly. I always knew RJ would be a good father though. He is the definition of a family man. RJ has 3 sisters and it truly amazes me how he goes above and beyond to help and be there for them. Whether its [*sic*] one of them needing an oil change or one of them needing guy advice, RJ is always there. But that's my RJ, always trying to help and be there for others. RJ is the most selfless person I've ever met. He would give the shirt off his back for anyone in need. RJ is the kind of person that always puts other peoples [*sic*] happiness and needs before his own.

(Ex. A, Donna Velez Letter.)

Nearly every letter, whether written by friend or family, conveys that RJ is an exemplary family man and a wonderful father. Family was always RJ's priority, as his uncle Chris Farkas notes: "We'd talk about his different ideas for his future including finding a career that would lead to a good steady job… and starting a family. He looked forward to one day becoming a good father figure the way his own dad was to him. I have always been proud of him and his accomplishments...." (Ex. A, Chris Farkas Letter.)

Friend Marina Quagliato recognizes that RJ "is the rock in [*sic*] which not only Donna leans on, but his whole family, and now his baby daughter too." (Ex. B, Marina Quagliato Letter.) His sister Daisha's husband, Travis Lee, has also seen RJ for the amazing father he is: "Robert is now a father and my respect for him as a man is how amazing he is to his daughter and future wife. Every time we are there, he is feeding her, changing her, playing with her, and putting her to sleep. He gets up early just to be the first-person [I.F.] sees in the morning. He is the type of father I wish my father were to me." (Ex. A, Travis Lee Letter.) RJ's niece, A.M., also describes, in her letter, seeing RJ as a dad to his daughter,

and contrasts him with her own father, who was a far less active father. "He's a really good Dad, I wish my dad had been like him growing up." (Ex. A, A.M. Letter.)

Another important aspect of RJ's dedication to his family is reflected in the letters of Donna's mother and her close friends. All describe the positive impact RJ has had on Donna independent of his interventions during her [redacted]. Donna's mother, Lucy Velez, writes in her letter of a man from a good family who has changed her daughter's life and stepped up to all challenges he has faced: "He comes from a good, hard-working family. He is a good son and brother to his three sisters. He is always ready to help his parents and sisters when they need him. He is also [a] volunteer at an organization for the protection of animals." (Ex. A., Lucy Velez Letter.) Not only has RJ changed his own life, but he changed her daughter Donna's: "When my daughter met Robert, my daughter was not the [*sic*] in the right path. She was not well. But with Robert's patience, love, and guidance, little by little, he was able to make my daughter change." (*Id.*).

Donna's friends have observed the same attribute. Nicole Perricho knew Donna to be in a "time of darkness in her life" when she met RJ, and feels, "If it wasn't for Robert, I don't know that Donna would be who she is today. Because of Robert we have the best version of Donna today, you can tell she is loved [], cared for, and treated with undoubted respect. Being in the presence of the two of them is nothing shy of magic." (Ex. B, Nicole Perricho Letter.) As Donna's childhood best friend, Deanna Kroon, a Registered Diagnostic Medical Sonographer who has known RJ for nearly five years, writes:

> Although I have not known Robert for very long, I know how much of a positive impact he has made in Donna's life since they have met. Donna's life has been forever changed for the better since she met Robert and that is something I am thankful for because all I could ever want for my friend is a

> man that will care for her, support her, and make her happy and I know that is what Robert provides for her.

(Ex. B, Deanna Kroon Letter.) RJ's love for Donna has noticeably helped her to come out of a time of darkness in her life and survive the traumas the last year have brought. And overall, how he handled the events described above shows that he has much to offer and is deserving of the Court's mercy.

**b. RJ's Compassion and Strength Have Held His Immediate Family Together and Helped His Siblings Through Truly Tough Times**

RJ was raised in semi-rural New Jersey. His father, Robert Farkas, Jr., was self-employed in the construction industry as a tile installer. (PSR ¶ 182.) His mother, Cynthia, ran the household and helped her husband with the administrative side of his business. (*Id.*) RJ was fortunate to have had what he considered a good childhood growing up in a middle-class household with a close nuclear family. (*Id.* ¶ 183). His parents instilled in him the value of a good work ethic, waking him up as a child to do calisthenics in advance of his sports practices for baseball, soccer, tag football, and roller/ice hockey. (*Id.*)

Because of his parents' influence during his formative years, RJ witnessed and learned the responsibilities of being a parent. These traits are now part of his personality and have guided him to be a dedicated father and provider for his family.

RJ's mother tells the Court that first and foremost she is:

> [T]he proud mother of Robert Farkas. Proud because as a mom, all you could wish for is your children to treat people the way you want to be treated. He is always so respectful & loving to his three sisters, family, and friends. I know every mom writing probably says the same thing but kindness to people who are less fortunate than you is one of the biggest life lessons you can teach your children, a love of all living creatures is one of my greatest gifts I pride myself on teaching them.

(Ex. A, Cynthia Farkas Letter.) She describes a son who was never in trouble, whose "character and kindness radiate when you talk to him." (*Id.*)

RJ has three sisters: two full sisters who are younger than he, Daisha and Brielle, and one paternal half-sister who is older, Kristina.[2] (*Id.* ¶¶ 182-83.) Without exception, each describe him as a great brother and a – if not the – primary positive influence in their lives. He was always supportive of his sisters, encouraging them to be better at whatever they were doing and providing guidance when they endured difficult circumstances. RJ's sisters have all written meaningful letters detailing the closeness of their respective relationships with RJ, how he is the glue of the family, how he is there for – and sacrifices for – others, and how this case has actually changed him for the better.

Daisha describes RJ as "a kind-hearted person who has supported me my whole life." (Ex A, Daisha Letter.) As a child, she had brain surgery, five major ear surgeries and a learning disability but she always knew RJ was there for her. (*Id.*) In her letter, she recalls the fear she had at age 12 when she went to the hospital for her brain surgery because she did not understand why it was happening. (*Id.*) RJ "took care of me the entire time after I got home. He would help me walk to the bathroom, bring me my food and drinks…, and help me get upstairs to my bed at night. I could not do much on my own and it gave me comfort to know that not only did I have my parents but my brother too." (*Id.*). RJ's support was not limited to major life events but included the everyday: "Every time I would come home crying after school, he would always hug me and let me cry on his shoulder. Without hesitation he would tell me everything is going to be ok even though I did not think so at the

---

[2] The PSR incorrectly spelled Kristina's name as "Christina."

time. He would always tell me people are just mean and that I am the bigger person because I did not say anything back to a bully." (*Id.*)

RJ also was there for and counseled his sister when she was 17 and was trapped in an abusive relationship. She had previously hidden the relationship from him:

> My brother and I tell each other everything so when he found out that I never told him he was upset. He kept asking me why and that he could've helped me through it. Robert looked me into my [*sic*] and asked if I was okay and hugged me. We cried together and he said please tell me things so I can help you through it. He told me he felt like he failed me because he did not know that I was in such a toxic relationship. I told him it was common for people who had been abused to not say anything about it. He was always my protector and I felt like I was trapped, and it was better if I pretended it never happened. My brother's reaction is why he is a perfect father to his beautiful daughter.

(*Id*.) Though she simply wanted to move on and bury the pain and embarrassment, RJ wanted to be sure she was mentally and physically well.

RJ's other younger sister, Brielle, describes a family she never wanted to leave and a brother she adores that she has relied on for her entire life. (*See generally*, Ex. A, Brielle Letter.) She too views RJ as the rock of the family and the glue keeping them all together. She explains how RJ and Donna had moved to Florida, moving in to their first apartment together, but despite that, RJ invited his other sister Daisha to live with them because he knew she could use a fresh start as well:

> He's always been the person in our family to show us the importance of being together. RJ has always made me want to be a better sibling, not by the things he'd say, just by his actions. Our sister Kristina lived about 4 hours from us in Leesburg, Florida and she was going through the toughest time of her life. Her whole marriage was abusive, and my brother was constantly reassuring Krissy of her worth. During this time, RJ was looking for new ways to make ends meet in Florida. He used to work with my dad in New Jersey, late into the night installing hard flooring in grocery stores, hospitals, residential houses and more. As a family, we've all watched our dad work hard on his hands and knees to provide for us. This type of work for so many years can really wear down on your body and RJ knew he wanted to find success another way.

(*Id.*) RJ's older half-sister Kristina describes a happy childhood she shared with RJ. Though she was the older sister, "RJ would try to help me anytime I was struggling or scared … he would encourage me that I could do it." (*Id.*) His impact on her life has been profound, as told at length in her own words:

> RJ has always been considerate and thoughtful…. My brother has had a tremendous impact on my life. He's always there to help you see the other side of things or to make you smile after a tough day, to give you a pep talk of encouragement when you need to pick your chin up and to remind you to have faith in God. He's been my reminder of strength, courage, hope, kindness and love throughout my life and especially in my past few adult years when I found myself in an abusive marriage for 13 years with a Federal Corrections Officer.
>
> My brother continued to give me hope. When I thought I couldn't leave this man, he encouraged me to understand I was indeed strong enough, smart enough and beautiful inside and out. Although he knew I didn't feel that way about myself after being broken down for so long he let me know he believed in me when I needed it most. During my darkest hour I wanted to give up, he begged me to turn to God and see the blessings right in front of me. I was suffering and terrified of everything. I was stuck so far away from my family, which was my strength and I felt alone, isolated and broken. RJ reassured me he was always just one call away, I was never truly alone and would always have my family's support and encouragement.

(*Id.*)

Kristina goes on to describe how when she left her husband, RJ and their father were both there for her. As her life took a turn towards depression and substance abuse, RJ pushed her to go into rehab to get the help and therapy she needed. "If it wasn't for my brother's encouragement with this I honestly don't know where I'd be in life right now. I got the help I so desperately needed and now I'm the best version of myself I ever been [*sic*]." (*Id.*) In her letter's final paragraphs, Kristina describes an exemplary man who inspires her and those around her:

> My brother always encourages us all to be the best versions of ourselves, to live in faith and help others. He's taught us that the little things don't matter and what matters is to make a difference. He inspired us to volunteer like he does. My daughter and I have been a part of numerous pass it forward community events with clean ups, planting and events to give back to the community.

(*Id.*)

RJ's impact on his family extends beyond his immediate family. Although Kristina describes RJ's important relationship with her 13-year old daughter, who is also RJ's goddaughter, her daughter also took the time to write her own letter on RJ's behalf. "Uncle RJ is my favorite uncle. He is the best uncle in the world because he's always there for me. Some of the first and favorite memories I have with him are us being silly … Uncle RJ knows how much I love playing basketball so every time he sees me he tries to make sure we have at least one game." (Ex. A, A.M Letter.) She confirms her mother's high opinions of RJ's character:

> Uncle RJ is a very kind hearted person, who always puts everyone first. He is very thoughtful, caring, giving and easy going.… He always puts others before himself and whenever someone wants to do something he tries his very hardest to make it happen.

(*Id.*)

RJ's Aunt Jeanne Farkas and Uncle Glenn also wrote to the Court, with Jeanne describing RJ's relationship with her son who has autism:

> Throughout the years, he has devoted time to develop a special relationship with my son Christopher. Chris has autism. RJ was a hockey player through his school years. Chris has been playing ice hockey on a special needs hockey team for the last 11 years. RJ & Chris have developed a close personal bond throught [*sic*] hockey, talking about players, teams, positions and how Chris can get better. RJ always encouraged Chris and supported him whenever he could.

(Ex. A, Jeanne Farkas Letter). She sees these same characteristics in the man RJ has become: "He is now a father and is showing the same loving, caring and devoted side of himself to his family that I have seen him do with my son." (*Id*.) RJ's love of and dedication to his immediate and broader family provides further strong evidence of his true character and the life he will lead when this case is behind him.

**c. RJ is a Trusted and Reliable Friend**

While the letters from Donna and RJ's family demonstrate to the Court RJ's true personality, the letters from his friends, both new and old, confirm his positive character by providing the same insight from a different perspective. Long-term family friend Donna DeStefano reiterates his good character in her letter. DeSefano is the Director of Community Relations for RWJ Barnabas Health Institute for Prevention. In 2013, she was appointed by Governor Chris Christie and unanimously approved by the N.J. State Senate to serve as a public member of the Governor's Council on Alcoholism and Drug Abuse (GCADA). (Ex. B, DeStefano Letter.) To date, she holds the position of Second Vice Co-Chair. She also founded a not for profit (Parents in Connection) in 2010 where she helps families who struggle with substance abuse issues. She has known Robert since he was 18 months old and has observed him to always be "an honest, caring, fun loving kid" and "a great role model to his three sisters." (*Id*.) Though she considers herself an aunt to him, she recognizes that despite his youth, he has actually provided support to her:

> When my mother passed away in 2009, RJ surprised me by coming to my house one day with lunch. He spent hours with me just talking about old times. For a young man to have that kind of compassion and take time out of his day really solidified what I've always known about him. He's an incredible person and indomitable spirit that makes being around him a joy. He's honest, intuitive and smart.

(*Id.*) Regardless of age or generation, RJ is a compassionate friend and support to all those in his life. DeStefano notes, "As an adult, RJ is a responsible young man, a father now…. [*sic*] and in a thriving relationship where he hopes to have the chance to be there to nurture and raise his daughter." (*Id.*)

Donna's friend Deanna wrote not only about RJ's impact on Donna, but on her impressions of him and how he has become her friend:

> I have learned about the person he is and the great qualities he possesses. Robert is a generous, selfless, and kindhearted man who has proven above and beyond that he would be there and do anything for the people he cares about. Robert is a giver, he is selfless, and he's the don't think just do for others to make people happy. Robert would never intentionally try to hurt others. His intentions are never bad, and I know this for a fact because I have witnessed his genuine, selfless and giving character for myself. I have seen him show these qualities for people he doesn't know, people who have nothing for themselves, his family, his fiancé, his future in laws, his friends, and most importantly his daughter. I know the love Robert has for my best friend Donna and how much he not only cares for her well-being, but also the people who are important to Donna…. Robert has been so kind to me and genuinely cares about the good and bad in my life. When I'm upset with something, he always has doors wide open if I need to get away and visit my best friend since we are so many states apart.

(*Id.*)

RJ has also impacted the life of a friend of his sister, Brielle. This friend, Marina Quagliato, writes: "It is with great honor that I have the opportunity to vouch for what a positive attribute Robert has been to not only my life, but to everyone else's that he comes into contact with." (Ex. B, Quagliato Letter.) She considers the Farkas family as an extension of her own and RJ her older brother. She describes RJ as someone she has always known "to be a hardworking, passionate, and loving human being. He is the type of person who you can rely on for anything, especially when it comes to his closest friends and family, who I know mean the world and more to him." (*Id.*)

### d. RJ's Kindness to Strangers and Charity Work

Consistent with RJ's character, kindness to others is not limited to family and friends. Multiple letter writers describe his thoughtfulness towards complete strangers. RJ's mom, like several others, relayed stories of RJ doing acts of charity for complete strangers. His sister Daisha recounts:

> There was one day I was down in Miami while my husband was in school. My brother and I were on our way to get something to eat. We got to the place and he kept staring at this man a short distance from us. I asked Robert what was up, and he told me to go get the food and he would be right back. He said just wait by the car for him. Five minutes later he walked up to the stand and brought the guy food because he was down on his luck. When we got into the car, he said the man lost his job and his wife kicked him out. Robert bought him food and gave him whatever clothes he had in his car.

(Ex. A, Daisha Letter.) RJ's niece, A.M., has a similar anecdote:

> One time when we were at the store, there was a guy in front of us inline [*sic*] who didn't have enough money to buy his Gatorade, even though he didn't even know this man my uncle saw a chance to help someone, so he bought it for him. This made me want to be like him, so the next day me and my mom went to eat and I paid for the guy behind us in the drive-thru line. I really felt proud and called my uncle and told him how i (*sic*) really enjoyed doing a random act of kindness just like him.

(Ex. A, A.M. Letter.) Daisha's husband, Travis Lee, confirms RJ's reputation as someone who is kind and giving. He has known RJ for approximately 16 years, as he met Daisha in high school. Travis echoes the consistent sentiment that RJ is a "very caring person" who "will go out of his way for not just his family but for complete stranger[s]..." (Ex. A, Travis Lee Letter.)

RJ's consideration of others has only grown since his release from custody as he has reflected on his place in society. For example, he now volunteers with the Humane Society.

As Brielle describes in her letter:

> When RJ was first released, we signed up to become volunteers at the Humane Society. He instantly wanted to do something to better himself and we both have such a passion for helping animals in need.… I smile thinking about the events we worked together where my brother would sit in the cages with animals to show everyone passing by how love-able they were.…This was our thing to do together to help forget about the outside world. We were making a difference together and I'm so thankful we were able to do this for so long.

(Ex. A, Brielle Letter.) RJ's example of volunteering at the Humane Society has grown beyond his personal contributions as he has inspired his niece as well: "I love animals and want to be like my uncle and volunteer at an animal shelter too." (Ex. A, A.M. Letter.) RJ's kindness and caring for others, including animals, has changed lives for the better in ways large and small.

**e. RJ's Remorse and How That Has Changed Him**

RJ's remorse and the fact that he is a changed man is readily apparent to those that know him. The Court can see this first and foremost in his own letter. (*See generally*, Ex. C, RJ Letter.) One of the things that so deeply changed RJ was seeing the impact of his actions on his family members, in particular his father. RJ's letter described what happened:

> [redacted] My hero, my rock, my dad was now being [redacted] because of my crimes not his. To know this happened to my father, my role model and best friend, to hear this happened because of MY actions was crushing and is hard to even type this at the moment. [redacted] I am deeply ashamed that my actions led to this. If I knew then what I know now I would have never lied to the public about our company. This is a gut wrenching reality that I will forever hold onto.

(Ex. C, RJ Letter.)

RJ's brother-in-law, Travis, who was living with the Farkas family in New Jersey at the time of RJ's arrest, recalls how it affected the family – and RJ's father -- in particular. As he describes it,

> "when Robert went to prison [] [REDACTED] Robert's father [REDACTED]. [he] would make excuses to go into Robert's old room in their house just to feel close to him. [REDACTED]."

(Ex. A, Travis Lee Letter; *see also*, Kristina Letter.) The impact of his arrest on his father will never leave him.

RJ's [REDACTED], among other things, has helped RJ acknowledge his crimes, realize the effect of his actions on others, especially those closest to him, and change for the better. Indeed, RJ's mother feels strongly that acknowledging prior wrongs is an important character trait and knows RJ has done so: "I also live by you cannot change what you don't acknowledge. My son, RJ, has acknowledged his wrongs." (Ex. A, Cynthia Letter.) RJ's father tells the Court that he sees in his son a changed man: "Unfortunately, he got involved with something far bigger than him and, he still feels responsible for the decisions and choices he made, I can guarantee you he is remorseful, apologetic, and regretful of all his actions." "I can tell you, whole heartedly, that my son is rehabilitated. He will never be in trouble like this or before you in court ever again. He has learned a very hard lesson that he will never forget." (Ex. A, Robert Farkas, Sr. Letter.)

Donna knows the man RJ was, the man he has become, and the man he will be. She has observed how RJ is remorseful for his conduct and conveys how she needs his continued support caring for their young daughter. She too seeks the Court's mercy, but not solely for

Robert's benefit, but for the betterment and stability of their entire new family. (*See generally*, Ex. A, Donna Letter.)

His sister Daisha also recognizes that RJ is a changed man. "My respect for him as a person and my brother remains, because I could not ask for a better brother. I think Robert is remorseful for his actions and wants to right his wrongs…. He felt so much guilt because he could not be there to tell our father everything is going to be ok." (Ex. A, Daisha Letter.) She is confident in his remorse and still feels he has made her a stronger and better person. (*Id.*) Daisha's husband Travis is also confident in RJ's change and remorse: "Roberts [*sic*] actions as a father, brother, son, and everyday human being have shown me how remorseful he is. He is worried about his future wife's mental health and wants to continue being a great spouse and father to his daughter. He fears [for] the well being [*sic*] of his parents and the rest of his family. He is doing the best he can to move forward in a positive direction in his life." (*Id.*)

Brielle describes the positive growth she has seen in RJ throughout her letter and asks that the Court allow RJ "the opportunity to further prove himself." (Ex. A, Brielle Letter.) She continues:

> My brother has a huge support system within our large family and his fiancé, Donna's family. He will be focused on being best [*sic*] father to his first daughter, [I.F.] and husband to his future wife while never reoffending. RJ is such a special person and this difficult time has not dulled the sparkle in his eye or changed his outlook on life. He is not bitter, he is better because of this.
>
> …We are thankful and hopeful as a family. It brings tears to my eyes seeing the change within RJ after all of this and the readiness to close this chapter. With our parents getting older, we just want to be together …. We want to continue the healing amongst our families and healing can begin once responsibility has been accepted and I hope you see that within RJ, today.

(*Id.*)

Donna's mother Lucy said that despite all that has happened, "it comes as no surprise he is ready to accept responsibility and expressed deep remorse for his actions." (Letter of Lucy Velez.) She recognizes the toll imprisonment would take on his daughter and seeks the Court's leniency: "[L]ife without Robert would not only affect him. It would affect his... little baby girl who... has suffered enough." (*Id.*)

RJ's friend Marina Quagliato concurred: "It is inarguable that Robert has the sincerest remorse for his actions and for the strain it has put on all his loved ones." (Ex. B, Quagliato Letter.) And his friend Deanna Kroon is aware of RJ's guilty plea and the circumstances that bring him before the Court. She believes he is remorseful and has "proved to become [*sic*] an even better version of himself." (Ex. B, Kroon Letter.)

**f. RJ Has A Strong Support Network and Will Contribute to Society**

As set forth in their letters, RJ's family members and friends believe he has changed and is remorseful and they stand ready to support him in what will undoubtedly remain a challenging transition. RJ's mom explained that her entire family has moved to Florida including her two granddaughters. She too is eager to relocate there and is only awaiting the release of the bond on her home in New Jersey relating to this case. She is eager to see her son restart his life: "I want to watch my son become a married man and raise his daughter who is truly all of our blessing through this dark time. I am going to be 63[] years young and I want to enjoy my grandchildren & children." (Ex. A, Cynthia Letter.) Though she knows RJ has already learned and grown from this case, she closes her letter with a promise to continue to guide him: "We will guide RJ to make every right decision for the rest of his life. He will not be in front of you again." (*Id.*). RJ's father offers an understandably different

tone in light of the toll RJ's arrest took on him, but he conveys the same love for his son and the same ongoing support. (Ex. A, Robert Farkas, Jr. Letter.)

Like other members of her family, his sister Kristina recounts how RJ's young new family and his entire family would suffer if he were incarcerated again. As she urges in her letter:

> Sending RJ to prison would be harder on my family than it would be on RJ. This is especially true for his future wife Donna and their new baby girl [I.F.] RJ is a truly remarkable Dad. It would be devastating to see him have to leave his family, leaving his future wife and new baby I.F. to have to grow up without a Dad. Having a father figure is so important to little girls and when you are blessed to have a Dad that loves and cares for you the way RJ does with I.F. that is everything.

(Ex. A, Letter of Kristina.) She also asks that the Court judge RJ for the entirety of who he is, rather than the limited acts that bring him before the Court.

Kristina's daughter shares a concern that she is particularly suited to understand – the suffering that his daughter could endure if he is incarcerated:

> I'm worried for my Aunt Donna and by baby cousin [I.F.]. With him being such a good Dad it would be very hard to see him have to leave his family. With my dad always working and never being home I can kind of understand how that would feel. I just wanted my family to be together. My dad would have to work on holidays like Christmas and my Birthday. When I was 3, we moved to Florida away from family for my Dad's new job. It was so hard for me not seeing my family or My Dad anymore. It was mostly me and my mom all the time. She was a stay at home mom and took care of me. I remember how hard that was and how sad I would be all the time, I wouldn't want to see [I.Z.] go through the pain of not seeing her dad or My (future) Aunt Donna going through not seeing her husband and having to raise [I.Z.] on her own, kind of like my mom had to do with me."

(Ex. A, A.M. Letter.) She closed recognizing, "I know no one is perfect, but our family is perfect together." (*Id.*)

Collectively, the letters leave no doubt RJ has consistently touched and inspired people around him, and that those individuals have not forgotten or abandoned him despite his conduct in this case. They will be there for him when he emerges from this period in his life and starts his life anew. In return, RJ is committed to not letting them down, and he will undoubtedly be a contributing member of society. RJ's case has had the consequence of causing him to grow personally and has inspired him with even greater resolve to continue to support and help his family and many other people.

**g. RJ's Serious Medical Condition and Prognosis**



3

4







3. **<u>The Nature and Circumstances of the Offenses</u>**

The defense respectfully submits that an examination of the nature and circumstances of RJ's offenses, as required by 18 U.S.C. § 3553(a)(1), indicates that a sentence below the applicable Guidelines range of 70-87 months is warranted for RJ. To be sure, the crimes RJ has pleaded guilty to committing are serious offenses and he accepts responsibility for his participation in them. In a nutshell, those crimes were: RJ and his co-conspirators conducted a fundraising initiative in 2017 called an "initial coin offering" in which they sold to the public unregistered securities, in the form of digital tokens called CTR tokens, that Centra Tech issued. Centra Tech, where RJ worked and held executive positions, purported to offer various cryptocurrency-related financial products. RJ and his co-conspirators used fraudulent



misrepresentations and omissions to induce purchases of more than $25 million in CTR tokens from Centra Tech.

But, as the Court compares the crimes in the instant case, and RJ's participation in those fraud conspiracies, to other frauds that have been perpetrated in this and other districts, mitigating factors come to light and place the Centra Tech scheme toward the less serious end of the universe of fraud offenses.

First, unlike many frauds, there are significant funds available to repay the victims. On October 15, 2020, the defense learned from the government that the Ether (ETH), a cryptocurrency, that it seized from Centra Tech was sold for approximately $33.4 million (although it is awaiting confirmation of that figure from the U.S. Marshals). Much of the ETH seized was the money victims utilized to purchase the CTR tokens. Indeed, in October 2019, RJ (and Sharma) had filed a motion seeking to have the government sell the ETH so that those who purchased CTR tokens from Centra Tech could be paid back with the proceeds. (*See* Dkt. No. 193.) As a result of recent sale, the victims in this case—those who purchased CTR tokens from Centra Tech have funds available to repay them, hopefully in full. The significant and assured repayments to those defrauded that will occur in this case rarely happens in fraud cases. Usually, the victims are left with nothing.

In that way, this case is similar to *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD) (RER) (E.D.N.Y.). In *Zaslavskiy*, a recent case in the Eastern District of New York involving cryptocurrency, Judge Raymond J. Dearie noted that it was extraordinary that most or all of the victims would be recompensed and therefore sentenced the defendant well below the Guidelines range even though he was main actor in that fraud.

Relatedly, the reason that funds for repayment exist is that the funds raised in the initial coin offering were not solely used for personal use and depleted, as is the case in most frauds. RJ, for one, was motivated by an overzealous, admittedly illegal and misguided, attempt to establish Centra Tech as a real-time cryptocurrency business. He allowed his desire to succeed in business to lead him to knowing participation in the fraud schemes.

There is no dispute that the vast majority of funds raised through the initial coin offering were used with the intention to build a business or had not been spent at the time of RJ's and Sharma's arrests. There were certainly some significant personal expenditures by the co-conspirators, but a substantial portion of the raised capital was reinvested in the company, such as leasing office space in Florida, hiring employees, including experienced executives, and retaining technical experts.

Of course, RJ does not suggest that this motivation justified his actions in any way. RJ wrongly participated in conduct that misled those that contributed funds to Centra Tech and purchased CTR tokens. However, his motivation does offer the Court insight into the significant difference between the fraud in this case and that which exists in many other cases. The fraud here was not outright theft and RJ did not commit these crimes solely with the intent to personally enrich himself and lead a lavish lifestyle. Although admittedly illegal and improper, as the Court engages in the nuanced evaluation of the nature and circumstances of the offense, the defense respectfully submits that RJ's conduct falls toward the lower end of the universe of fraud offenses and weighs in favor of a downward variance pursuant to the sentencing considerations set forth in 18 U.S.C. § 3553(a).

The second important circumstance of RJ's offense conduct that warrants consideration for a downward variance is the fact that inequal sentences often result when

courts apply the Guideline section applicable to fraud offenses, U.S.S.G. § 2B1.1, commonly referred to as the "fraud guideline." The fraud guideline is inherently flawed, lacks proportionality, and has no basis in any empirical data. These vagaries have caused courts to recognize and warn about the inequities caused by mechanical application of the fraud guideline. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

In *Algahaim*, the Second Circuit agreed with the long-standing criticisms of the fraud guideline finding that the Sentencing Commission, in promulgating Section 2B1.1, "let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range" thereby causing an "unusualness . . . that a sentencing court is entitled to consider" in determining the appropriateness of a non-Guidelines sentence. *Id.* While recognizing that the Sentencing Commission was "entitled" to use this approach, the Second Circuit expressed its concern regarding this method of calculating an appropriate criminal sentence and noted that it lacked any precedential support. *Id.*

In *United States v. Johnson*, Judge Nicholas Garaufis of the Eastern District of New York heeded the Second Circuit's admonition, explaining, in part, his rationale for a below-Guidelines sentence for a defendant convicted of a large-scale fraud as follows:

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. It is no wonder that Judge Stefan Underhill, concurring in a recent Second Circuit opinion, called the loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb." *United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013)* (Underhill, J., concurring); see also *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission ... effectively guaranteed that many such sentences would be irrational on their face."). Given the feeble

> underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's Guidelines sentence. Accordingly, Judge Underhill opined that, because the loss Guideline "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices ..., district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." See *Corsey*, 723 F.3d at 379 (op. of Underhill, J.). I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

No. 16 Cr. 457 (NGG), 2018 U.S. Dist. Lexis 71275, at *11-13 (E.D.N.Y. Apr. 25, 2018) (*available at* https://casetext.com/case/united-states-v-johnson-2478).

RJ does not dispute that, pursuant to *Pinkerton* liability and Guidelines §2B1.1, he is legally responsible for more than $25 million but less than $65 million of "loss." (PSR ¶ 164.) However, the application of this loss amount here, which increases RJ's offense level by nearly four times (22 points), representing almost three quarters of his total offense level of 27, clearly implicates the concerns expressed by the Second Circuit in *Algahaim* and Judge Garaufis in *Johnson.*

The 16 loss categories that are set forth in §2B1.1 are not based on any empirical data or any logical policy concerns. This is the exact reason that the Second Circuit identified this bracketing procedure as "unusual." *See Algahaim,* 842 F.3d at 800 (2d Cir. 2016). The Sentencing Commission has arbitrarily attributed certain loss amounts to trigger an increase in a defendant's offense level. However, these attributions are based on nothing. For example, a fraud that involved more than $6,500 increases the offense level by 2 points, and a loss of over $15,000 increases it by 4 points. Absent is any policy or explanation as to why a difference of $8,500 doubles the increase. Equally perplexing is the fact that the next 2-point

increase does not occur until the fraud causes greater than $40,000 of loss. Thus, when looking consecutively at two of the sixteen "finely calibrated" categories, an $8,500 difference in loss amount has equal importance and effect as a $25,000 difference. Taking this analysis to the extreme, the difference between a scheme involving a loss amount of $6,500.01 and one involving a loss amount of $15,000.01 is 4 points. The difference between a scheme involving a loss amount of $250,000,000.01 and one involving a loss amount of $550,000,000.01 is also 2 points. As a result, a spread of $8,500 and $300 million may have an identical impact on a Guidelines calculation. This incongruity is the practical result of essentially random loss attributions made by the Sentencing Commission in §2B1.1.

The defense respectfully submits that the arbitrariness and unfairness of the fraud Guidelines is particularly acute in this case and warrants a downward variance. Twenty-two points are added to RJ's offense level based solely on the amount of "loss." This increase results in RJ's sentencing range skyrocketing from 0-6 months to 70-87 months. Without any empirical correlation to his actual conduct, RJ's exposure mechanically, and very significantly, increased.

Such mechanical application of the Guidelines is particularly inappropriate here because, as discussed above, RJ played a minor role in the offense. Within its justification for recommending a below-Guidelines sentence for RJ, the Probation Office noted in the PSR that RJ had limited discretion and generally had a supporting role (assisting in tasks). (PSR at p. 47.) Moreover, RJ's direct share of the fraudulent proceeds was approximately $350,000 out of the over $25 million that was raised. (*Id*.) Despite RJ receiving a 2-point role reduction, the Probation Office recognized that holding RJ accountable for the entire amount of the fraud in the manner suggested by the Guidelines is still inherently

unreasonable. Every person convicted of the fraud, regardless of their level of participation and the amount of enrichment they individually gained, is held equally accountable save a small reduction for role in the offense.

Importantly, whether the loss was $5,000 or between $25 million and $65 million, as is the case here, RJ would have received the same rote 2-point reduction. By definition, role reduction does not account for the loss amount attributed to the individual defendant. In this case, the Guidelines take no account of what percentage of the fraud RJ perpetrated. Instead, his lesser role entitles him to a mechanical reduction of 2 points. Such a reduction is clearly of less significance in a case like this, which involves a substantial loss amount, than it would be in another case where the loss amount was lower. Stated another way, 16 points (the enhancement for loss in this case) minus the 2-point reduction still leaves a sizable enhancement of 14 points and does relatively little to lower the Guidelines range. In another case where the loss amount is lower, the 2-point reduction would likely be much more significant.

Based on all of the above, the defense respectfully submits that the Court should adopt the suggestion of the Probation Office and award RJ a downward variance as a result of his lesser role and the manner in which the calculated loss amount overstates his personal culpability. That said, the Court should award a more significant variance than proposed by the Probation Office proposes.

4. **The Remaining 18 U.S.C. § 3553(a) Factors Support Time-Served with Home Confinement and Community Service**

In arriving at a sentence that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, the Court also is required to consider a number of

other factors not discussed above, namely, the need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a).

RJ, of course, recognizes the serious nature of the offenses here. But it should not be overlooked that he was a "minor participant," not the mastermind. RJ also does not dispute the importance of the laws he violated or the seriousness of his offenses, and he sincerely regrets his illegal conduct. That said, it bears pointing out he did not engage in violence and did not defraud others to maintain a lavish lifestyle.

His case also provides more than adequate deterrence for financially-related and non-violent crimes like his for a number of reasons. All of these reasons further support the defense's recommended sentence of time-served with home confinement and community service. First, RJ has suffered a very public downfall, more than most convicted felons. His arrest was the focus of extensive national media coverage, including in the *New York Times* and major Florida news outlets.[19] This case will haunt him the rest of his life in a way that is uniquely harsh due to the media coverage.

Second, RJ has already served time in prison, and has lived under pretrial conditions that have significantly imposed on his freedom. He spent approximately a month under the harsh conditions of the Metropolitan Correctional Center, a facility which several district judges have found to be particularly unsanitary. *See United States v. Behr*, No. S1

[19] *See, e.g.*, https://www.nytimes.com/2018/04/02/technology/virtual-currency-arrest-centra.html

03CR1115-02 (RWS), 2006 WL 1586563, at *5 (S.D.N.Y. June 9, 2006) ("The MCC houses criminals of all types of offenses together in 26-bed dormitories. It is overcrowded, unsanitary, and lacks certain facilities."); *see also id.* (noting that "[r]ecently, the Honorable Kimba Wood reduced an individual's sentence by one third based upon the harsh conditions in Unit 11-South at the MCC").[20] From May 23, 2018 until September 11, 2018, RJ was on home detention with GPS monitoring and a curfew. On September 11, 2018, his curfew was lifted because of his compliance, but he was required to continue GPS monitoring with home detention until June of 2020 following his plea. Following his guilty plea earlier this year, his conditions were further loosened. To be sure, he has not been really free since his arrest as he was on home confinement, and he has already spent several weeks in prison prior to his release.

Third, as part of his plea agreement, RJ has agreed to forfeit all of his ill-gotten proceeds, which should also act as a deterrent to anyone considering doing what he has done. Specifically, the parties have entered into a Consent Preliminary Order of Forfeiture as to Specific Property/Money Judgment that they wish to be deemed part of the sentence and included in the judgment of conviction, which was filed with the Court on October 13, 2020. (Dkt. No. 395.) This further supports the defense's recommended sentence because it shows RJ's relative lack of personal gain. RJ is agreeing to forfeit the approximately $350,000 he received (out of the over $25 million raised in the initial coin offering) and a watch that was a gift from Sharma. RJ never had any personal interest in, or right to, the ETH raised in the initial coin offering or Centra Tech property. This consequence alone serves as both a

[20] We believe this case to be *United States v. Mendola*, 03-CR-449 (KMW) (S.D.N.Y. 2005).

general deterrent to anyone who may be inclined to commit similar crimes and as a specific deterrent to RJ, who never wants to go through this again.

Turning now to the last pertinent §3553(a) factor, neither imprisonment nor other forms of custody are necessary to protect the public from future crimes. Based on his lack of criminal history alone, RJ poses the lowest possible risk of recidivism. More importantly, as the letters attest, and as he has shown while on pretrial release, RJ has demonstrated genuine remorse and has learned the most difficult of lessons from this case. RJ presents no risk of reoffending and any form of custody is wholly unnecessary to protect the public. Enabling RJ to remain out of custody and with his young family, both of whom rely on RJ to be in the family home, will undoubtedly benefit society far more than imprisoning him for even a brief period of time.

**CONCLUSION**

RJ readily acknowledges, regardless of his level of his participation, that his crimes represent a tremendous failure on his part. That said, he has accepted responsibility for his conduct, he is sincerely remorseful for what he has done, and he is dedicated to being a productive and law-abiding citizen when this is behind him. All indications are that he will never do anything like this again and can be a valuable and contributing member to society. A sentence of time-served with home confinement and a significant amount of community service would be sufficient but not greater than necessary to achieve all goals of federal

/

/

sentencing and fundamental fairness.

Dated: October 16, 2020

/s/ Paul Petruzzi
Paul Petruzzi
Law Offices of Paul D. Petruzzi
8101 Biscayne Boulevard, PH 701
Miami, Florida 33138
(305) 373-6773
petruzzi-Law@msn.com

/s/ Brian Klein
Brian Klein
Baker Marquart LLP
777 S. Figueroa Street, Suite 2850
Los Angeles, California 90017
(424) 652-7800
bklein@bakermarquart.com

/s/ Sanford Talkin
Sanford Talkin
Talkin, Muccigrosso & Roberts, LLP
40 Exchange Place
18th Floor
New York, New York 10005
(212) 482-0007
samt@talkinlaw.com

*Attorneys for Robert J. Farkas, III*