UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA                     :
:
      - v. -                                   :       S2 18 Cr. 340 (LGS)
:
ROBERT FARKAS,                               :
    a/k/a "RJ,"                                :
:
           Defendant.                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

ILAN T. GRAFF
Attorney for the United States
Acting Under 28 U.S.C. § 515
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Samson Enzer
Daniel Loss
Negar Tekeei
Assistant United States Attorneys
   - Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ....................................... 1

  I.   Summary of Offense Conduct ............................................. 1

    A. The Origins of the Conspiracy to Defraud Centra Tech Investors and Roles of the Conspirators During their Fraudulent Fundraising Efforts. ................................. 3

    B. Fraudulent Conduct in Connection with the ICO and Centra Tech Fundraising Efforts.... 5

      1.   Fraudulent Representations Concerning Centra Tech's Purported Executive Team. .. 5

      2.   Fraudulent Representations Regarding Partnerships with Bancorp, Visa, and Mastercard. ........................................................................ 7

      3.   Fraudulent Representations Concerning Centra Tech's Purported Licenses in 38 States. ................................................................ 12

      4.   Fraudulent Representations Conveyed During Media Interviews ........................... 14

      5.   Fake Demonstrations and Fake "Centra Tech" Cards. ............................... 15

      6.   Additional False Representations in Marketing Materials and Communications. ..... 16

      7.   Market Manipulation ......................................................... 17

    C. The October 27, 2017 *New York Times* Article and Subsequent Steps Taken by Sharma, Farkas, and Trapani. ....................................................... 18

  II.   Procedural History and Guilty Plea ...................................... 20

  III.  Presentence Investigation Report ....................................... 21

DISCUSSION ............................................................... 22

  I.   The Nature and Seriousness of Farkas's Criminal Conduct and the Need for Just Punishment Warrant a Substantial Sentence of Imprisonment. ........................... 22

  II.  A Substantial Sentence of Incarceration is Necessary to Afford Adequate Deterrence and Promote Respect for the Law. ...................................................... 27

  III.  Farkas's Medical History Does Not Support the Significant Variance He Seeks. ........... 28

  IV.  Farkas's Family Ties and Personal History Do Not Support the Time-Served and Home Confinement Sentence He Seeks. ..................................................... 31

FORFEITURE AND RESTITUTION .............................................. 32

CONCLUSION .............................................................. 33

i

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Centra Tech, Inc. co-founder Robert Farkas ("Farkas" or the "defendant"), which is scheduled for December 15, 2020. The parties and the United States Probation Office agree that the advisory Sentencing Guidelines range applicable to the defendant's conduct is 70 to 87 months' imprisonment. Farkas seeks a non-custodial sentence of home confinement and community service. As discussed in further detail below, although there are mitigating circumstances surrounding Farkas's offense conduct that warrant a variance below the advisory Guidelines range, the non-custodial sentence that Farkas seeks would be insufficient in light of the purposes of sentencing enumerated in Title 18, United States Code, Section 3553(a). The Government respectfully submits that a substantial sentence of incarceration, followed by three years of supervised release, would be appropriate to serve the goals of sentencing enumerated in Section 3553(a), including the need for the sentence imposed to reflect the seriousness of Farkas's criminal conduct, to promote respect for the law and provide just punishment, and to afford adequate deterrence to criminal conduct.[1]

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.   Summary of Offense Conduct

From at least approximately July 2017 through October 2017, Farkas, along with co-defendants Sohrab Sharma and Raymond Trapani solicited investors to provide valuable digital assets in exchange for the purchase of digital tokens called "Centra tokens" or "CTRs" that were issued by the startup company that they co-founded, called Centra Tech, Inc., during the

---

[1] Throughout this memorandum, "PSR" refers to the Final Pre-Sentence Investigation Report dated September 16, 2020; "Dkt." refers to docket entries in this case, unless otherwise noted; "Plea Agreement" refers to the June 15, 2020 plea agreement entered into by the Government and Farkas; and "VIS" refers to Victim Impact Statements submitted to the Court in connection with this case on September 30, 2020 and October 30, 2020.

company's fundraising efforts, including during the company's "ICO."[2] PSR ¶¶ 25-31. As part of Centra Tech's fundraising efforts, Farkas, Sharma, and Trapani deliberately made a series of fraudulent oral and written misrepresentations to investors. *Id.* ¶ 25. Based in part on these fraudulent claims, investors provided digital funds that included at least 100,000 units of the valuable digital currency "Ether," as well as additional amounts in other digital currencies such as Bitcoin, that were worth more than $25 million at the time of the defendants' fundraising efforts, for the purchase of Centra tokens issued by Centra Tech. *Id.* ¶¶ 26, 55. At certain times in 2018, as the fraudulent scheme was ongoing, those funds were worth more than $60 million. *Id.* ¶ 26.

During the company's fundraising efforts, Sharma, Farkas and Trapani deliberately made or caused Centra Tech to make the following fraudulent claims in soliciting such investments from victims, among others:

- Sharma, Farkas and Trapani claimed to investors that Centra Tech's executive team included a purported Chief Executive Officer named "Michael Edwards" and a purported Chief Financial Officer named "Jessica Robinson" who had impressive work histories and academic credentials. In fact, "Michael Edwards" and "Jessica Robinson" were fictitious people who were fabricated to dupe investors. *Id.* ¶ 118.

- Sharma, Farkas and Trapani claimed to investors that Centra Tech had developed a debit card that enabled users to spend various cryptocurrencies to make purchases at stores that

---

[2] An "initial coin offering" or "ICO" is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "digital currency" or "cryptocurrency," as opposed to "fiat currency," which is a term used to describe currency that a government has declared to be legal tender, such as the U.S. dollar. "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does not have legal tender status. Unlike fiat currency, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains." A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping. The tokens or coins issued in an ICO are issued and distributed on a blockchain. Tokens are often also listed and traded on online internet platforms, typically called digital currency exchanges, and they usually trade for other assets. Often, tokens are listed and tradeable immediately after they are issued.

accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with Bancorp, Visa and Mastercard to issue Centra Tech debit cards. *Id.* ¶ 29. In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard. *Id.*

- Sharma, Farkas and Trapani claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states. In fact, Centra Tech did not have such licenses in the majority (if not all) of those states. *Id.* ¶ 30.

In addition, to attract investors to purchase Centra tokens issued during their fundraising efforts, Sharma, Farkas and Trapani also used various market manipulation techniques to artificially inflate the market price of Centra tokens on a cryptocurrency trading exchange called "EtherDelta" that was based in Manhattan. *Id.* ¶ 26.[3]

After the completion of Centra Tech's fundraising efforts in approximately October 2017, Sharma and Farkas continued the fraudulent scheme (at least until their arrests in this case in April 2018) which, among other things, prevented Centra Tech investors from seeking a return of their investments, and artificially inflated the value of Centra Tokens traded on secondary cryptocurrency exchanges. PSR ¶ 147.

### A. The Origins of the Conspiracy to Defraud Centra Tech Investors and Roles of the Conspirators During their Fraudulent Fundraising Efforts.

In or about late June or early July 2017, Sharma started Centra Tech from the apartment in Miami where Sharma was living at the time with his girlfriend, Brielle Farkas, one of Farkas's sisters. Sharma caused Centra Tech to be incorporated and launched Centra Tech's website in July 2017. *Id.* ¶ 13. In or about the middle or end of July 2017, Sharma invited Farkas and Trapani to join him in efforts to raise funds for Centra Tech. *See id.*

---

[3] The victims who invested in Centra tokens during the ICO based on fraudulent misrepresentations by Sharma, Farkas and Trapani included investors based in Manhattan, and various electronic communications relating to this fraudulent scheme were sent and received from Manhattan during and in furtherance of the scheme. PSR ¶ 26.

Sharma was the architect of Centra Tech and of the company's ICO and marketing materials (which, as noted, contained a variety of misrepresentations). *Id.* ¶ 27. For example, when Farkas and Trapani joined Centra Tech, Sharma had already created (or caused others to create) a company website for Centra Tech with, among other things, a link to an early version of the white paper soliciting investments in the company's ICO. *Id.*

At the beginning of their fraudulent fundraising efforts, Sharma, Farkas and Trapani worked out of a small room in Sharma's apartment. It was not until early October 2017, after their fundraising efforts had raised more than $25 million in assets from investors, that they and Centra Tech moved into leased luxury office space at an office building in downtown Miami. *Id.* ¶ 146.

Sharma, the leader of the conspiracy, tasked Farkas and Trapani with various assignments that primarily related to promoting investor interest in Centra Tech's fundraising efforts. *Id.* ¶ 28. For example, at Sharma's urging, Farkas and Trapani monitored various online chat rooms and blogs for "trolls" who posted disparaging information about Centra Tech or its ICO and took measures to address such disparagement. *Id.* Many of those measures involved various lies and other types of deceptive conduct. *Id.*

As described in further detail below, and as is relevant to Farkas's sentencing, Farkas knowingly and willfully participated in the scheme from approximately July 2017 through April 2018, and carried out numerous acts in furtherance of the goals of the conspiracy. However, in doing so, Farkas acted largely at the direction of his principal co-conspirator and the leader of the conspiracy, Sharma. *Id.* ¶ 153. In addition, although Farkas did exercise some decision-making authority and discretion, he did so to a lesser degree than Sharma and Trapani. Farkas largely played a supporting role, assisting with tasks and taking steps in furtherance of the conspiracy at the direction of others. *Id.* Farkas's personal monetary benefit was approximately $350,000, while

Sharma and Trapani received and used for their own purposes millions of dollars of fraudulently obtained investor funds. *Id.*

**B. Fraudulent Conduct in Connection with the ICO and Centra Tech Fundraising Efforts.**

In late July and early August 2017, during the early stages of Centra Tech's ICO, Sharma, Farkas and Trapani deliberately made and caused to be made a series of fraudulent misrepresentations to Centra Tech investors:

**1. Fraudulent Representations Concerning Centra Tech's Purported Executive Team.**

In soliciting investor funds from approximately July 2017 through approximately October 2017, Sharma, Farkas, and Trapani made multiple fraudulent statements and omissions concerning Centra Tech's executive team. *Id.* ¶¶ 118-129. These fraudulent representations included reference to two purported senior executives at Centra Tech named "Michael Edwards" and "Jessica Robinson." In fact, "Michael Edwards" and "Jessica Robinson" did not exist. *Id.* ¶ 118.

For example, white papers published by Centra Tech to solicit investments in the company's ICO contained a section entitled "Centra Tech Team" listing: (i) a purported individual named "Michael Edwards" as Centra Tech's "CEO & Co-Founder," along with a supposed picture of "Michael Edwards"; and (ii) a purported individual named "Jessica Robinson" as Centra Tech's "CFO," along with a supposed picture of "Jessica Robinson." The white papers also included a picture of "Michael Edwards." *Id.* ¶119. A photograph of "Michael Edwards" in at least one white paper was actually a picture associated with an individual by a different name who is a Canadian physiology professor who had no knowledge of Sharma, Farkas, and Trapani, or Centra Tech, and who had never given Sharma, Farkas, and Trapani or anyone associated with Centra Tech permission to use his photograph. *Id.*

5

After an internet blogger posted an article exposing that the photograph of "Michael Edwards" was actually of a Canadian professor with no ties to Centra Tech, Sharma, Farkas, and Trapani switched to using a photograph of Farkas's father as the photograph of "Michael Edwards" in other white papers and marketing materials. *Id.* ¶ 120. Farkas asked his father if he could use the photograph, and his father agreed. *Id.* The photograph of Farkas's father was used on various Centra Tech marketing materials, including the Centra Tech website. *Id.* Farkas also posted a photograph of his sister as the fictitious "Jessica Robinson." *Id.* ¶ 125.

In addition, during their fraudulent fundraising efforts, Sharma, Farkas, and Trapani caused profiles for various Centra Tech executives to be published on LinkedIn's professional networking website, including the following:

- On August 3, 2017, a user profile page appeared on LinkedIn, a business-and employment-oriented social networking service that operates via websites and mobile apps, for "Michael Edwards." The LinkedIn page stated that "Michael Edwards" has launched Centra Tech with the mission to design the world's first multi-blockchain asset debit card" and had managed various aspects of Centra Tech's Centra Card and Centra Wallet programs, including "[e]stablished licensing and partnership terms with Visa & Mastercard." The LinkedIn page also stated that "Michael Edwards" earned a master's in business administration from Harvard University, had more than 20 years of experience in the banking industry as a financial analyst at Bank of America (1993 through 2001), a vice president at Chase (2001 through 2011) and a senior vice president at Wells Fargo (2011 through 2016), and was the "CEO & Co-Founder of Centra Tech, where he worked since May 2016 and had "[e]stablished licensing and partnership terms with Visa & Mastercard," among other accomplishments. *Id.* ¶ 123. These statements were all false, as "Michael Edwards" did not exist.

- According to a LinkedIn profile for "Jessica Robinson" that was available to the public via the internet as of August 2017, "Jessica Robinson" had close to five years of experience as the Chief Financial Officer of Johnson Communications before becoming the Chief Financial Officer of Centra Tech, where she had worked since December 2016 and had "[c]reated the partnership between Centra and a Major US bank." *Id.* ¶ 125. Farkas posted a photograph of his sister on the LinkedIn page for the fictitious "Jessica Robinson." *Id.*

In fact, and as Sharma, Farkas, and Trapani well knew, "Michael Edwards," and "Jessica Robinson," of Centra Tech were not real people. *Id.* ¶ 126. Sharma, Farkas, and Trapani took active steps to conceal the fact that "Michael Edwards" and "Jessica Robinson" did not exist. *Id.* ¶ 127.

For example, on September 13 and 14, 2017, Sharma, Farkas, and Trapani participated in a group cellphone text message conversation while Sharma was on a business trip in South Korea for the purpose of soliciting investments in Centra Tech from a particular company. *Id.* ¶ 129. During this group conversation, Trapani sent a text message to Sharma and Farkas in which Trapani wrote "Just gotta close this shit with [the South Korean company] get that ETH." Sharma responded, "We need to remove mike Edwards and "Jessica asap," "After ICO."

### 2. Fraudulent Representations Regarding Partnerships with Bancorp, Visa, and Mastercard.

In soliciting investor funds from approximately July 2017 through approximately October 2017, Sharma, Farkas, and Trapani made materially false representations to investors that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra Tech debit cards. *Id.* ¶¶ 25, 29, 45-54. Sharma, Farkas, and Trapani were aware that the representations about Centra Tech's purported partnerships with Bancorp, Visa, and Mastercard were false. *Id.* In fact, Centra Tech had not entered into any partnerships with Bancorp, Visa, or Mastercard. Sharma, Farkas, and Trapani's efforts to convey false information regarding Centra Tech's purported partnerships with Bancorp, Visa, and Mastercard began from early on in the conspiracy and lasted throughout the conspiracy.

In approximately August 2017, Bancorp became aware of Sharma, Farkas, and Trapani's false statements regarding Bancorp, and alerted Centra Tech and the defendants. *Id.* ¶ 91. In approximately August 2017, a representative of Bancorp ("Representative-1") learned from Bancorp's marketing group that a potential investor or purchaser of Centra Tech tokens had inquired as to whether Bancorp had a business relationship with Centra Tech, as was represented by Centra Tech in its marketing materials at the time. *Id.* In investigating the inquiry in approximately August 2017, Representative-1 reviewed the Centra Tech Website and a white

paper posted on the Centra Tech Website. *Id.* The representative discovered that Bancorp's issuer statement, a statement regarding who the card issuer is any time a Visa or Mastercard image is displayed, was being used on the Centra Tech Website. *Id.* Representative-1 knew by looking at the Centra Tech Website and white paper that Bancorp would never work with a company such as Centra Tech by virtue of the risk level of the product Centra Tech was offering. *Id.* Representative-1 reviewed Bancorp internal databases, to include Bancorp's list of entities with which it had card issuance relationships and entities involved in Bancorp's co-branded incentive card program, to see whether Bancorp had any sort of relationship with Centra Tech. *Id.* ¶ 92. Through this process, Representative-1 confirmed that Bancorp did not have any relationships with Centra Tech. Representative-1 took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement. *Id.* One screenshot that Representative-1 retained stated the following:

- "The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc. "The Bankcorp," and the "The Bankcorp Bank" are registered trademarks of the Bankcorp Bank 2014. Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee schedule, if any.

- "The Centra Card Mastercard Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Mastercard International Incorporated. "The Bankcorp" and "The Bancorp Bank" are registered trademarks of The Bankcorp Bank 2014. Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee scheduled, if any."

*Id.* ¶¶ 93-94. Representative-1 also reviewed a white paper that was posted to the Centra Tech Website in August 2017. Representative-1 recalled that the white paper contained multiple misrepresentations, including about Centra Tech's purported relationship with Bancorp. *Id.* ¶ 95.

In approximately August 2017, Representative-1 attempted to reach individuals at Centra Tech through the "Contact Us" portion of the Centra Tech Website to request that Centra Tech

remove the Bancorp logo and the false statements regarding Centra Tech's purported relationship with Bancorp. Representative-1 did not receive a response from Centra Tech. *Id.* ¶ 96.

On August 30, 2017, Sharma sent an email to an individual not at Centra Tech and copied Farkas on the email. In that email, Sharma conveyed a message that he had received from Bancorp stating the following:

> Mr. Sharma: I left a voicemail on your phone, but I am following up here as well. CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH. YOU ARE ALSO DIRECTED TO CEASE AND DESIST USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OR ANY CARD PRODUCTS OR WALLETS YOU OFFER. Please REMOVE any and all references to The Bancorp Bank or The Bancorp Inc. from any and all websites, marking materials or other communications, including blogs as this has not been authorized by The Bancorp. I expect you will be hearing from federal banking regulators as well.

*Id.* ¶¶ 97-98. On August 30, 2017, during a group cellphone text message conversation between Sharma, Farkas, and Trapani, they discussed Bancorp's cease-and-desist notice. *Id.* ¶ 99. Sharma asked Farkas to remove the Bancorp logo from Centra Tech's press releases, and Farkas did so as requested. *Id.* Sharma further responded "Okay," "We gotta get that shit removed everywhere and blame freelancers lol[.]" *Id.*

During Centra Tech's ICO, Trapani participated in a video promoting Centra Tech. *Id.* ¶ 101. The video contained false representations about Centra Tech's purported partnership with Bancorp. *Id.* This video was available to the public via the internet as of September 22, 2017, well after Sharma, Farkas, and Trapani had received and were aware of Bancorp's cease-and-desist notice; however, it was subsequently removed. *Id.* On September 22, 2017, during a group cellphone text message conversation, Farkas wrote: "Says Bancorp on your video ray is that ok."

Trapani responded: "Gotta get it edited but we have been saying Bancorp." Sharma wrote: "What video," "Fake [take] it off," "I don't wanna get sued." *Id.*

Sharma, Farkas, and Trapani repeatedly acknowledged to one another that Centra Tech's white papers, website, and marketing materials contained material false representations about the company and its purported product even while they were raising funds from victim investors using those very same marketing materials. For example, on September 29, 2017, during a group cellphone text message conversation, Sharma advised Farkas and Trapani that the SEC had announced an enforcement action an ICO issuer called RECoin and the three of them discussed taking down the version of Centra Tech's white paper available on the Centra Tech Website at the time. In one message, Sharma wrote: "I rather cut any fufu," "Off right now," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap." In another message, Sharma wrote: "Delete all the cards have shipped info," "Everything gotta get cleaned up," "RJ [*i.e.*, Farkas] can u jump on that…on our pages." At approximately 11:55 p.m., Trapani wrote that the REcoin ICO was "pitching a straight security," to which Sharma responded: "Yea," "I know," "but fill fraud can be a word thrown around . . . ." Shortly thereafter, Sharma wrote: "I want a product page like [another company]," "Theirs is so nice." Trapani wrote "Lol yeah no real product." Sharma wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap." Trapani wrote "Feel you." PSR ¶ 102.

In approximately October 2017, well after the defendants had raised millions of dollars based on their false representations about Centra Tech's relationship with Visa, Visa also became aware of Sharma, Farkas, and Trapani's false statements regarding Visa, alerted Centra Tech and

the defendants, and demanded that the defendants remove all references to Visa from the Centra Tech Website and any promotional materials. *Id.* ¶¶ 103-106.

With respect to Mastercard, Mastercard's internal records of licensing agreements and relationships with card-issuing banks and other third parties contained no record of any Mastercard-approved relationship, either direct or indirect, with Centra Tech. *Id.* ¶ 113.

On or about September 11, 2017, after Sharma, Farkas and Trapani's fraudulent fundraising efforts were well underway and had already raised millions of dollars in victim-assets, Sharma reached out for the first time to Intercash, a Canadian company that provides program manager services for prepaid fiat currency payment card programs. *Id.* ¶ 114. On or about September 26, 2017, near the conclusion of their fundraising efforts, Sharma caused Centra Tech to enter into an agreement with Intercash pursuant to which Intercash pledged to use its "best endeavors" (but made no guarantees) to procure specified services, including finding an issuing partner bank licensed to issue standard Mastercard-branded prepaid fiat currency payment cards. *Id.*

In or about December 2017, well *after* the conclusion of the ICO and the defendants' fundraising efforts, Intercash provided Centra Tech with approximately 400 to 600 test cards that were standard Mastercard-branded, generic prepaid fiat currency Mastercard payment cards issued by Wirecard Card Solutions Limited ("Wirecard") under Wirecard's license agreement with Mastercard. *Id.* ¶ 115. Upon receipt of the test cards, Sharma and Farkas, breached Centra Tech's agreement with Intercash by tampering with the card designs to falsely rebrand them as "Centra Cards" bearing Centra Tech's and Mastercard's logos. *Id.* This continued to create a false impression to investors that Centra Tech had a partnership with Mastercard, when in fact, Mastercard had not approved any card program with Centra Tech. *Id.*

Upon learning of the use of the falsely branded "Centra Cards" in or about February 2018, Mastercard notified Wirecard that it had come to Mastercard's attention that Wirecard appeared to be operating a Centra Card prepaid program involving cryptocurrency that had not been approved by Mastercard in violation of Mastercard's rules, and Intercash promptly suspended Centra Tech's account. *Id.* ¶ 116. Wirecard explained in a March 9, 2018 letter to Mastercard that the Centra Tech branded cards were "never . . . submitted to nor approved for use by Intercash or [Wirecard]." *Id.* The letter explained that Centra Tech impermissibly "added their own branding" to "some test cards (generic approved Intercash branded cards only)" that Intercash had sent to Centra Tech exclusively "for the purposes of evaluation and beta internal testing," and that Centra Tech improperly "added their own branding to overlay the correctly approved card design and created unapproved social media coverage of a product that does not exist, without any consent or authorization from Intercash or [Wirecard]." *Id.* Wirecard further informed Mastercard that "there will be no partnership with Centra and no agreement to provide them with a card programme," and that "[t]he test cards that were issued to Centra have been terminated and no further cards will be issued to them." *Id.*

Accordingly, Centra Tech did not have any direct or indirect relationship with Mastercard that was approved by Mastercard, contrary to the defendants' numerous false representations.

### 3. Fraudulent Representations Concerning Centra Tech's Purported Licenses in 38 States.

In soliciting investor funds from approximately July 2017 through approximately October 2017, Sharma, Farkas, and Trapani fraudulently claimed that Centra Tech held money transmitter and other licenses in 38 states. In fact, and as the defendants well knew, Centra Tech did not have such licenses in a number of those states.

Specifically, Sharma, Farkas, and Trapani caused Centra Tech to represent in an early white paper ("White Paper-1") that: "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Main, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia Washington, and West Virginia." *Id.* ¶ 131. White Paper-1 further stated that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments." *Id.* In fact, Centra Tech did not hold such licenses in a number of those states. *Id.* ¶ 132. For example, a review on March 12, 2018 of a database maintained by the Nationwide Multistate Licensing System, a financial services industry online registration and licensing database, and of certain state licensing databases, revealed that seven of the states where Centra Tech claimed to hold licenses (namely, Arizona, Connecticut, Delaware, Florida, New Jersey, New York, or South Dakota) had no record for Centra Tech. *Id.* Moreover, while Centra Tech took some efforts to begin the licensing process, those efforts did not begin until October 2017, months after Sharma, Farkas, and Trapani began raising funds for Centra Tech by, among other things, falsely stating that Centra Tech had money transmitter licenses in 38 states. *Id.* In fact, as of January 2018, Centra Tech still did not have the licenses that the defendants claimed it had. *Id.*

Sharma, Farkas, and Trapani were well aware of the falsity of their representations with respect to Centra Tech holding money transmitter and other licenses in 38 states. For example, during a group cellphone text message conversation that took place on August 30, 2017, between Sharma, Farkas, and Trapani, Sharma sent text messages to Farkas and Trapani about applying for

state licenses for Centra Tech (licenses that Centra Tech had represented it already held in 38 states). *Id.* ¶ 134. For example, Sharma wrote in one message: "Gotta apply for all licenses." *Id.*

### 4. Fraudulent Representations Conveyed During Media Interviews

During their fraudulent fundraising efforts, Sharma, Farkas, and Trapani repeated their fraudulent claims about Centra Tech's purported partnerships with legitimate financial institutions, its purported executive team, and its purported money transmitter licenses verbally in interviews that were broadcast over the Internet. *Id.* ¶¶ 56-72.

One example took place on August 6, 2017, during an interview of Sharma for which Farkas and Trapani was present. In early August 2017, shortly after Centra Tech's ICO began, Cliff High, an analyst and predictor of cryptocurrency trading market trends with a wide internet following among cryptocurrency traders, publicly endorsed Centra Tech's ICO to his viewers — an endorsement that he later told his followers was a mistake. *Id.* ¶ 56. Nevertheless, Centra Tech's ICO raised more than a million dollars in digital assets from investors by early August 2017. *Id.* After realizing his mistake, Cliff High conducted a hostile interview of Sharma about Centra Tech's fundraising efforts. *Id.* The interview was videotaped and then published on the YouTube website on or about August 6, 2017. *Id.*

Sharma participated in the interview remotely from a computer in the room in his apartment where he and his co-conspirators, Farkas and Trapani, were running Centra Tech's ICO. *Id.* ¶ 57. Trapani and Farkas were both present in the room when Sharma participated in the interview. *See id.* During the interview, Sharma made several false statements about Centra Tech in response to questions from Cliff High. *Id.* ¶ 58. For example, Sharma made false claims that "Michael Edwards" was the CEO and a seed investor in Centra Tech, and that Centra Tech had a licensing agreement with Bancorp to issue Centra debit cards with Visa and Mastercard logos on the cards.

*Id.* All of these claims by Sharma were false, as he as well as Farkas and Trapani well knew. *Id.* Farkas and Trapani did not interrupt the interview or correct any of the false statements that Sharma made during the interview.

Although the interview did not seem to go well, the publicity that Centra Tech's ICO received from the interview, and from subsequent paid-celebrity-endorsements from Floyd Mayweather and Khaled Mohamed Khaled, a/k/a "DJ Khaled," helped draw investors' attention to the ICO. *Id.* ¶ 59.

### 5. Fake Demonstrations and Fake "Centra Tech" Cards.

Sharma, Farkas, and Trapani also generated investor interest in Centra Tech by staging fake demonstrations and posting them on social media to dupe investors into believing that Centra Tech had an operational cryptocurrency debit card. *Id.* ¶¶ 73, 75.

For example, in early August 2017, during the defendants' fraudulent fundraising efforts, Farkas recorded a video, that they later posted on YouTube, purporting to show Sharma using a "Centra Card" to make a purchase at a mall in Florida, as well as a supposed real-time deduction in the cryptocurrency balance in Sharma's digital wallet, as purportedly displayed on a supposed smartphone application on Sharma's iPhone. *Id.* Farkas recorded Sharma swiping the card and the application on his phone adjusting the balance for the transaction. *Id.* In reality, Sharma was using an ordinary credit card to make the purchase, no cryptocurrency was used or exchanged in the transaction, and the defendants used a device called a scraper to manipulate the displayed account balance on Sharma's iPhone to mislead investors into believing that cryptocurrency had been deducted from Sharma's digital wallet and that Centra Tech had a fully operational cryptocurrency debit card. *Id.* After certain members of the public noticed aspects of the YouTube video revealing that the card used by Sharma was actually a standard credit card, Sharma, Farkas,

and Trapani had another individual take the video down from the YouTube website, edit out parts of the video that revealed it was a fake demonstration, and re-upload to YouTube the edited version of the video. *Id.*

In September 2017, Sharma, Farkas, and Trapani also caused multiple plastic cards bearing the "Centra Tech" logo that falsely included the Visa and/or Bancorp logos to be sent and delivered by commercial interstate mail carriers to Centra Tech victim investors in the United States and elsewhere. In reality, many of these fake Centra Tech cards were standard credit cards that Sharma, using a credit card account controlled by him, fraudulently caused to be created. *Id.* ¶ 100.

### 6. Additional False Representations in Marketing Materials and Communications.

In August 2017, at Sharma's request, Farkas coordinated the creation of a pitch deck showing that Centra Tech was working with reputable companies, including a well-known insurance company, which Farkas knew was fake. *Id.* ¶ 74.

On August 28, 2017, after a prospective investor asked Sharma for proof to verify representations that Centra Tech had a contract with a particular investment venture capital firm, Sharma sent several text messages to Trapani and Farkas expressing his worry about the investor obtaining the fake "fufu … [contract] for the investment firm." Sharma further stated the following: "I'm gonna say our [Non-Disclosure Agreement] is very tight," and that "[w]e can't share the contract." In response Trapani wrote, "Get any worry out of your mind you're a fucking closer," and Farkas wrote "Dance," "Do what you do." *Id.* ¶ 76.

In early September 2017, Farkas, using the email address support@centra.tech, and at times signing his name "Bob," or "Robert Farkas CMO Centra," exchanged a series of emails with an individual at a marketing company seeking to write promotional materials and/or articles about

16

Centra Tech ("Individual-1").   *Id.* ¶ 80.  On September 6, 2017, Farkas described Centra Tech as follows:

> The biggest problem in the crypto word is being able to spend your cryptocurrency effortlessly. The Centra Card and Centra Wallet app are the solution. Our Currency Conversion Engine Module (CCE Module) allows real time conversion of all supported cryptocurrencies to give the user the ability to spend their assets in real time anywhere in the world that accepts Visa or Mastercard. Thanks, Bob.

*Id.* ¶ 81.  On September 13, 2017, Individual-1 appeared to have provided Farkas with a draft of written materials related to Centra Tech and, later that same day, Farkas responded with edits, including the following misrepresentation:

> Title: Can we change it too: This company has brought cryptocurrency into the real world reason being is that our card is live and working and has been shipped to clients already. ☺ Thanks, Bob."

*Id.* ¶¶ 82-83.

On October 13, 2017, Farkas sent an email to Sharma attaching Farkas's edits to an investor pitch deck for Centra Tech, dated, August 15, 2017. The pitch deck falsely stated, among other things, that: (i) Centra Card gives users "[a]ccess to more than 36 Million Points of Sale whereever [sic] Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa"; and (iii) Centra Tech in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."  *Id.* ¶ 84.

### 7.  Market Manipulation

From in or about August 2017 through in or about October 2017, and in order to promote interest in Centra Tech's ICO, Sharma worked with Farkas and Trapani to manipulate and artificially increase the price of digital Centra tokens issued by Centra Tech as part of its ICO on various cryptocurrency exchanges, including Manhattan-based EtherDelta.  *Id.* ¶¶ 26, 32. The

defendants, among other things, sold and purchased large blocks of Centra tokens using funds raised from Centra Tech investors through the ICO and concealed that they (as opposed to unbiased investors without any employment relationship with Centra Tech) were executing the transactions. *Id.*

### C. The October 27, 2017 *New York Times* Article and Subsequent Steps Taken by Sharma, Farkas, and Trapani.

On October 27, 2017, the *New York Times* published an article about Centra Tech and its co-founders Sharma, Trapani, and Farkas. The *Times* Article raised questions about (a) the defendants' qualifications, (b) the accuracy of the defendants' representations to investors during the Centra Tech's fundraising efforts, including misrepresentations about the members of Centra Tech's executive team, and (c) the pending perjury indictment in Manhattan against Sharma and Trapani. *Id.* ¶ 135. On September 19, 2017, the Manhattan District Attorney's Office filed a sealed indictment in New York County Supreme Court charging Sharma and Trapani with perjury. *Id.* As a result, Sharma was arrested on or about October 3, 2017 and Trapani surrendered on or about October 5, 2017.[4] *Id.* The *Times* article noted that, "For now, the bigger problem facing Mr. Sharma and Mr. Trapani is the perjury indictment by a Manhattan grand jury on Oct. 5," as Centra Tech had completed its fund-raising efforts. *Id.*

In the wake of the *Times* article, Centra Tech investors and the public began asking questions regarding the credibility of the company's claims and the stability of its executive team. *Id.* ¶ 136. On October 27, 2017, Sharma signed corporate resolutions: (a) removing himself from his positions as a Director and President of Centra Tech; (b) appointing Trapani's grandfather, William Hagner, as a Director and President of Centra Tech; and (c) appointing Farkas as a director of Centra Tech with full authority to control the company bank accounts. *Id.* ¶ 137. On October

---

[4] Both Sharma and Trapani later pled guilty to perjury charges in that case.

31, 2017, Farkas was also appointed as the Chief Operating Officer of Centra Tech. *Id.* Centra Tech issued a public statement on October 31, 2017 claiming that "Co-Founders Sam Sharma and Ray Trapani are stepping aside to support the continued growth of the Company" and that "the reconstituted Executive Management team" included "William Hagner as President" and "Robert Farkas as Chief Operating Officer," among others. *Id.* In early November 2017, Trapani separated from Centra Tech. Sharma continued to serve behind the scenes as the *de facto* chief executive officer of the company notwithstanding the company's public statement to the contrary. *Id.*

### D. Extradition Research and Document Destruction

In late November 2017, the SEC issued an initial subpoena to Centra Tech seeking documents from Centra Tech as part of the SEC's investigation of the scheme to defraud Centra Tech investors. *Id.* ¶ 139. This SEC subpoena requested a broad array of documents from Centra Tech relating to its co-founders, including Farkas. *Id.* In addition, Centra Tech, Sharma, Farkas, and Trapani, among others, were sued in Florida federal court in December 2017 in a civil securities fraud class action arising from the company's fraudulent ICO. *Id.* Sharma, Farkas, and Trapani were aware of the SEC's investigation and the civil suit. *Id.*

While the SEC subpoena and securities class action litigation were outstanding, Farkas requested and received research on foreign extradition laws from an attorney who was employed by Centra Tech ("Employee-1"). *Id.* ¶140. Specifically, Farkas asked Employee-1 to conduct research regarding foreign extradition laws. *Id.* Employee-1 performed this extradition research and reported the results to Farkas via email. *Id.* Farkas then approached Employee-1 and stated that he deleted his email. *Id.* Based on Farkas's demeanor during this interaction and the way in which he made that statement about deleting email, Employee-1 understood Farkas to be

suggesting that Employee-1 should also delete the copy of the email that Employee-1 had sent to Farkas regarding extradition research. *Id.*[5]

In approximately February 2018, when Farkas said he had destroyed his copy of Employee-1's extradition research and implied that she should do the same, Farkas was well aware that he was at risk of being charged by the SEC and also by the Government for his fraudulent conduct relating to Centra Tech. *Id.* ¶ 141.

## II.   Procedural History and Guilty Plea

On March 31, 2018, Sharma and Farkas were charged by federal criminal complaint (Dkt. 1), with: (i) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, (ii) securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; (iii) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and (iv) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Farkas was arrested on April 1, 2018, and ordered detained until he was released on bail conditions on May 25, 2018. PSR at 2; Dkt. 27. On April 18, 2018, Trapani was also charged by criminal complaint with the same charges as were filed against Sharma and Trapani. On May 14, 2018, a grand jury returned Indictment 18 Cr. 340 against Sharma, Farkas, and Trapani, which contained the same charges as the criminal complaints. On July 17, 2019, Trapani pled guilty, pursuant to a cooperation agreement with the Government, to charges in a ten-count superseding Information (S1 18 Cr. 340). PSR ¶ 7.

---

[5] In late February 2018 and early March 2018, Farkas twice traveled outside of the United States on business trips for Centra Tech (the first time to South Korea, and the second time to Canada), and returned to the United States afterwards on both occasions. PSR ¶ 140. On the day of Farkas's arrest in this case, April 1, 2018, Farkas was at the airport in Florida about to travel to South Korea to conduct Centra Tech business with another Centra Tech employee, a video technician. *Id.* That employee plus another witness interviewed by the Government stated that Farkas was going on a preplanned business trip, and there are flight records showing that they booked return flights to the United States at the conclusion of the trip.

Shortly following the Indictment, in May 2018, Farkas proffered on two occasions and admitted his conduct. However, Farkas's attempt at cooperation was not successful.

On June 16, 2020, Farkas pled guilty pursuant to a plea agreement with the Government, to securities and wire fraud conspiracy charges set forth in a two-count superseding Information (S2 18 Cr. 340), for participating from at least in or about July 2017 through in or about April 2018 in the above-described scheme to defraud Centra Tech investors.  PSR ¶¶ 1-5.

## III.  Presentence Investigation Report

The Probation Office, consistent with the Plea Agreement, calculated that Farkas has a total Guidelines offense level of 27: the base offense level is six (U.S.S.G. § 2B1.1(a)(2)); 22 levels are added because the loss amount resulting from the offenses is more than $25,000,000, but less than $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(L)); two levels are added because the offenses involved 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)); two levels are added because a substantial part of the fraudulent scheme was committed from outside the United States, and the offenses involved sophisticated means (U.S.S.G. § 2B1.1(b)(10)(B) and (C); a two-level reduction is warranted because Farkas's role in the offenses relative to Sharma and Trapani was that of a minor participant; and a three-level reduction is warranted because Farkas clearly demonstrated acceptance of responsibility and gave timely notice of his intention to enter a plea of guilty (U.S.S.G. §§ 3E1.1(a) and (b)).  PSR ¶¶ 161-174; Plea Agreement at 3.  Farkas has no prior convictions and is in Criminal History Category I. PSR ¶ 177; Plea Agreement at 4.  Accordingly, Farkas's advisory Guidelines range is 70 to 87 months' imprisonment.  PSR ¶ 217.

After interviewing Farkas and preparing its final presentence investigation report for his case, the Probation Office has recommended a term of 60 months' imprisonment for Farkas. PSR at 48. In making its recommendation, the Probation Office found that, although the instant offenses

did not involve crimes of violence, Farkas's actions were "nevertheless serious." *Id.* at 50. The Probation Office considered that Farkas and his co-defendants caused victims "to experience stress, anxiety, depression, and financial hardship," and, although Farkas is a first-time offender and notwithstanding his relatively minor role in the offense conduct, "a custodial sentence is warranted." *Id.* Considering all of the relevant factors – including Farkas's role, his personal history and recent fatherhood, and the need for just punishment and deterrence from future behavior – the Probation Department recommended a variance allowing for a sentence of 60 months' imprisonment. *Id.*

## DISCUSSION

In view of the need in this case to reflect the seriousness of the offense, afford just punishment, promote general deterrence, and encourage respect for the law, a sentence requiring Farkas to serve a substantial term of imprisonment is necessary to meet the goals of sentencing as set forth in Title 18, United States Code, Section 3553(a). To be sure, there are mitigating circumstances surrounding Farkas' offense conduct that warrant a variance below the Guidelines-recommended sentencing range of 70 to 87 months' imprisonment. But the non-custodial sentence that Farkas seeks would be insufficient in light of the purposes of sentencing enumerated in Section 3553(a).

## I.   The Nature and Seriousness of Farkas's Criminal Conduct and the Need for Just Punishment Warrant a Substantial Sentence of Imprisonment.

The "nature and circumstances" of Farkas's criminal conduct and the need to impose just punishment weigh decidedly in favor of a substantial sentence of incarceration. *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A). Farkas asks for a sentence of time served (which was a total of 55 days) "with home confinement and a substantial amount of community service." Dkt. 403 at 3. In doing so, Farkas elides the seriousness of his offense conduct and the impact it has had on so many of

his victims. Farkas's undeniable criminal conduct speaks for itself. Day in and day out, for approximately nine months, Farkas participated in a scheme that directly caused losses of tens of millions of dollars in funds from hundreds of victim investors. His participation continued even in the aftermath of the mounting criticism he faced as a result of the *New York Times* article, which revealed many of the lies that he and his co-conspirators used to lure investors. The methods that Farkas employed to lure victims, and then work to cover up the scheme by attempting to create a company and a product that lived up to the lies he perpetrated, evince the serious nature of his conduct and his role in the scheme which, while minor compared to Sharma and Trapani, was nonetheless significant and ongoing in nature. Farkas's actions included, *inter alia*: (i) participating in the lies that Sharma concocted regarding Centra Tech's fake partnerships with Bancorp, Visa and Mastercard; (ii) offering the use of and using his family members' photographs as the fake Michael Edwards (his father) and the fake Jessica Robinson (his sister), so as to perpetuate the material fiction that such esteemed executive team members, loaded with fake credentials, existed; (iii) participating in recording and producing videos staging fake demonstrations of a "Centra Card" to mislead investors into believing that Centra Tech had a fully operational cryptocurrency debit card that worked on established networks when it did not; (iv) manipulating the price of digital Centra tokens issued by Centra Tech as part of its ICO on various cryptocurrency exchanges; and (v) working with Sharma and others to salvage the façade of Centra Tech as a legitimate company through April 2018.

Contrary to Farkas's legal arguments, in this case the estimated loss amount of more than $25 million appropriately reflects the severity of the harm caused by Farkas's actions. In arguing that "significant funds" remain available to repay the victims, and that the Court should credit that as a mitigating factor for Farkas at sentencing, Farkas fails to acknowledge that those funds were

seized by the Government only after a repeated and ongoing effort by Sharma to obstruct law enforcement's access to and attempts to secure those funds.[6]  Nor does Farkas acknowledge that the funds seized by the Government do not represent all the funds that he and his co-conspirators raised from their victims during their fraudulent fundraising efforts.  The Government has provided records to Farkas (and Sharma) of financial analyses demonstrating that they raised millions of dollars in victim-assets in addition to, and separate and apart from, the 100,000 ETH that the Government was able to seize pursuant to judicially authorized seizure warrants.   That the Government was able to seize 100,000 ETH is, indeed, significant.  However, millions of dollars in additional funds that the defendants raised through their scheme were dissipated or remain unsecured.[7]

---

[6] After Farkas and Sharma were arrested in April 2018 on federal securities and wire fraud charges in this case for defrauding Centra Tech investors, this Office and the FBI seized a total of approximately 100,000 Ether units from a digital wallet controlled by Sharma that the defendants had obtained from Centra Tech investors through their fraudulent fundraising efforts, pursuant to two judicially-approved seizure warrants, to prevent anyone from dissipating those investor funds during the pendency of this criminal prosecution.

[7] This fact, among others, distinguishes this case from *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD) (E.D.N.Y.), upon which Farkas relies for the assertion that he should receive a non-custodial sentence because victims have the opportunity of compensation in this case.  *See* Dkt. 403 at 30 ("In *Zaslavskiy*, a recent case in the Eastern District of New York involving cryptocurrency, Judge Raymond J. Dearie noted that it was extraordinary that most or all of the victims would be recompensed and therefore sentenced the defendant well below the Guidelines range even though he was main actor in that fraud.).   In *Zaslavskiy*, the district court sentenced a defendant who defrauded investors through two initial coin offerings (one of which was through the company REcoin, the subject of text messages between the defendants in this case while they were carrying out their fraudulent scheme), and who was facing a Guidelines range of 30 to 37 months' imprisonment, to 18 months' imprisonment.  *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD) (E.D.N.Y.) (Dkt. 50, 66).   The defendant, Maxim Zaslavskiy, pled guilty to one count of conspiracy to commit securities fraud for which the loss amount was approximately $308,963. *Id.* By contrast, Farkas directly received approximately $350,000 and a Rolex watch from fraud proceeds in this case, and helped to raise millions more than his co-conspirators dissipated.   The *Zaslavskiy* example, in which a defendant who caused approximately $300,000 of loss and faced a Guidelines range of 30 to 37 months' imprisonment was sentenced to 18 months' imprisonment, mitigates in favor of a substantial custodial sentence in this case, in which Farkas caused at least

Farkas's argument that "the vast majority of funds raised" were "used with the intention to build a business or had not been spent at the time of" his arrests (Dkt. 403 at 31) only proves the brazen nature of the fraud he knowingly participated in: he and his co-conspirators lied, repeatedly, to victim investors about various aspects of Centra Tech in order to raise millions of dollars that they spent significant amounts of on themselves, and then scrambled to patch together a business that might develop what they had promised investors they had already developed in order to cover up their fraud. That they used millions of dollars of their fraudulently obtained funds "to build a business" which they had lied to investors about can be of no comfort to their hundreds of victim investors and is absolutely no justification for Farkas's conduct. The use of victim investors' funds to attempt to "build a business" was an extension of the fraudulent scheme, and no credit should be awarded to Farkas on that basis. [8]

The victim impact statements submitted by some of victims in this case illustrate the financial, personal, and emotional harm that Farkas and his co-conspirators inflicted when they repeatedly lied to investors to raise funds and then used those funds for their own personal benefit and, as Farkas puts it, to "build a business" founded on those lies:

- Mike Conard reported that he invested in Centra Tech because he "was looking for ways to invest money so that [his] kids can have a future." Finding out that Centra Tech was a scam "sparked and caused a lot of family hardship," including the end of his nine-year marriage. *See* Mike Conard VIS.

- Maikel Priest describes the "huge impact" of the fraud on his life: "I had to sell my car, I had to leave my apartment and went back to live with my parents. It was the straw

---

$25,000,000 of loss (and personally benefited to the tune of approximately $350,000) and faces an agreed-upon Guidelines range of 70 to 87 months' imprisonment.

[8] When Farkas was arrested on April 1, 2018, Centra coins were valueless, Centra Tech had drawn down the victim funds that Sharma and Farkas had liquidated into bank accounts, and Sharma and Farkas were winding down Centra Tech in favor of offshoot companies in the cryptocurrency business bearing various names.

that made the bucket overflow. I lost my total investment budget and have to give up my dream." *See* Maikel Priest VIS.

- Waldemar Derdau described receiving a $900 per month disability pension, and feeling "[v]ery [a]ngry" and "quite [d]epressed" that his funds were stolen from him. *See* Waldemar Derdau VIS.

- Edward Lawlor described taking out a line of credit to purchase ETH to invest into Centra Tech, and reported that he is still, approximately three years later, paying off his line of credit. *See* Edward Lawlor VIS.

- Ali Khalid described the serious mental, emotional, and financial toll the fraud has taken on him and his family, including "severe anxiety and depression." *See* Ali Khalid VIS.

- John Kraayenvanger described investing in Centra Tech "after being misle[d] having seen a working product," and "the loss of most of [his] life savings." *See* John Kraayenvanger VIS.

Although Farkas received less personal monetary benefit than his co-conspirators, Farkas's participation in the scheme nevertheless directly resulted in the substantial amount of loss to the victims, which will only be partially resolved through the *Government's* efforts to secure and preserve the victims' funds.[9]

Against this backdrop, the impact of harm caused by Farkas, and the nature and seriousness of the offenses in which he participated, cannot be ignored and militate in favor of a substantial sentence of incarceration.

---

[9] The suggestion that Farkas should be afforded some credit for the preservation and expected return of some funds to victims because he and Sharma moved, in October 2019, for funds seized by the Government to be returned to the victims (a motion that had no legal basis and was, in fact, opposed by victims in this case) should be rejected. Two months before Farkas and Sharma were slated to stand trial in this case – a year and six months after their arrests – they filed a motion with this Court for the purported purpose of obtaining an order directing the Government to "immediately" return the seized Ether to anyone who purchased Centra tokens during the ICO and suffered a loss as a result. In reality, the defendants' motion to return the seized Ether to their victims was an attempt to manufacture evidence that they wanted to admit at trial to invite the jury to acquit them on a "no harm, no foul" theory of criminal liability: that because they had allegedly offered to return (some of) the assets that they stole through lies, they should not be convicted of fraud.

## II.   A Substantial Sentence of Incarceration is Necessary to Afford Adequate Deterrence and Promote Respect for the Law.

A substantial sentence of incarceration is also necessary to serve the sentencing goals of adequately deterring criminal conduct—in this case, stealing money from innocent victims for one's own (and one's friend's) purposes—and to promote respect for the law that prohibits such conduct. *See* 18 U.S.C. §§ 3553(a)(2)(A), 3553(a)(2)(B). Specific deterrence remains a concern in this case, notwithstanding Farkas's apparent recent efforts, while on court-ordered pretrial supervision, to lead a law-abiding lifestyle. General deterrence is also a serious concern.

General deterrence is particularly important here in light of the nature of the fraudulent scheme. Compared to more traditional ways that companies raise capital, ICOs present increased risks of fraud and manipulation because the markets for digital assets are less regulated than traditional capital markets. *See, e.g.*, "Spotlight on Initial Coin Offerings," *available at* www.sec.gov/ICO (last visited Oct. 30, 2020). Moreover, fraudulent ICOs leave victims with little recourse because it is often difficult to trace investments that are made using cryptocurrencies. *Id.* Additionally, while legitimate ICOs represent a new and efficient means to raise capital, the loss of investor confidence that may result from fraudulent ICO offerings will make it more difficult for honest coin issuers to raise capital through the digital asset markets. As a result, a substantial sentence in this case is needed to send a strong message to others, like the defendant, who seek to use digital assets or other new technologies to commit old-fashioned fraud.

A sentence of time served (of 55 days in jail), home confinement and community service, as Farkas seeks, against the backdrop of the massive fraud in which Farkas participated, would hardly deter others from committing similar crimes. On the other hand, a significant prison sentence will serve to deter others who may consider engaging in similar crimes, and buttress confidence in the financial markets by sending the message to the investing public that individuals

who raise money through lies and deceit about their companies, their products, and themselves for their personal benefit and for the benefit of their co-conspirators will be appropriately punished.

III.     **Farkas's Medical History Does Not Support the Significant Variance He Seeks.**



## IV.    Farkas's Family Ties and Personal History Do Not Support the Time-Served and Home Confinement Sentence He Seeks.

Farkas's sentencing submission, and the letters of support from his family and friends, are noteworthy in that they represent an indisputable reality: Farkas committed this brazen scheme – time and again choosing lies and deceit for personal and artificial professional gain – notwithstanding his relatively privileged personal history and the admirably strong affection and support provided by his extensive network of family and friends. By his own account, Farkas was "fortunate to have had what he considered a good childhood growing up in a middle-class household with a close nuclear family." Dkt. 403 at 12. In this regard, Farkas stands in stark contrast to thousands of other defendants who commit crimes against a backdrop of devastating financial hardship, trauma, abuse, or other exceptionally difficult life circumstances. Farkas, who

was 30 years old when he began committing the instant offenses, had a strong familial support network, options, and opportunities.  Instead, he chose fraud and deceit.  After his arrest, and while he was facing trial in this case, Farkas chose to get engaged and start a family.  The support he has provided his family in connection with the birth of his child may demonstrate that Farkas hopes to put his criminal conduct behind him.  The letters of support from Farkas's family members are commendable.  However, Farkas's recent life choices and the impact that a custodial sentence may have on his family do not support the non-custodial sentence he seeks because they do not mitigate the nature and seriousness of his criminal conduct, and they do not obviate the need for a sentence of incarceration that would serve as just punishment and afford adequate deterrence to criminal conduct.

## FORFEITURE AND RESTITUTION

Farkas has consented to the entry of an order of forfeiture for $347,062.58 in fraud proceeds that he received directly, and a Rolex watch that was purchased for him with fraud proceeds derived from his offenses.  Dkt. 395.

With respect to restitution, the Government has filed a motion, with the consent of the defendants, pursuant to 18 U.S.C. § 3663A(c)(3) for an order from the Court forgoing restitution as impracticable in this case.  *See* Dkt. 404.  The Government intends instead to exercise its discretion under applicable forfeiture laws to proceed via the well-established process of forfeiture and remission to compensate victims of the Centra Tech fraud perpetrated by Farkas and his co-conspirators.  *Id.* at 1.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a substantial sentence of imprisonment would be reasonable and just in this case.

Respectfully submitted,

ILAN T. GRAFF
Attorney for the United States
Acting Under 28 U.S.C. § 515

By: _____/s/_____
Samson Enzer
Daniel Loss
Negar Tekeei
Assistant United States Attorneys
Southern District of New York