1    KCF7FARC

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x

4    UNITED STATES OF AMERICA,

5              v.                           18 Cr. 340 (LGS)

6    ROBERT FARKAS,

7                   Defendant.

8    ------------------------------x
                                           New York, N.Y.
9                                          December 15, 2020
                                           11:00 a.m.
10

11   Before:

12                    HON. LORNA G. SCHOFIELD
                                           District Judge
13

14                    APPEARANCES (via telephone)

15   AUDREY STRAUSS
          Acting United States Attorney for the
16        Southern District of New York
     BY:  SAMSON ENZER
17        DANIEL LOSS
          NEGAR TEKEII
18        Assistant United States Attorneys

19   BRIAN KLEIN
     PAUL PETRUZZI
20   SANFORD TALKIN
          Attorneys for Defendant

21

22

23

24

25

1            (Case called)

2            DEPUTY COURT CLERK:  Good morning.  We are here in the

3      matter of 18 Crim. 340, United States of America v. Robert

4      Farkas.  Before we begin, I would like too remind the parties

5      and anyone listening that recording or rebroadcasting of this

6      proceeding is prohibited.  Violation of this prohibition may

7      results in sanctions.  We are here before the Honorable Lorna

8      G. Schofield.  If counsel would just state their name for the

9      record.

10           MS. TEKEEI:  Good morning, your Honor.  Negar Tekeei

11     on behalf of the United States, and joining me are my

12     colleagues AUSAs Sam Enzer and Dan Loss.  I would also like to

13     note that our special agents Brendan Rav and Kristen Elaine are

14     also joining by phone.

15           THE COURT:  Great.

16           MR. PETRUZZI:  Good morning, your Honor.  Paul

17     Petruzzi on behalf of Robert Farkas.  Mr. Farkas is present

18     remotely, participating in the proceedings from his home.  Also

19     present with me are cocounsel, Sam Talkin and Brian Klein.

20           THE COURT:  OK.  Good morning, everyone.

21           As you can see, we are proceeding by video conference,

22     and I myself is outside the District.  Mr. Farkas, can you see

23     and hear me?

24           THE DEFENDANT:  Yes, your Honor.

25           THE COURT:  Good morning.  If at any point you cannot

1    see or hear me, or anybody else, please let me know, and we

2    will try to fix that.  OK?

3              THE DEFENDANT:  OK.

4              THE COURT:  You have the right to be physically

5    present for your sentencing.  Your lawyer has made a written

6    request that we proceed remotely, because I understand you are

7    living in Florida, and of course travel is risky during the

8    days of the pandemic.  And your lawyer has stated that you

9    waive your right to be physically present.  Is that correct?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  And do you want us to proceed with your

12   sentencing this way by video?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  I find the proceeding cannot be further

15   delayed without serious harm to the interests of justice,

16   because Mr. Farkas is understandably eager for the sentencing

17   to proceed, and the proceedings in this case have been

18   previously delayed because of the pandemic.

19             Mr. Farkas, do you have family members or friends who

20   are there with you or are joining us by phone?

21             THE DEFENDANT:  Yes, your Honor, my parents are here.

22             THE COURT:  Do you want to just introduce them and let

23   them say hello?

24             THE DEFENDANT:  Yes, sure.

25             THE COURT:  Thank you all for being here.  It's

1    extremely important for a court in this kind of situation to

2    understand that the defendant has lots of support.  And it's

3    clear to me not only from the letters I have read but also from

4    your family's presence here that you do, so thank you for

5    introducing them and thank you for having them.

6           We are here today to impose sentence in the case of

7    United States v. Robert Farkas.  Mr. Farkas pleaded guilty to

8    two counts, the first conspiracy to commit securities fraud,

9    and the second conspiracy to commit wire fraud.  This was all

10   pursuant to a plea agreement dated June 15, 2020.

11          To prepare for the proceeding today, I have reviewed

12   the presentence report -- which was last revised in September

13   of 2020 -- and also received and reviewed the defendant's

14   submission dated October 16, 2020, and the letters that I just

15   referenced.  So, for the record I have read them, but I will

16   mention who I have read letters from.  So Mr. Farkas, I have

17   your letter and I have read it.  Thank you.  I also have

18   letters from your immediate family members:  Brielle Farkas,

19   your sister, who I just met; Cynthia Farkas, your mother; also

20   Robert Farkas, your father; Dyesha Lee, your sister; Christina

21   McGowen, your sister; and Donna Valez, your fiancee.

22          I also have letters from other family members:

23   Christopher Farkas, your uncle; Glenn Farkas, your uncle; Jean

24   Farkas, your aunt; Travis Lee, your brother-in-law; Alexis

25   Maziarski, your niece; and Lucy Valez, your fiancee's mother.

1          I also have letters from friends:  Donna Destefano,

2    Dyana Koon, Andrew Malwicki, Nicole Parico, and Marina

3    Quasiato.  I also have a letter from Dr. Rafeal Kellman as well

4    as a copy of your medical records.

5          In addition, I have the government's submission which

6    is dated October 30, 2020.  I also received and reviewed 24

7    victim impact statements and a related letter from the

8    government that I received yesterday.

9          Is there anything I am missing, Mr. Petruzzi?

10         MR. PETRUZZI:  No, your Honor, not that I am aware of.

11         THE COURT:  Ms. Tekeei, is there anything I'm missing?

12         MS. TEKEEI:  No, your Honor.  I do believe we received

13   one additional victim impact statement yesterday, which our

14   victim witness coordinator is preparing and our paralegals are

15   preparing to produce to the Court, however, the Court has

16   accurately looked at everything that has been submitted to the

17   Court so far.

18         THE COURT:  All right.  And the additional victim

19   impact statement, do you either want to summarize it for me or

20   tell me it's substantially the same as the others that I have

21   reviewed?

22         MS. TEKEEI:  Your Honor, it is substantially the same

23   as the others that you have reviewed.

24         THE COURT:  Thank you.

25         I would also note that I have reviewed the transcript

1    of Mr. Farkas's guilty plea before Judge Cott, which took place

2    on June 16, 2020, and I signed an order accepting your plea.

3              Mr. Petruzzi, have you read the presentence report?

4              MR. PETRUZZI:  Yes, I have, your Honor, as well as the

5    addendum.

6              THE COURT:  And have you discussed it with your

7    client?

8              MR. PETRUZZI:  Yes, your Honor, I have.  We have

9    reviewed all matters in the presentence report and any

10   pertinent objections thereto, all of which have been resolved.

11             THE COURT:  Thank you.

12             And, Mr. Farkas, have you read the presentence report

13   and discussed it with your lawyers?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  And have you had the opportunity to go

16   over with him any errors in the report or anything else that

17   you think should be taken up with the court?

18             THE DEFENDANT:  Yes, your Honor.

19             THE COURT:  Ms. Tekeei, have you reviewed the

20   presentence report?

21             MS. TEKEEI:  Yes, your Honor.

22             THE COURT:  So, I will put the question to you first

23   Ms. Tekeei.  Putting aside the calculations of the sentencing

24   guidelines, does the government have any objections to the

25   report regarding its factual accuracy?

1          MS. TEKEEI:  Your Honor, we have one clarification to

2     make, and it is consistent with the substance of the

3     government's letter that was submitted yesterday.  It is with

4     respect to paragraph 155 of the PSR.  That paragraph described

5     a victim impact statement in which the victim reported that his

6     failed Centra Tech investment led to the divorce from his wife,

7     and so we request that that particular paragraph be clarified,

8     as we have no objection to removing that particular sentence,

9     which I believe is ten lines down from the top and begins with

10    "additionally another victim".  Consistent with our letter of

11    yesterday, we have no objection to striking that sentence from

12    the PSR.

13         THE COURT:  OK.  So, is this actually a request to

14    amend the presentence report and strike the sentence?

15         MS. TEKEEI:  I mean technically it is, your Honor, and

16    I am certain defense counsel have no objection to that.  But

17    the Court should certainly inquire.

18         THE COURT:  All right.

19         And, Mr. Petruzzi, do you have any objections to the

20    report regarding its factual accuracy?

21         MR. PETRUZZI:  No, your Honor, I do not.  Consistent

22    with Ms. Tekeei's, I guess, request for clarification or

23    revision of the report, I would also ask that it just simply

24    note that because of the circumstances, the government hasn't

25    independently verified all of the information in the victim

1    impact statements.  But having said that, none of it I believe

2    changes the guidelines calculations that the parties have

3    arrived at.  I think it would go probably to the weight that

4    your Honor would accord each of the victim impact statements.

5              THE COURT:  So, you are also asking for a note that

6    that the government has not independently verified all the

7    victim impact statements.  I actually recall reading that but I

8    don't recall reading it necessarily in the presentence report.

9              Ms. Tekeei, do you have any objection to that

10    amendment as long as we are amending the report?

11              MS. TEKEEI:  No, your Honor.  I think that's

12    consistent with our letter from yesterday, which is where the

13    Court probably first saw that language, and so we have no

14    objection to a statement along the lines of the government has

15    produced to the Court and to the defense the victim impact

16    statements that have been submitted to its victim witness

17    coordinator, without undertaking to independently verify all of

18    the assertions contained in those victim impact statements.

19              THE COURT:  OK.  So, I will adopt the factual

20    recitation set forth in the presentence report with those two

21    amendments:  One, regarding a clarification to paragraph 155 as

22    we discussed, and the other is to add a note about the victim

23    impact statements in general.

24              I direct that a complete copy of the presentence

25    report be prepared for the Bureau of Prisons and the Sentencing

Commission.  The report will be made part of the record in this matter and placed under seal.  If an appeal is taken, counsel on appeal may have access to the report without further application.

Mr. Farkas, what I would like to do now is turn to the sentencing guidelines.  We are still required to consider the guidelines in determining what the appropriate sentence is, although we're not required to follow the recommendation.  But, in any event, it's necessary for me to accurately calculate what the guidelines recommendation is.

So, as you know in this case, there was a plea agreement between you and the government in which the parties stipulated to a particular calculation of the guidelines, and the calculation in the presentence report appears to be the same as what appears in your plea agreement, so I assume there is no objection to the calculation in the presentence report.

Is that right, Ms. Tekeei?

MS. TEKEEI:  Yes, your Honor.

THE COURT:  And, Mr. Petruzzi, is that right?

MR. PETRUZZI:  Yes, your Honor, it is.  Thank you.

THE COURT:  So, based on the parties' agreement, and the absence of objection, as well as my independent evaluation of the sentencing guidelines, I accept the guideline calculation in the presentence report.  I find the offense level is 27 and the Criminal History Category is I.

1          So, Mr. Farkas, what all of that means is that the

2     recommended prison term under the guidelines is 70 to 87

3     months, as well as a fine between $25,000 and $250,000

4     supervised release of one to three years on each count, and

5     probation is not recommended.

6          That of course is separate from the maximum sentence

7     that I can impose, which is much greater.  The maximum term of

8     imprisonment is up to five years on each count, which comes to

9     a total of ten years.  The maximum fine is $250,000.

10    Supervised release under the statute, the maximum is three

11    years.  And the statute would also permit probation of up to

12    five years.

13         There is a mandatory special assessment of $100 per

14    count or $200, which I will impose.  And with regard to

15    restitution, on November 5, 2020 I granted the government's

16    motion, finding that restitution is impracticable in this case.

17    And with respect to forfeiture, I understand and have seen an

18    agreement that the defendant consents to the entry of a money

19    judgment against him in the amount of $347,062.58; also that

20    the defendant has never claimed to have any right, title or

21    interest in any of the 100,000 ether units that the F.B.I.

22    seized in 2018 in connection with this case; and finally Mr.

23    Farkas consents to the forfeiture of a particular Rolex watch

24    that his co-defendant, Mr. Sharma, gave him from proceeds of

25    the crimes that are charged and admitted.

1          Are there any objections to the sentencing options I

2     have outlined?  Mr. Petruzzi?

3          MR. PETRUZZI:  No, your Honor.  Thank you.

4          THE COURT:  Ms. Tekeei?

5          MS. TEKEEI:  No, your Honor.  Thank you.

6          THE COURT:  So, I see from the plea agreement that

7     neither party believes that an upward or downward departure is

8     appropriate, so while I have authority to depart, I decline to

9     do that.  That of course is separate from a variance.  And for

10    some of the people listening, that's all a way of saying

11    technically that the parties have reserved their right to ask

12    the Court to vary from the recommendation in the guidelines.

13    So, I will hear from the government first.

14         MS. TEKEEI:  Your Honor, one housekeeping matter, with

15    the Court's permission prior to our discussion of the

16    guidelines and the sentencing factors.  And the court has

17    already alluded to this.

18         But one additional factor to why we believe there is a

19    CARES Act basis to proceed here via video conference remotely

20    is that because restitution is impracticable in this case, and

21    the government intends to proceed via the well established

22    process of forfeiture and remission to compensate the victims

23    of fraud in this case, that process cannot begin until after

24    the assets have been judicially forfeited and following the

25    entry of a final order of forfeiture.  So, sentencing is

important and the final order of forfeiture are critical

components in that process, and as this case has been pending

for more than two and a half years, the victims here do have an

interest in seeing it resolved and proceeding toward the point

at which they can receive compensation.  And we add that only

to supplement the record as to the Court's original findings

that we may proceed under the CARES Act by video conference.

THE COURT:  OK, thank you.  And I will adopt what you

said as additional findings as the basis to proceed by video.

And as long as we are on the subject, could you tell me what

the schedule is for compensating the victims.  What steps have

to be taken and when do you expect it to happen?

MS. TEKEEI:  The first step would be the final order

of forfeiture, which happens after the preliminary order of

forfeiture is posted and victims and other parties have 30 days

to raise their hands and raise any issues that they may have

with the preliminary order of forfeiture.  Once the funds are

actually forfeited, then they go through the remissions process

with main Justice, the Department of Justice.  I don't sitting

here today have a schedule, and I wouldn't want to get out

ahead of ourselves on predicting the exact time line, but it is

our offices's recommendation, and we do seek to attempt to

proceed with the remissions process.

The victims in this case have been notified about

various matters, various proceedings via our victim

1     notification system, and we intend to alert the victims in this

2     case about the opportunity for remission and what they will

3     need to do in order to seek remission via the same victim

4     notification system.

5          THE COURT:  OK.  What I am inclined to do is to issue

6     an order asking for status so that I understand that this is

7     proceeding.  Obviously, getting compensation to the victims is

8     important for many reams.  Obviously it's important to the

9     victims, but I think it's also relevant to the sentencing here,

10    in that the argument has been made that victims largely will be

11    fully compensated or close to fully compensated.  But that only

12    has peace if it comes to pass and it comes to pass relatively

13    promptly.

14         So, would you have any objections and do you have any

15    suggestions as to who the directive should be addressed so that

16    I can get timely and accurate reports as to what is happening

17    with the remission system?

18         MS. TEKEEI:  Certainly, your Honor.  I would like to

19    answer the Court's question with clarity.  I think some of that

20    really depends on the sentencing of Mr. Farkas's co-defendant,

21    who in connection with his sentencing has agreed to forfeit the

22    $100,000 ether that the government seized.  So, I don't have a

23    perfect answer for you today, but how about the government will

24    provide the Court with a letter indicating how best to proceed

25    in terms of status updates to the Court and to whom the Court

1    can address any future directives related to the remissions

2    process.  I apologize for not having more perfect answers for

3    your Honor today, but I would rather not answer with an answer

4    that's not clear or inaccurate, and so we certainly can provide

5    the Court with better information and further clarification,

6    now that the Court has posed these questions.

7              THE COURT:  OK, I appreciate that.

8              Another question I have is it sounded from your answer

9    as though this process can't begin until the sentencing of the

10   co-defendant who has agreed to forfeit the ether.  Is that

11   correct?

12             MS. TEKEEI:  Yes, your Honor.  A preliminary order of

13   forfeiture has been entered in connection with Mr. Sharma,

14   however, that order of forfeiture is not yet final, and

15   sentencing is an important component to that.

16             THE COURT:  OK.  I should know this, but I don't have

17   it handy.  Do you know what our sentencing date is for

18   Mr. Sharma?

19             MS. TEKEEI:  I believe it's January 19, but I can

20   double check.

21             THE COURT:  That's all right.  I am sure Mr. Street

22   has it.

23             DEPUTY COURT CLERK:  That's correct, your Honor.

24             THE COURT:  Thank you.

25             So, having addressed that restitution process, do you

1    have other remarks with regard to sentencing?

2         MS. TEKEEI:  Thank you, your Honor.  And we will try

3    to be brief and only amplify some of the points in our prior

4    submission.

5         As the Court is now aware from the lengthy briefing in

6    this matter, the PSR and the parties' submissions in connection

7    with sentencing, Mr. Farkas and his coconspirators first lied

8    to their victims in order to raise more than $25 million in

9    victim investor funds, and then they lied to cover up the

10   scheme and lull their victims when certain aspects of their

11   fraud were discovered and widely publicized.

12        Mr. Farkas in particular embraced and participated in

13   the lie about Centra Tech's fake partnerships with Bancorp,

14   Visa and Mastercard.  He used his family photographs as fake

15   Centra Tech executives to perpetuate the material fiction that

16   those executives who had substantial but entirely faked

17   credentials actually listed.  He recorded and produced videos

18   stating state demonstrations of the so-called Centra Card to

19   mislead investors, and he helped to manipulation the price of

20   digital Centra Tech tokens issued by Centra Tech as part of the

21   ICO -- or the initial coin offering.  These are undisputed

22   facts for the PSR.

23        As we conveyed in our sentencing submission, your

24   Honor, we certainly recognize that there are mitigating factors

25   here that do weigh in favor of a below guidelines range

1    sentence.  Those include Mr. Farkas's role in the offense, the

2    amount of money he personally received, the steps he has taken

3    to get his life back on track after the arrest, and the support

4    that he has provided to his young family and the support his

5    family has provided to him.  However, we do not believe that

6    these factors are so extraordinary that they should give rise

7    to a sentence of no additional incarceration.

8         Mr. Farkas and his co-conspirators capitalized on a

9    burgeoning new world of cryptocurrency investments.  They used

10   that as their primary vehicle for the fraud, the initial coin

11   offering, a new type of investment opportunity.  And as

12   compared to more traditional ways of raising capital, I feel it

13   presents increased risk of fraud and manipulation, and they

14   make it more difficult to trace investment by victim

15   investors -- a real problem and a real issue that we are having

16   in this case here.  It's not a hypothetical issue.

17        By peddling lives about fake executives, fake business

18   relationships and fake cards under the auspices of an initial

19   coin offering, Mr. Farkas and his coconspirators took advantage

20   of hundreds of victim investors in a relatively short

21   timeframe, a sentence of additional incarceration will send the

22   important message that lies and deceit in the innovative

23   digital securities world will be met with the same consequences

24   as lies and deceit in more traditional markets.

25        Against this backdrop, the type of sentence that Mr.

1    Farkas is requesting is not appropriate when considering the

2    serious nature of the offense and the need to afford just

3    punishment and to promote general deterrence.

4           And with respect to Mr. Farkas's medical concerns,

5    your Honor, this is not a binary issue.  There is a clear

6    middle road here where the Court can -- and we submit should --

7    impose the sentence that it would on Mr. Farkas absent the

8    COVID-19 pandemic, and simply direct the latest surrender date

9    as this court and other courts in this district have done in

10   light of the pandemic.  Unless the Court has any other

11   questions, we have no further statements.

12          THE COURT:  Thank you.  I don't have any further

13   questions.

14          Mr. Petruzzi, would you like to be heard?

15          MR. PETRUZZI:  If I may, may it please the Court, good

16   morning again, your Honor.

17          First, I would like to thank Ms. Tekeei and also

18   Mr. Enzer and Mr. Loss, and I would like to thank my cocounsel

19   as well, Judge, Mr. Talkin and Mr. Klein.

20          For the past two years or more a little bit I have had

21   the pleasure of working with this extraordinary group of

22   lawyers.  In a sense, I think, as your Honor can see from Ms.

23   Tekeei's argument, we have worked collaboratively to try to get

24   the victims made whole.  We have all known for some time that

25   there would have been an ability to liquidate the seized ether

1     tokens that the government has, and we have worked to make that

2     happen.  So, while it has been great to work with everybody,

3     it's not to say that we haven't had our disagreements as we

4     have worked through this process.  And one of those

5     disagreements is right now, and that's what sentence your Honor

6     would find appropriate and what sentence we are advocating for.

7          We certainly disagree with the government.  We think

8     that this case is unique.  We think that our client, Mr.

9     Farkas, is very unique with respect to his participation in the

10    offense.  And we think because of who he is, what the offense

11    was, and his participation in the offense was, and where we are

12    with the victims, and the availability of proceeds to make the

13    victims whole, we think the sentence we are requesting is a

14    sentence that's reasonable, and that's sufficient under the

15    circumstances.

16         So, in any event, I would like to -- and we recognize

17    that it would be a relatively extraordinary variance.  And it's

18    not to say that the parties all haven't agreed that a variance

19    wouldn't be appropriate.  I think it's an unusual case where

20    the government, probation and the defense agree that some

21    sentence below the low end of the guideline range would be an

22    appropriate sentence.  In this case we have that situation, and

23    your Honor has at least from my view the unenviable task of

24    figuring out what that is.

25         And so I'd like to start with the nature and

1    circumstances of the offense.  There is very little I can add

2    to the government's submission.  Certainly there is little I

3    can add to the PSR with respect to the nature and circumstances

4    of this particular offense, your Honor.

5            The only thing that I would say is that the ICO lasted

6    from July of 17 to October of 17, and a lot of the preliminary

7    work for that ICO was done before Mr. Farkas even joined the

8    company at the invitation of his sister's boyfriend.  And

9    that's somebody that Mr. Farkas really didn't know very well at

10   the time, although your Honor has recognized that from Mr.

11   Farkas's letters he is all too willing to help his sisters and

12   his sister's friends when a call arises.

13           What did he do with respect to this offense?  Quite

14   simply, as the government recognized, he did what he was told,

15   and that's why the parties have all agreed that a minor role

16   adjustment would be appropriate.

17           So, what do you do with an individual who has been

18   involved in a sophisticated offense but he is just sort of the

19   unsophisticated guy?  And I think that that's also reflected by

20   the fact that we have a $36 million intended loss here and a

21   defendant who personally profited, at least from what our

22   agreement is and what the numbers reflect, $348,000, which is a

23   relatively small percentage of that 36 million.

24           So, to a degree the offense itself vis-a-vis Mr.

25   Farkas's participation in it seems to be overstated, and that's

often the problem when there is this giant amount of intended
loss by an individual who played relatively speaking a minor
role in that offense.

So, the offense itself may have been sophisticated.
Mr. Farkas's role in it may not have been all that
sophisticated insofar as he was just doing what he was told.
So then the question becomes who was he answering to.  And I
think your Honor in arriving at a just and appropriate sentence
has to look at the relative culpability of the parties in this
case.

So, Mr. Farkas is someone who comes into the case
after being recruited by a friend and future family member, and
he comes into the case without having any experience in the
finance world, in the cryptocurrency world.  The furthest he
got in college was part of a semester at West Virginia
University before he withdrew.

So he had really no financial experience.  He had
literally gone from being a bartender to an assistant -- for
lack of a better term -- in this cryptocurrency start-up.  And
you heard from Ms. Tekeei some of the things he did.  He helped
produce these videos.  In other words he held the camera.  He
was present.  He did not come up with the technology.  He did
not come up with a pitch deck -- in fact, there wasn't one.
This is not the type of SEC-type fraud, securities fraud, white
collar offense, where you have a bunch of individuals sitting

1    around going off a list of names of potential investors and

2    cold calling them.  That didn't happen here.  So, it was more

3    of what I would sort of to steal a phrase describe as

4    irrational exuberance in the cryptocurrency market at the time,

5    with all sorts of folks jumping into it, and on the basis of

6    what somebody may have heard on Red-it, or on the basis of what

7    somebody may have heard from some talking head on a podcast,

8    decided to jump in and spend anywhere from hundreds of

9    thousands to hundreds of dollars.  So, that's what we have in

10   this particular offense.

11            Fortunately -- fortunately -- Mr. Farkas's

12   codefendants didn't waste the money.  Now, the government makes

13   a very good point -- and we believe it's a mitigator -- that

14   Mr. Farkas never had any access to that 100,000 ether.  He

15   never had a claim to it.  That wasn't his.  It wasn't something

16   that he was entrusted with.  It wasn't something that he was

17   directed to handle.  He just simply had no access to it.  We

18   believe that that's a mitigator.  But fortunately that 100,000

19   ether wasn't wasted by his codefendants in that it's available

20   and that the government has now sold it -- and I note sold it

21   for a profit.  I think it's docket entry 410, the

22   government-filed letter to your Honor indicating basically what

23   all of these numbers are, and that is seems from that letter

24   that the total amount of fraud proceeds are somewhere slightly

25   north of $36 million.  The ether sale itself generated slightly

over $33 million.  And that's all more than what the government

established as the value of that 100,000 ether, which was 29

million.  So, I think the government was quite candid -- and

it's helpful to a degree -- that there is some 4.4 million in

appreciation of this cryptocurrency at the time of its sale, so

that's more money that's now available for the victims in the

offense, and of course none of it that Mr. Farkas either had

access to or control over.  And that's significant given what I

was calling relative culpability.

So, Mr. Farkas again did what he was told.  But who

was he with?  And who was he working with?  Well, he didn't

have any prior experience in finance, but both Mr. Trapani and

Mr. Sharma -- who both directed him in his activities -- they

both had experience in finance.  They both had experience in

let's say not telling the truth to people in finance.  Mr.

Trapani, for example, had been involved with some fraudulent

activities before.  Mr. Farkas didn't even know him.  They met

for the first time through Mr. Sharma.  So when Mr. Farkas even

became involved in this, he was a fish out of water -- at least

his water.

You know, Robert Farkas did not grow up in a world

that would lead him to this, I think your Honor, but some of

his traits -- what I would consider positive traits -- helped

get him involved in this.

So RJ grew up in a pretty rural part of New Jersey.

He wanted to -- he was excelling in hockey when he was young.

He hoped to get a scholarship, and hopefully at some point he

wanted to play professional hockey.  That all came to an end

when he contracted Lyme disease.  He couldn't play anymore.  He

spent about a year in bed.  And candidly I know the government

had some issues with Mr. Farkas's Lyme disease, but it's

something that's there.  I don't know whether the right word

would be that it's dormant or whether it's in remission, but no

matter how you slice it, the Lyme disease is not something

that's going away and it's something that affected his life

negatively, and it's something that has helped to shape his

life from his teen years thereon.  So, that hockey scholarship

was unavailable to him.

He followed some of his friends and went to University

of West Virginia, and whether it was the Lyme disease or his

ADHD, he just couldn't get through that first semester, Judge.

So, he had to drop out, and he went to bartending; he became a

waiter.  But he is also somebody who is loyal to a fault

perhaps, loyal to his sisters, kind to those around him, and as

a result of that he ultimately moved to Florida.  He wanted to

be closer with his sister as part of the move, and he wanted to

try to try to start something new in his life.  And he got

about as far as bartending until he was invited to assist

Mr. Sharma in Centra Tech.  And maybe that's what I mean by he

is perhaps kind and helpful and maybe loyal to a fault, because

1    that's what got him involved in this offense, and it is

2    something that is far bigger than he is.

3         I think the characteristics that he has, coupled with

4    the nature and circumstances of the offense and his role in it,

5    all shout out for a sentence far below the guideline sentence,

6    particularly when one looks at the 22-level increase that the

7    loss amount causes in the advisory guideline range with respect

8    to Mr. Farkas's minor involvement or minor role therein.

9         So it seems from the government's presentation, your

10   Honor, that the crux of its concern is that the sentence that

11   we're asking for and the government's view doesn't reflect the

12   seriousness of the offense or promote respect for the law or

13   just punishment but almost most strikingly that it doesn't

14   provide for adequate deterrence, whether specific or general

15   deterrence, and on that score we disagree.

16        Mr. Farkas is a different defendant than Mr. Trapani

17   and Mr. Sharma.  He is perhaps not the right defendant to send

18   this message via.  He is not perhaps the right vehicle to send

19   that type of message, because none of this was his idea; none

20   of this was his thing.  And he followed folks like Mr. Trapani

21   in conducting himself while at Centra Tech.

22        But with respect to deterrence -- and I want to talk

23   about specific deterrence first -- the jail that Mr. Farkas has

24   created for himself -- or perhaps that circumstances have

25   created for him -- has a far more significant deterrent effect

1   than any jail could ever have.  Your Honor knows from the

2   letters that you read what happened to Mr. Farkas's father upon

3   Mr. Farkas's arrest.  Mr. Farkas' father was so distraught that

4   he tried to take his own life.  RJ caused that.  He has to look

5   at his father at every Thanksgiving, for every holiday that

6   they will all spend together, he has to look at his father

7   whenever he sees him, knowing that he caused that to happen.

8   There can be no better deterrent effect than that, knowing that

9   his conduct has that effect on his family, on his friends, on

10  the victims in this case, and now on his immediate family and

11  his daughter Isabella.  He knows that the rest of his life he

12  has to walk a straight line.  He knows what he has caused.

13  There can be no more suffering that he could endure, no amount

14  of jail time that your Honor could give him that could

15  substitute for the look that he has to see in his father when

16  his father looks back at him, knowing what he caused his father

17  to do or attempt.  That's an adequate deterrent.

18          It's also an adequate deterrent when he looks at his

19  young family.  Now, the government suggests that this

20  circumstance is not a mitigator because it's more of a life

21  choice.  Well, I submit that having a child is not always

22  necessarily a life choice and sometimes some things happen, but

23  one thing is for sure here, that the child that RJ and Donna

24  had will be the only child that they will have.

25          Your Honor has read through the suffering that they

both went through during Isabella's birth and the medical

issues that Donna has now had as a result.  There is no reason

for me to repeat them now; they are all very personal matters;

and your Honor has reviewed them in the letters.  That's a

deterrent effect.  This is the only child that he and Donna

will have, and he wants to do things with her, he wants to be

there for her, he wants to be the guiding light in her life,

and that's not something that you do from behind bars, and

that's not something that this young man is going to risk

losing by engaging in something this stupid ever again.

Frankly, I don't think that anything like this was ever in

Robert's DNA.  He was a blue collar guy in a white collar

offense.

        THE COURT:  So long as you raised that -- you don't

have to answer the question, but it is one that is in my mind.

That is, given what happened here, and the circumstances, I can

understand given where he was in his life and who these people

were, and what the prospects were, why he agreed to join this

business venture, but what he did was blatantly dishonest and

was all in an effort to get money from investors.  And I guess

what I don't understand is why he didn't walk away when he saw

what was happening.  Anything you want to share on that?

        MR. PETRUZZI:  I think I alluded to it earlier, your

Honor.  The traits that make Robert a good brother, a kind

soul, a loyal person, sometimes those traits are traits that

1    get people into trouble when they are misguided, when they

2    don't get the full picture.  Part of it -- part of it -- was

3    his understanding -- and albeit perhaps a wrong-headed

4    understanding -- his understanding was that he was trying to

5    make a business succeed.  It was a wrong-headed understanding.

6    It was something that was his belief at the time.  It doesn't

7    excuse the knowing misrepresentations that he made.  It doesn't

8    excuse the fact that he was part of these criminal agreements.

9         And your Honor can see in the government's submissions

10   there were often times when his codefendants, Mr. Sharma would

11   say, RJ, you have to clean this up -- and I am paraphrasing --

12   but there were misrepresentations made in the white papers that

13   existed before RJ started the company.  And when the money

14   began rolling in what I described as this irrational exuberance

15   in the crypto world, when the money started rolling in, these

16   parties -- at least the principals -- decided that they needed

17   to continue in trying to make things right.  And it was

18   misguided beyond belief, and it was in many ways compounding

19   the problem because misrepresentations were made, and you don't

20   correct misrepresentations by adding additional

21   misrepresentations to them or continuing to make them.  That

22   much is understood, and that's why Mr. Farkas pleaded guilty.

23   That's why Mr. Farkas is doing what he can to make sure that

24   the victims receive all of their investments back.  And we have

25   an opportunity for that to happen in case thankfully.

1          So, to try to answer your Honor's question, he was in

2     too deep and it was a brief period of time.  The ICO again

3     lasted from July until October of 2017, and then shortly

4     thereafter the SEC became involved, and things snowballed to a

5     point where he was ultimately charged with this offense.  But

6     we are talking about a period of time that can be measured in

7     months -- a few months.

8          I agree with your Honor.  He agrees with your Honor.

9     He recognizes the pain that he caused.  He recognizes the lies

10    that he told that for one reason or another -- either directly

11    or indirectly -- got people to spend money and give money to

12    Centra Tech, and those investments were supported by a bed of

13    false statements.  He knows that, your Honor.  That's why we're

14    in criminal court.  He understands that.  The question is

15    whether the sentence that we're asking for is the sentence that

16    is sufficient but not greater than necessary under the

17    circumstances to send him a message.

18          THE COURT:  Let me ask another question.  Looking

19    forward rather than backwards, I understand that he wants to

20    take care of his family and wants to have a different life, and

21    I believe that he is very sincere about that, but what can you

22    tell me about his plans for future employment?

23          MR. PETRUZZI:  Very well.  So, the recidivism question

24    is an issue.  I think it's something that is addressed by his

25    future employment prospects.  Also, the fact that he is not a

likely recidivist is something that's apparent from the record.
He has no priors.  He has no traffic tickets that we know of.
He was 31 when the offense occurred.  He is 34 now.  And his
future prospects, as indicated in the presentence report, are
with his family's business.  He intends to help his father in
the family business like he has been doing.  He is not in
Centra Tech because there is no Centra Tech, and it's not his
thing anyhow, Judge.

THE COURT:  I guess what I understood was part of the
reason he got into Centra Tech is that he didn't really want to
be part of the family business; he wanted to do something
different; and he wanted to do something he was passionate
about and that was not working in the family business.  And so
I guess one concern I have is, you know, what is he going to do
in the future that gives him satisfaction in what he wants and
the ability to support his family that is realistic and law
abiding.

MR. PETRUZZI:  To answer that sort of in the negative,
it would be unrealistic for him to get into any financial
business.  He has no training in that regard, and now he is
going to be saddled with a felony fraud conviction.  So, I
suspect nobody will be sending him any invitations to
participate in any type of financial business ever again, so he
will be working with his dad on the family business like he has
been.

1          Your Honor has the presentence report, and his current

2     employment to my mind isn't any different from what his future

3     employment will be.  It's something he has done while he has

4     been on bond for the past two plus years, some of which was

5     home confinement, a large portion of it.  Nevertheless, it's

6     something that he does now.  Whether it makes him happy to be

7     close to his father, I can answer for him.  The answer is yes.

8     Whether it makes him happy to be in his father's business, he

9     can answer for your Honor, but I do believe that to be yes as

10    well.

11         It's not the high-flying crypto world, but then again

12    he is not really cut out for that anyhow, Judge.  It even

13    brings to mind some of the things that he was asked to do with

14    his market manipulation.  He was even told to stop doing that

15    by the folks who told him what to do at Centra Tech because he

16    couldn't even do it right.

17         This is not a white collar crime guy.  He just is not,

18    Judge.  What is going to make him happiest in the future is

19    spending time with his daughter and his family, and doing some

20    type of work with his father in his father's business to make

21    it grow.

22         I can't predict the future, but if the past is any

23    good predictor of the future, this is a young man who up until

24    age 31 never did anything wrong, worked hard, worked in jobs

25    like bartending and being a waiter and laying tile.  Those are

jobs that he worked in.

I think what will make him happiest now as he embarks on this new part of his life is his family and his daughter and his soon-to-be wife.

Not everybody enjoys their employment.  Some people just have jobs to take care of their families.  I believe RJ is one of them.

Sending a general deterrent message is also an issue that the government raised, and in a vacuum I would agree with them, but there are two other individuals in this case that your Honor can send those messages via.  But more than that Mr. Farkas pleaded guilty to 18 U.S.C. 371, and Congress has already made a determination as to what penalties are appropriate for a violation of that statute, and they range from probation -- which is authorized -- to five years.  To sentence this defendant, Mr. Farkas, at the top of the statutory maximum of 18 U.S.C. 371 as opposed to the bottom, I think would be just inappropriate under the circumstances, given who he is, what his participation was in the offense, but mostly, you know, where he is going to be in the future.

He doesn't appear to be someone likely to be a recidivist -- he just doesn't -- and I think your Honor can send a general deterrent message consistent with this being a Class B felony, consistent with the penalties that have been promulgated by Congress.

1          We would ask for your Honor to impose a

2    nonincarcerative sentence.  Mr. Farkas has already done 55 days

3    in custody.  In a vacuum 55 days doesn't seem to be a whole lot

4    for those of us who are federal practitioners, but for this

5    particular defendant who had never been arrested before, who

6    hadn't even been stopped for a traffic ticket, it's

7    significant.  He spent time in the Federal Detention Center in

8    Miami, which is a maximum security facility.  From there he was

9    moved to Atlanta to the USP, which is another maximum security

10   facility.  From there he was moved to Oklahoma, which was

11   another maximum facility, and from there he was moved to the

12   MCC.  He got a tour of the United States in maximum custody,

13   with belly chains, being transported on airplanes from one city

14   to another for two months while his father was in the hospital

15   after nearly killing himself, while his other family members

16   were obviously concerned about him.  Judge, that was hard time.

17   It may have been brief, but it was hard time.

18          After that he was on home confinement, and he did

19   fine.  He didn't have even the slightest hiccup while on home

20   confinement, to the point where the parties agreed to modify

21   that and change it to house arrest with a curfew.  And he

22   stayed with that curfew for many, many months, and he has done

23   fine on supervision.  It just doesn't seem to make a whole lot

24   of sense to have someone who has been on supervision --

25   stringent supervision -- for two years, to then turn around and

1    be incarcerated.

2              I understand the government's concerns about general

3    deterrence.  I just don't think that Mr. Farkas is the right

4    person to send that message through.  And, frankly, I think

5    your Honor would be authorized and well within your Honor's

6    discretion to express general deterrence by a nonincarcerative

7    sentence.  That's what we're asking for.

8              I don't know whether your Honor had any other

9    questions for me, but I'm happy to answer them.

10             THE COURT:  No, I did ask my questions already.  Thank

11   you.

12             MR. PETRUZZI:  Yes, Judge.

13             THE COURT:  Mr. Farkas, if you would like to speak,

14   now is your opportunity.  You don't have to say anything.  I

15   have a pretty good understanding of what happened here, having

16   read all the papers and heard from the lawyers, and I read your

17   letter, but if you would like to say anything, I would like to

18   hear it.

19             THE DEFENDANT:  Thank you, your Honor.

20             I'm generally not much of a talker, and I would like

21   to save the Court's time, so I will be brief.

22             I do want to say that I am extremely ashamed of my

23   actions -- I'm sorry -- and I am fully aware of the impact my

24   criminal conduct caused my family, my friends and the many

25   victims.  Not a day goes by without me thinking about all of

them, including the anxiety and financial hardship that I have

inflicted on the victims.  If they can hear me now, I want them

to know that I have personally experienced hardship, depression

and anxiety myself, and I know what it's like.  There are not

enough words for me to find to say that I'm sorry to the

victims, but I'm sincerely sorry.  I have tried to make sure

they can get back everything they lost.

As I rock my daughter to sleep every night, I think of

what kind of father I want to be.  I want to protect her, see

her grow, take her to her first day of school, read her a book

before bed, and remind her that she can be whatever she chooses

to be, and to help her make the right choice in life.

Being with her, being her father is the most

incredible and fulfilling role that I have been granted, and it

saddens me at the same time.  I was on the verge of losing my

own father because of my conduct, and this is something that I

cannot and will not forget.

The last three years has put life in perspective for

me and has allowed me to look into deeper issues that I was

trying to cover up for years, and appreciate things that I

didn't consider important.

I hope that I can be a father, son, and the positive

member of society that I always wanted to be, and look back on

my life in years to come proud of the man I became.

To your Honor and any victims actually listening right

1    now, thank you for your time.

2

3             THE COURT:  Thank you.

4             I am required to address any victim who is present and

5    permit them to be reasonably heard.

6             Ms. Tekeei, are you aware of any victims who are

7    present?

8             MS. TEKEEI:  I am not aware of any victims who are

9    present, your Honor.

10            THE COURT:  OK.  I don't know if people are muted, but

11   I see that there are two call-in users who are actually not

12   muted.  If there are any victims on the phone who would like to

13   be heard, now is your opportunity to be heard.

14            OK.  I don't hear from any of the three lines that are

15   unmuted, so I will assume if there are any victims present,

16   that they did not need to be heard beyond the letters that I

17   have received and of course reviewed.

18            Mr. Petruzzi, is there any reason why sentence should

19   not be imposed?

20            MR. PETRUZZI:  There isn't, your Honor, but it

21   occurred to me that I didn't ask for a particular sentence, so

22   if I may, I had alluded to a nonincarcerative sentence.  We are

23   asking that your Honor impose a sentence of time served

24   followed by five years of supervised release with a special

25   condition of 18 months of home confinement.

1          THE COURT:  Thank you.  I think that's something

2     slightly different from what I saw in your papers, so thank you

3     for that clarification.

4          Ms. Tekeei, is there any reason why sentence should

5     not be imposed?

6          MS. TEKEEI:  No, your Honor.

7          THE COURT:  OK.  So, as I have stated, the guideline

8     range applicable in this case is 70 to 87 months, which is

9     equal to five years and ten months to seven years and three

10    months.

11         Under the Supreme Court's decision in United States v.

12    Booker and cases that have followed it, that recommendation is

13    just one of the factors that courts are required to consider.

14    There is a list of factors that I'm also required to consider

15    in the statute called 18 U.S.C. Section 3553(a), and those

16    include, first, the nature and circumstances of the offense, as

17    well as Mr. Farkas's own personal history and characteristics.

18         Also -- and the lawyers have been talking about this a

19    fair amount -- the need to have the sentence reflect the

20    seriousness of the offense, afford adequate deterrence, protect

21    the public from further crime, provide the defendant with

22    needed educational or vocational training, and I am also

23    required to impose a sentence that is sufficient but no greater

24    than necessary to comply with the purposes set out above.

25    Another factor is the need to avoid unwarranted sentence

disparities among similarly situated defendants.  And I would
just note the other defendants in this case have not been
sentenced, and I also see and accept counsel's
representations -- both the government's and the defendant's --
that your role was a much lesser role than the other two
defendants, so I don't actually think that factor of sentencing
disparity is relevant here, except I think a fair and
proportional sentence of course is one that is less than, for
example, Mr. Sharma's by a great deal.

        In any event, I find that the sentence I am about to
pronounce is sufficient but not greater than necessary to
satisfy all of these various purposes that I have just
mentioned.

        So, there is no sentencing that is easy, and this one
is certainly no exception.  And I thought carefully about it
and considered all the materials.  And I have to start with the
offense.  There is no way around it.  In my mind, this is a
very serious offense.  It was a blatant fraud.  It was visited
on over a hundred victims.  The amount of money perhaps because
of the exuberance of the market, the amounts of money are
staggering, almost $30 million on the conservative side.  And
although your role was the least culpable one, and you did what
you were told and you were not a supervisor, certainly the
things that you did was dishonest and fraudulent by any
measure, and so in my mind that makes this a very serious

crime.

I know you were arrested in April and remanded and spent some time in jail until May 25, so you spent almost two months in jail:  And I know that was a time that was difficult for you, certainly not something in your experience.  I know you don't have a criminal history.  You're now 34 years old, so certainly you are a young plan, and I credit the fact that you really want a different life, you want to turn your life around.  Are you not the kind of person who should be spending time with criminals or in jail.

I know you were born and raised in New Jersey in a stable and loving family; I can see that by the people who are surrounding you right now.  And I know about this important relationship you have with your fiancee and your daughter and how that has really changed your perspective on what is important and what you need to do in your life.

But, in addition to supporting your daughter, you need to set an example, and I hope going forward that that is something that you will be able to do.

I know you have been working in your family's business for a long time, since 2000, and I understand you wanted to do something different, and I also appreciate what your lawyer says, which is that you understand that at least at the moment the family business is where something stable is, where a stable income is, and something you know how to do and do well,

but I would also like you to get some job counseling, to take

some tests to find out what your aptitudes are, what fits your

personality and figure out -- and maybe in the end the answer

to all of that is your family business, but I want you, because

you are a young man I want you to explore that, because I think

that condition and naivety in part led you to this crime, and I

hope that as you move forward you will be realistic about what

you can do and realistic about your obligations to your family.

So, I know that your friends and your family portray

you as someone who is kind and thoughtful and attentive --

perhaps to a fault -- to those around you and those who are

close to you.  I feel like from the letters I have seen I have

a good sense of who you are.  But notwithstanding that -- and I

don't mean to leave it a mystery -- I think it's important to

impose a sentence of incarceration under the circumstances,

because of the nature of the crime, to promote respect for the

law and also for what is called general deterrence, to send a

message to other people who might consider committing this kind

of crime.

Unfortunately, I can't just consider you alone and

your circumstances.  There are broader considerations like just

punishment, the seriousness of the crime, general deterrence,

all of those things that don't necessarily have to do with your

individual circumstances but that are part of what goes into

sentencing.  And so that is something that I have to consider,

1    and this is something I think that is driving the sentence.

2          So the probation department recommends a

3    below-guideline sentence of 60 months, which is five years,

4    plus a $25,000 fine.  The government recommends a

5    below-guidelines custodial sentence, without specifying how

6    much.  And your lawyer asked for a below-guideline sentence of

7    time served, five years supervised release, with 18 months home

8    confinement.  And I assume this was still part of the

9    suggestion -- it was in the papers but not something that was

10   just mentioned -- that is also some amount of community

11   service.

12         MR. PETRUZZI:  Yes.

13         THE COURT:  Thank you.  And, as I said, I am

14   considering the offenses of your codefendants, but in my mind

15   that only argues for a lesser sentence for you because there is

16   a real difference how much they gained and stood to gain from

17   the crime and also the nature of their participation compared

18   with yours.

19         So, I will now state the sentence I intend to impose,

20   and the attorneys will have a final opportunity to make legal

21   objections before it's final.

22         Mr. Farkas, after assessing the particular facts of

23   this case, the factors under Section 3553(a), including the

24   sentencing guidelines, I conclude that a sentence below the

25   guidelines is justified as follows:

1          Mr. Farkas, it is the judgment of the Court that you

2     are to serve a custodial sentence of a year and a day, to be

3     followed by three years of supervised release, all to be served

4     concurrently on both counts.

5          And I am going to make a special condition of your

6     supervised release 200 hours of community service, as directed

7     by the probation department.  And I am also going to put a

8     proviso on that, and that is that it must be directly assisting

9     people who are in need.  Because I hope you will understand

10    from the experience that there are many people -- particularly

11    these times in the pandemic -- whose lives are so much more

12    difficult than all of us who are here on the phone, including

13    you, and I am hoping that by helping other people, that will

14    give you some perspective in how to organize your life as you

15    go forward.

16         In imposing a term of supervised release, with all of

17    the various conditions, I am not doing that for punishment, but

18    I am doing it to help you try to organize and arrange to live

19    the kind of life I know you want to live, to set an example for

20    your daughter.

21         The standard conditions of supervised release will

22    apply.  You must also meet the following special conditions

23    which are explained in detail in the presentence report and

24    which I'm just summarizing:

25         First, you must not commit another crime, federal

1    state or local; you must not illegally possess a controlled

2    substance.  You must not possess a firearm or destructive

3    device.  Mandatory drug testing is suspended.  I don't think

4    that's an issue for you.  You will also cooperate in the

5    collection of your DNA.

6            What I am going to do though is require an outpatient

7    drug testing and treatment program as specified in the PSR, so

8    not the occasional testing but outpatient program; also

9    outpatient mental health treatment, as specified in the

10   presentence report; also an employment assistance program that

11   will help you assess your skills and aptitudes and provide

12   guidelines on getting the necessary training for you to fulfill

13   your obligations.

14           Once you are released, you will submit to a search of

15   your home, workplace, vehicle, anywhere under your control.

16   You will provide the probation officer with access to any

17   requested financial information.  You must not incur new credit

18   charges or open additional lines of credit without the approval

19   of the probation officer unless you are in compliance with the

20   installment payment schedule that I assume will be agreed upon

21   for you to repay the forfeiture amount.

22           And after you are released from prison, you are to

23   report to the nearest probation office within 72 hours, and you

24   will be supervised in the district of your residence.

25           I am not imposing a fine because with the forfeiture

obligation and your other financial obligation, I don't believe

you would have the ability to pay a fine.  Restitution is taken

care of with the prior order I signed.  I will sign a separate

order of forfeiture.  And I am imposing a mandatory special

assessment of $200, which will be due immediately.

Does either counsel know of any legal reason why the

sentence should not be imposed as stated?  Mr. Petruzzi?

MR. PETRUZZI:  No, I don't, your Honor.

THE COURT:  Ms. Tekeei?

MS. TEKEEI:  No, your Honor.

THE COURT:  So, the sentence as stated is imposed.

Are there any applications in connection with the

sentence?  Mr. Petruzzi?

MR. PETRUZZI:  Yes, your Honor.  I would ask that your

Honor recommend to the Bureau of Prisons that Mr. Farkas be

incarcerated at a facility in South Florida consistent with his

custody level.

THE COURT:  OK.  And how about his surrender date?

MR. PETRUZZI:  If I could also add to that if it's all

right with your Honor, that he could serve part of his sentence

in a residential reentry center?  I believe that they are under

the auspices of the Bureau of Prisons, so it would count as

incarcerative.

THE COURT:  I don't know if that is within my purview.

You may.  But the general message I've gotten is that courts

1    don't specify where and how the sentences are served.  So, I
2    don't think I can do that.
3          But I will make a recommendation to a facility in
4    South Florida consistent with his custody level, in order to
5    facilitate -- and I have been told it's important to say why --
6    in order to facilitate family visitation.
7          Did you want to make a request about a surrender date?
8          MR. PETRUZZI:  If I can have a moment, your Honor, so
9    I can ask Mr. Farkas, text him something.
10          THE COURT:  Sure.
11          MR. PETRUZZI:  If we can ask for sometime January or
12    February.
13          THE COURT:  Let's say May.  I am concerned about the
14    pandemic.  If he really wants to do it in January and get it
15    over with, I will, but it seems to me late spring might be
16    better, but that's not for me to decide; it's really for you
17    all.
18          MR. PETRUZZI:  Let me suggest this.  If your Honor
19    would be kind enough to set a date in April, that would be
20    great.  And if Mr. Farkas wants to surrender before that, then
21    I suppose he always could.
22          THE COURT:  OK.  What you will have to do is wait for
23    the Bureau of Prisons to send you where he will be designated,
24    so in other words where you should surrender, but I think they
25    will do that far in advance.  I will make the surrender date

Friday, April 30 at 2 p.m.  And if for some -- well, I will

just leave it at that, Friday, April 30 at 2 p.m.

Ms. Tekeei, are there any open counts that need to be

dismissed?

MS. TEKEEI:  Your Honor, there is an underlying

indictment that the government moves to dismiss.

THE COURT:  OK, I will grant that application.  And,

Ms. Tekeei, I would also like by a week from today a letter

from you along the lines we discussed, basically with a

proposal for updating the Court and also whatever you can tell

me about how you expect the claims process to proceed.

Mr. Farkas, subject to your waiver of rights in the

plea agreement, you may have the right to appeal your

conviction of sentence.  If you are unable to pay the cost of

appeal, you may apply for leave to appeal in forma pauperis.

The notice of appeal must be filed within 14 days of the

judgment of conviction.

And what I will do is I will just continue your bail

conditions, so in other words just continue to do what you have

done in terms of complying with your bail conditions.  And

please be sure and surrender by April 30, because if you don't,

your failure to report could result in a charge for a separate

criminal offense.

I want to thank you again, all of your family and

friends for the support they have given to you.  It's so

1    important.  Let me just address them for a minute.

2          Mr. Farkas really needs your help in trying to have a

3    life that he needs and wants to have, and so I hope that you

4    will give him your emotional support and be there for him

5    during these next months, because I expect that they will be

6    challenging.

7          And, Mr. Farkas, I wish you the best of luck I see a

8    different future for you, very different than the one from your

9    past.  I believe you can do it, and so the best of luck to you.

10         Also there was a government request to file their

11   submission with redactions, and I will grant that request.

12         Thank you, your Honor.

13         THE COURT:  Anything else we need to do?

14         MS. TEKEEI:  Not from the government.

15         MR. PETRUZZI:  Nor from the defense.  Thank you very

16   much for your time, your Honor.

17         THE COURT:  OK, thank you.  We are adjourned.

18                           -  -  -

19

20

21

22

23

24

25